# EXHIBIT A

# DETROIT POLICE DEPARTMENT FOLLOW UP REPORT

**DETROIT POLICE DEPARTMENT**

Case No. **1503300406**
Report No. **1503300406**
Report Date: **3/31/2015**

# 1

Page 1 of 3

| | | | |
|---|---|---|---|
| Subject: | **4/4 33/In Custody Death** | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Case Report Status | **A   APPROVED** | Date Entered | **3/31/2015 1:05:21 AM** | Reporting Officer | |
| County | **82   WAYNE** | Entered By | **MORENO  TRACY** | **MORENO  TRACY** | |
| City/Township | **DETROIT** | Date Verified | **3/31/2015  7:44:50 AM** | | |
| | | Verified By | **TOMSIC  PATRICK** | Assisted By | |
| Occurred On | **3/30/2015  :00:00 PM** | Date Approved | **4/1/2015  3:42:50 PM** | **CARTHAN  ERIC** | |
| | | | | **CARVER  ROBIN** | |
| (and Between) | | Approved By | **BOYLE  MICHAEL** | | |
| Location | **VERNOR/LAWNDALE** | Connecting Cases | | Assist Agency | |
| CSZ | **DETROIT MI 4820** | Disposition | **ACTIVE** | | |
| Census/Geo Code | **5241** | Tactical Actions | | | |
| Grid | **SW5  0205** | Clearance Reason | | | |
| Call Source | | Date of Clearance | | | |
| | | Reporting Agency | **DETROIT POLICE DEPARTMENT** | | |
| Vehicle Activity | | Division | **2nd/Southwest District** | | |
| Vehicle Traveling | | Notified | | | |
| Cross Street | | | | | |
| Means | | | | | |
| Other Means | | | | | |
| Motive | | | | | |
| Other Motives | | | | | |

Report Narrative   **NO FORCE USED**

**PO MORENO T BADGE 3036**
**PO CARVER R BADGE 2845**
**PO CARTHAN E BADGE 2507**

**A  NONE 1 VICTIM   OHN DOE BM 24   POSSIBLE ID INFO OF ANTHONY DEMONE CLARK REED BM 1/22/  1 6451 WILLETTE**

**S  T/S VERNOR AND MULLANE FOR TINTED WINDOWS**

**C  MY PARTNERS AND I WHILE WORKING SCOUT 433 IN MARKED SCOUT CAR AND MODIFIED UNIFORM WERE ON PATROL IN THE AREA OF VERNOR AND MULANE WHEN I OBSERVED A RED DODGE CHARGER WITH TINTED WINDOWS STOPPED AT THE LIGHT  THE VEHICLE WHICH WAS STOPPED FACING WEST HAD A PLATE # OF BARB338  I GOT BEHIND THE VEHICLE AND AS THE LIGHT TURNED GREEN THE CHARGER BEGAN TO PULL THROUGH THE INTERSECTION AT WHICH TIME I ACTIVATED MY IN DASH LIGHTS TO EFFECT A TRAFFIC STOP  THE RED CHARGER CONTINUED TO TRAVEL WEST ON VERNOR ALTHOUGH I HAD MY LIGHTS AND SIRENS ON  WHILE THE VEHICLE CONTINUED TO TRAVEL WEST I COULD SEE THAT THE DRIVER HAD BEGUN TO REACH TO HIS RIGHT NEAR THE PASSENGER SIDE AREA  THE DRIVER MADE SEVERAL LUNGING MOTIONS TO HIS RIGHT WHILE DRIVING FOR ALMOST 6 BLOCKS WITH LIGHTS AND SIRENS AT A SPEED OF ABOUT 30 MPH BEFORE FINALLY PULLING OVER BETWEEN LAWNDALE AND CABOT  MY PARTNERS AND I E  ITED OUR SCOUT CAR AND APPROACHED THE VEHICLE WITH ME ON THE DRIVER SIDE AND MY TWO PARTNERS ON THE PASSENGER SIDE  AS I SLOWLY APPROACHED THE VEHICLE I GAVE LOUD VERBAL COMMANDS TO THE DRIVER TO ROLL DOWN ALL THE WINDOWS TO THE CAR TO WHICH HE DID  I THEN GAVE A VERBAL COMMAND FOR THE DRIVER TO TURN OFF THE VEHICLE WHICH HE ALSO DID  ONCE THE CAR WAS SHUT OFF I THEN GAVE COMMANDS FOR THE DRIVER TO PLACE HIS HANDS BEHIND HIS HEAD AND TO INTER LOCK HIS FINGERS WHICH HE ALSO DID BUT THEN QUICKLY MOVED HIS RIGHT HAND AND I AGAIN GAVE VERBAL COMMANDS TO PLACE HIS HANDS BEHIND HIS HEAD WHICH HE AGAIN DID  I WALKED TOWARD THE DRIVER SIDE OF THE WINDOW DURING WHICH TIME HE AGAIN MOVED HIS RIGHT HAND AND I GAVE ANOTHER COMMAND FOR HIM TO PLACE HIS HANDS BEHIND HIS HEAD WHICH HE DID  I THEN OPENED THE DOOR TO THE VEHICLE AND PLACED MY HANDS OVER THE HANDS OF THE DRIVER  I THEN ASKED HIM TO SLOWLY E  IT THE VEHICLE AND TO LAY ON THE GROUND DUE TO HIS VERY LARGE SIZE WHICH HE COMPLIED  I THEN WHILE STANDING OVER THE DRIVER BEGAN TO PLACE HIM IN HAND CUFFS DURING WHICH TIME THE DRIVER BEGAN TO SPEAK TO ME  THE DRIVER SAID   HEY MAN CAN YOU DO ME A FAVOR  I THINK I'M HAVING AN ASTHMA ATTACK CAN YOU GET MY INHALER   AFTER THE DRIVER WAS PLACED INTO HAND CUFFS I ALONG WITH MY PARTNER (PO CARTHAN ) HELPED THE DRIVER TO HIS FEET AND ON HIS OWN HE WAS ABLE TO WALK BACK TOWARD THE PASSENGER SIDE OF MY SCOUT CAR  WHILE STANDING AT THE SIDE OF OUR SCOUT CAR THE DRIVER BEGAN TO HAVE LABORED BREATHING WHILE STANDING AND AGAIN ASKED FOR HIS INHALER  MY OTHER PARTNER PO CARVER THEN GRABBED A SMALL GRAY ASTHMA INHALER FROM THE DRIVERS VEHICLE AND HANDED IT TO ME  I SHOWED THE INHALER TO THE DRIVER AND ASKED  IS THIS YOURS TO WHICH HE NODDED HIS HEAD YES  I THEN ASKED HIM   YOU WANT THIS  ' TO WHICH HE AGAIN NODDED HIS HEAD YES AND I HELD UP THE INHALER AND HE PLACED HIS MOUTH AROUND THE INHALER AS I ACTIVATED IT AND HE BEGAN TO INHALE  AFTER USING THE INHALER THE DRIVER THEN STATED  IM GONNA PISS ON MYSELF   AND THEN SAID THE THE WORD  AMBULANCE   AT WHICH TIME MY PARTNER PO CARVER WENT OVER THE RADIO AND REQUESTED AN AMBULANCE FOR A MAN HAVING AN ASTHMA ATTACK   UST SECONDS AFTER ORDERING EMS THE**

Printed For: _____

# DETROIT POLICE DEPARTMENT FOLLOW UP REPORT

DETROIT POLICE DEPARTMENT

Case No. **1503300406**
Report No. **1503300406**
Report Date: **3/31/2015**

**2**

DRIVER BEGAN TO LOOSE HIS BALANCE AND BEGAN TO LEAN AGAINST THE SCOUT CAR  UST A FEW MOMENTS LATER HE THEN FELL BACK ON TO T HE HOOD OF THE CAR AND BEGAN TO SLIDE OFF OF THE HOOD  MY PARTNER PO CARTHAN AND I WERE UNABLE TO HOLD UP THE DRIVER WHO BEGAN TO SLUMP OVER ON THE GROUND  I QUICKLY UN CUFFED THE DRIVER AND WE ROLLED HIM ONTO HIS LEFT SIDE WITH HIS ARMS OUT STRETCHED  WHILE LAYING ON HIS SIDE THE DRIVER'S LABORED BREATHING BEGAN TO SLOW SIGNIFICANTLY AND HE BEGAN TO GURGLE AND FOAM AT THE MOUTH AT WHICH TIME WE ASKED FOR AN ETA FOR EMS BUT NONE WAS AVAILABLE  AFTER ABOUT 30 SECONDS IT APPEARED THAT THE DRIVER HAD STOPPED BREATHING AND MY PARTNERS CHECKED FOR APULSE BUT WERE UNABLE TO FIND ONE AT WHICH TIME I ALONG WITH PO CARTHAN ROLLED HIM ONTO HIS BACK AND I BEGAN TO CLEAR THE AIRWAY AND BEGAN CHEST COMPRESSIONS  PO CARVER NOTIFIED RADIO THAT WE WERE BEGINNING CPR AND PO CARVER HAD RETRIEVED A POCKET MASK AND WE BEGAN CPR WITH ME PERFORMING CHEST COMPRESSIONS WHILE PO CARVER GAVE BREATHS TO THE DRIVER  PO CARVER AND I PERFORMED CPR UNTIL THE ARRIVAL OF MEDIC  WHO BEGAN  TREATMENT BY ALSO PERFORMING CPR AND THEN CONVEYING HIM TO DRH FOR TREATMENT  WHILE AT THE SCENE CODE 47   SGT HAMOOD MADE THE LOCATION ALONG WITH SCOUT 4 1 AND CODE 4 60  LT  QUARELLO   CODE 4 10 MADE DRH FOR CHART AND CONDITION INFORMATION  WHERE THE DRIVER WAS PRONOUNCED DECEASED BY DR  BRIAN KERN CHART # 11373637

MY PARTNERS AND I STOOD BY TO HOLD THE SCENE FOR HOMICIDE AND EVIDENCE TECHS  WHILE STANDING BY AT THE SCENE MY PARTNERS SEARCHED THE VEHICLE TO SEE WHAT THE DRIVER MAY HAVE BEEN ATTEMPTING TO CONCEAL BUT FOUND NOTHING IN THE CAR BUT DID OBSERVE A LARGE AMOUNT OF MONEY IN THE DOOR  AM OF THE DRIVER SIDE OF THE CAR AND INSIDE OF THE CENTER CONSOLE  WHILE SEARCHING THE CAR SOME PAPER WORK WAS FOUND WITH THE NAME OF ANTHONY CLARK  REED  PER LEIN WE FOUND ANTHONY DEMONE CLARK REED BM 1/22/  1 WHO HAD A SIMILAR PHYSICAL DESCRIPTION OF THE DRIVER HOW EVER WE WERE UNABLE TO OBTAIN A PHOTO TO CONFIRM THE IDENTITY  WHILE AT THE SCENE WE WERE NOTIFIED BY SCOUT 4 10 THAT SUSPECTED HEROIN HAD BEEN RECOVERED FROM THE BODY OF THE DRIVER WHICH WAS COLLECTED BY SCOUT 4 10  WE CONTINUED TO HOLD THE SCENE WHILE CODE 2401 CAPTAIN SZALAGY MADE THE SCENE AS WELL AS CAPTAIN CHAMBERS OF THE 4TH PRECINCT AS WELL AS UNITS FROM HOMICIDE  WE STOOD  BY UNTIL THE VEHICLE WAS TOWED TO GENES FOR EVIDENCE AND THEN CLEARED THE SCENE

O  SEE ABOVE

T  1 RED 06 DODGE CHARGER PL# BARB338 TOWED TO GENES TOW FOR EVIDENCE

## Offense Detail:   54  MISCELLANEOUS  GENERAL NON CRIMINAL

| | | | | |
|---|---|---|---|---|
| Offense Description | **54  MISCELLANEOUS  GENERAL NON CRIMINAL** | Location | **13  HIGHWAY/ROAD/ALLEY** | |
| IBR Code | | Offense Completed | **YES** | No. Prem. Entered |
| IBR Group | | Hate/Bias | **00  NONE (NO BIAS)** | Entry Method |
| Crime Against | | Domestic Violence | **NO** | Type Security |
| Offense File Class | **00** | | | Tools Used |
| PACC | | | | |
| Local Code | | | | |
| Using | | | | |
| Criminal Activity | | | | |
| Weapons | | | | |

## Victim V1: CLARK REED  ANTHONY

| | | | | | |
|---|---|---|---|---|---|
| Victim Code | **V1** | Victim Of | **54  MISCELLANEOUS  GENERAL NON CRIMINAL** | | |
| Victim Type | **I  INDIVIDUAL** | | | | |
| Name | **CLARK REED  ANTHONY** | DOB | **1/22/1  1** | Place of Birth | |
| AKA | | Age | **24** | SSN | |
| Alert(s) | | Sex | **M  MALE** | DLN | |
| | | Race | **B  BLACK** | DLN State | |
| Address | | Ethnicity | **U  UNKNOWN** | DLN Country | |
| CSZ | | Ht. | | Occupation/Grade | |
| | | Wt. | | Employer/School | |
| Home Phone | | Eye Color | | Employer Address | |
| Work Phone | | Hair Color | | Employer CSZ | |
| Email Address | | Facial Hair | | Res. County | |
| | | Complexion | | Res. Country | |
| Attire | | | | Resident Status | **U  UNKNOWN** |
| Injury | | | | Testify | |
| Circumstances | | | | | |

# DETROIT POLICE DEPARTMENT FOLLOW UP REPORT

**DETROIT POLICE DEPARTMENT**

Case No. **1503300406**
Report No. **1503300406**
Report Date: **3/31/2015**

# 3

Page 3 of 3

| Law Enforcement Officer Killed or Assaulted Information | Type | | Justifiable Homicide Circumstances | |
|---|---|---|---|---|
| | Assignment | | | |
| | Activity | | | |
| | Other ORI | | | |

Victim Offender Relationships
Offender          Relationship

Victim Notes

# EXHIBIT B

# DETROIT POLICE DEPARTMENT FOLLOW UP REPORT

**DETROIT POLICE DEPARTMENT**

Case No. **1503300406**
Report No. **1503300406 8**
Report Date: **3/31/2015**

# 1

Page 1 of 3

| | | | |
|---|---|---|---|
| Subject: | **4/4 33/In Custody Death** | | |

| | | | | | |
|---|---|---|---|---|---|
| Case Report Status | **A APPROVED** | Date Entered | **3/31/2015 1:14:41 AM** | Reporting Officer | |
| County | **82 WAYNE** | Entered By | **CARTHAN ERIC** | **CARTHAN ERIC** | |
| City/Township | **DETROIT** | Date Verified | **3/31/2015 7:44:47 AM** | | |
| | | Verified By | **TOMSIC PATRICK** | Assisted By | |
| Occurred On | **3/30/2015  :00:00 PM** | Date Approved | **4/1/2015 3:42:36 PM** | **CARVER ROBIN** | |
| (and Between) | | Approved By | **BOYLE MICHAEL** | | |
| Location | **W VERNOR AND LAWNDALE** | Connecting Cases | | Assist Agency | |
| CSZ | | Disposition | **ACTIVE** | **DPD** | |
| Census/Geo Code | **4558** | Tactical Actions | | | |
| Grid | **SW7  0207** | Clearance Reason | | | |
| Call Source | | Date of Clearance | | | |
| | | Reporting Agency | **DETROIT POLICE DEPARTMENT** | | |
| Vehicle Activity | | Division | **2nd/Southwest District** | | |
| Vehicle Traveling | | Notified | **47 SGT HAMOOD** | | |
| Cross Street | | | | | |

| | | |
|---|---|---|
| Means | | |
| Other Means | | |
| Motive | | |
| Other Motives | | |

Report Narrative                               **NO FORCE USED**

P O  ERIC CARTHAN # 2507
P O  TRACY MORENO # 3036
P O  ROBIN CARVER # 2845

A: NONE

S: TRAFFIC STOP   TINTED WINDOWS

C: SCOUT 433 MANNED BY OFFICER MORENO (DRIVER)  OFFICER CARVER (FRONT PASSENGER) AND I (CARTHAN PASSENGER REAR) WAS ON ROUTINE PATROL IN THE AREA OF W  VERNOR AND MULLANE WHEN I (WE) OBSERVED A BURG DODGE CHARGER WITH TINTED WINDOWS ON THE FRONT DRIVER AND PASSENGER SIDE STOPPED AT THE TRAFFIC LIGHT FACING WEST BOUND  OFFICER MORENO (DRIVER) DID A U TURN AND GOT BEHIND THE BURGUNDY CHARGER (MI REG: BARB 33B)  ONCE THE TRAFFIC LIGHT TURNED GREEN  OFFICER MORENO ACTIVATED HIS OVER HEAD LIGHTS AND SIREN  THE CHARGER DRIVER ( ON DOE)  REFUSED TO STOP  STILL DRIVING AT A LOW SPEED  EST 20 25 MPH  AS ABOVE CONTINUE TO DRIVE WESTBOUND  I OBSERVED THE DRIVER LEAN TO THE PASSENGER SIDE LIKE THREE TO FOUR TIMES AS IF HE WAS  HIDING SOMETHING LIKE DRUGS OR A GUN  BETWEEN LAWNDALE AND CABOT ON W  VERNOR THE CHARGER CAME TO A STOP  I AND OFFICER CARVER APPROACHED THE PASSENGER SIDE AND ORDER THE MALE BLACK DRIVER TO ROLL DOWN ALL THE WINDOWS AND HE COMPLIED  OFFICER MORENO THEN APPROACHED THE DRIVER SIDE AND ORDERED THE DRIVER ( ON DOE) TO PUT HIS HANDS ON TOP OF HIS HEAD AND HE COMPLIED  SECONDS LATER I HEAR OFFICER MORENO STATE  KEEP YOUR HANDS ON TOP OF YOUR HEAD AS OFFICER MORENO ORDERED   ON DOE OUT THE VEHICLE  I RELOCATED TO THE DRIVERSIDE OF THE VEHICLE BEHIND MORENO   ON DOE E ITED THE VEHICLE WITH THE ASSISTANCE OF OFFICER MORENO  OFFICER MORENO ORDERED HIM TO THE GROUND AND HE COMPLIED (NO FORCE USED)  I'M STANDING IN FRONT OF  ON DOE  AS OFFICER MORENO WAS HANDCUFFING HIM  ON DOE THEN ASKED HIM TO DO HIM AND FAVOR   GET HIS INHALER HAVING TROUBLE BREATHING AND HAVING AN ASTHMA ATTACK  I AND MORENO HELPED  ON DOE TO HIS FEET AND HE WALKED ON HIS OWNED TO THE FRONT OF OUR SCOUT CAR   ON DOE TOOK ONE HIT FROM HIS INHALER AND STATED  I NEED AMBULANCE   THEN URINATED ON HIMSELF  CARVER THEN ASKED DISPATCHED FOR EMS  AT THIS TIME   ON DOE LEANED BACK ON THE SCOUT CAR AND I ALONE WITH MORENO ATTEMPTED TO KEEP HIM STANDING STRAIGHT UP TO EASE HIS BREATHING   ON DOE THEN LEAN BACK AGAIN AND DOWN THE SIDE OF THE SCOUT CAR WITH MY ASSISTANCE AND MORENO  WE PUT  ON DOE ON HIS SIDE AND MORENO REMOVED THE HANDCUFFS  I CHECK FOR A PULSE AND ADVISED IT WAS WEAK AND HE FOAMING AT THE MOUTH  MORENO CLEARED HIS AIRWAY WITH HIS HAND  CARVER ADVISED DISPATCH OF FINDINGS AND ASKED FOR AN ETA  I CHECKED  ON DOE FOR A PULSE  NONE FOUND  I ADVISED MY CREW  I AND MORENO STRETCHED  ON DOE OUT  MORENO AND CARVER THEN PERFORMED CPR  ON DOE GURGLE AND WE ROLLED HIM TO HIS SIDE   ON DOE SPIT UP WHAT LOOKS TO BE CRACK COCAINE AND BLOOD  CARVER AND MORENO THEN CONTINUE CPR THEN MED   ARRIVED ON SCENE AND TOOK OVER SCOUT 47  SGT  HAMOOD WAS REQUESTED AND MADE THE LOCATION  460 LT  QUARILLO MADE THE SCENE

O: SEE ABOVE

T: 2006 4DOOR DODGE CHARGER  MI REG: BARB 33B  SW: 14328 B  T HELD AT GENES FOR EVIDENCE  NO VIN    UST ON THE DOOR

# DETROIT POLICE DEPARTMENT FOLLOW UP REPORT

**DETROIT POLICE DEPARTMENT**

Case No. **1503300406**
Report No. **1503300406 8**
Report Date: **3/31/2015**

# 2

Page 2 of 3

---

## Offense Detail:  54  MISCELLANEOUS  GENERAL NON CRIMINAL

| | | | | | |
|---|---|---|---|---|---|
| Offense Description | **54  MISCELLANEOUS  GENERAL NON CRIMINAL** | | Location | **13  HIGHWAY/ROAD/ALLEY** | |
| IBR Code | | | Offense Completed | **YES** | No. Prem. Entered |
| IBR Group | | | Hate/Bias | **00  NONE (NO BIAS)** | Entry Method |
| Crime Against | | | Domestic Violence | **NO** | Type Security |
| Offense File Class | **00** | | | | Tools Used |
| PACC | | | | | |
| Local Code | | | | | |
| Using | | | | | |
| Criminal Activity | | | | | |
| Weapons | | | | | |

---

## Suspect S1: DOE  OHN

| | | | | | |
|---|---|---|---|---|---|
| Suspect Number | **S1** | | DOB | | Place of Birth |
| Name | **DOE  OHN** | | Age | **30** | SSN |
| AKA | | | Sex | **M  MALE** | DLN |
| Alert(s) | | | Race | **B  BLACK** | DLN State |
| | | | Ethnicity | **U  UNKNOWN** | DLN Country |
| Address | | | Ht. | | Occupation/Grade |
| CSZ | | | Wt. | | Employer/School |
| | | | Eye Color | | Employer Address |
| Home Phone | | | Hair Color | | Employer CSZ |
| Work Phone | | | Hair Style | | Res. County |
| Email Address | | | Hair Length | | Res. Country |
| | | | Facial Hair | | Resident Status | **U  UNKNOWN** |
| | | | Complexion | | |
| | | | Build | | |
| | | | Teeth | | |
| Scars/Marks/Tattoos | | | | | |
| Suspect MO | | | | | |
| Other MO | | | | | |
| Attire | | | | | |
| Habitual Offender Status | | | | | |
| Suspect Notes | | | | | |

---

## Victim V1: CLARK REED  ANTHONY

| | | | | | |
|---|---|---|---|---|---|
| Victim Code | **V1** | | Victim Of | **54  MISCELLANEOUS  GENERAL NON CRIMINAL** | |
| Victim Type | **I  INDIVIDUAL** | | | | |
| Name | **CLARK REED  ANTHONY** | | DOB | **1/22/1  1** | Place of Birth |
| AKA | | | Age | **24** | SSN |
| Alert(s) | | | Sex | **M  MALE** | DLN |
| | | | Race | **B  BLACK** | DLN State |
| Address | | | Ethnicity | **U  UNKNOWN** | DLN Country |
| CSZ | | | Ht. | | Occupation/Grade |
| | | | Wt. | | Employer/School |
| Home Phone | | | Eye Color | | Employer Address |
| Work Phone | | | Hair Color | | Employer CSZ |
| Email Address | | | Facial Hair | | Res. County |
| | | | Complexion | | Res. Country |
| Attire | | | | | Resident Status | **U  UNKNOWN** |
| Injury | | | | | Testify |
| Circumstances | | | | | |

# DETROIT POLICE DEPARTMENT FOLLOW UP REPORT

DETROIT POLICE DEPARTMENT

Case No. **1503300406**
Report No. **1503300406 8**
Report Date: **3/31/2015**

# 3

Page 3 of 3

| Law Enforcement Officer Killed or Assaulted Information | Type |
| --- | --- |
| | Assignment |
| | Activity |
| | Other ORI |

| Justifiable Homicide Circumstances |
| --- |

Victim Offender Relationships
Offender          Relationship

Victim Notes

## Property Description Item 3: 35  8   OTHER MOTOR VEHICLE (NOT STOLEN OR RECOVERED)   VEHICLE

| | |
| --- | --- |
| Item No. | **3** |
| Property Category | **35  8   OTHER MOTOR VEHICLE (NOT STOLEN OR RECOVERED)** |
| Property Class | **24** |
| IBR Type | **24   OTHER MOTOR VEHICLES** |
| UCR Type | **V   OTHER VEHICLE (NOT STOLEN OR RECOVERED)** |
| Status | **E   EVIDENCE (INCLUDING OTHER SEIZED PROPERTY AND TOOLS)** |
| Count | **1** |
| Value | **5000** |
| Manufacturer | **DODGE** |
| Model | **CHARGER** |
| Serial No. | **2B3KA53H86H412628** |
| License No. | **BARB 33B** |
| Color | **MAR   MAROON OR BURGUNDY** |
| Description | **VEHICLE** |
| Vehicle Year | **2006** |
| Body Style | **4D   4 DOOR** |
| State | **MI   MICHIGAN** |
| License Year | |
| Recovered Date/Time | |
| Owner | |
| Disposition | |
| Evidence Tag | **1503300406** |
| Lock Seals | |
| Evidence Recovered Date/Time | **3/30/2015 11:00:00 PM** |
| Evidence Recovered By | **CARTHAN  ERIC** |
| Evidence Recovered From | **SCENE** |
| Evidence Location | **AP   AUTO POUND** |
| Alert(s) | |
| Drug Type | |
| Drug Quantity | |
| Drug Measure | |

Property Notes

# DETROIT POLICE DEPARTMENT FOLLOW UP REPORT

**DETROIT POLICE DEPARTMENT**

Case No. **1503300406**
Report No. **1503300406 6**
Report Date: **3/31/2015**

# 1

Subject: **4/4 33/In Custody Death**

| | | |
|---|---|---|
| Case Report Status | **A  APPROVED** | Date Entered | **3/31/2015 1:02:25 AM** | Reporting Officer |
| County | **82  WAYNE** | Entered By | **CARVER  ROBIN** | **ANDREWS  DAVID** |
| City/Township | **DETROIT** | Date Verified | **3/31/2015 7:44:04 AM** | |
| | | Verified By | **TOMSIC  PATRICK** | Assisted By |
| Occurred On | **3/30/2015 11:00:00 PM** | Date Approved | **4/1/2015 3:42:13 PM** | **KERR  CHRISTIAN** |
| (and Between) | | Approved By | **BOYLE  MICHAEL** | |
| Location | **W VERNOR/LAWNDALE** | Connecting Cases | | Assist Agency |
| CSZ | | Disposition | **ACTIVE** | |
| Census/Geo Code | **232** | Tactical Actions | | |
| Grid | **SW4  0204** | Clearance Reason | | |
| Call Source | | Date of Clearance | | |
| | | Reporting Agency | **DETROIT POLICE DEPARTMENT** | |
| Vehicle Activity | | Division | **2nd/Southwest District** | |
| Vehicle Traveling | | Notified | | |
| Cross Street | | | | |
| Means | | | | |
| Other Means | | | | |
| Motive | | | | |
| Other Motives | | | | |

Report Narrative

**PO CARVER  R  #2845  4 33**
**PO MORENO  T  #3036  4 33**
**PO CARTHAN  E  #2507  4 33**

**NO FORCE USED**

A) NONE   VICTIM   OHN DOE B/M/24

S) TRAFFIC STOP

C) MY PARTNERS AND I WHILE TRAVELING E/B VERNOR  AT APPRO    00PM ON ABV DATE    OBSERVED A BURGANDY CHARGER PL# BARB33B  WITH TINTED WINDOWS FACING W/B STOPPED AT THE TRAFFIC LIGHT ON VERNOR AND MULLANE  MY PARTNER COMPLETED A U TURN AND ACTIVATED LIGHTS AND SIRENS IN ATTEMPT TO EFFECT A TRAFFIC STOP  I THEN OBSERVED THE DRIVER LEAN OVER TOWARD THE PASSENGER SIDE AS IF HE WAS CONCEALING SOMETHING WHILE STILL TRAVELING WEST BOUND VERNOR  VEH CONTINUED TO TRAVEL A FEW MORE BLOCKS BEFORE FINALLY PULLING OVER NEAR LAWNDALE  UPON MY APPROACH OF THE PASSENGER SIDE  I OBSERVED SUB  STILL MOVING AROUND AND GRABBING AT HIS SHORTS  I THEN HEARD MY PARTNER  PO MORENO  GIVE VERBAL COMMANDS TO THE SUB  TO STOP MOVING AND PLACE HIS HANDS BEHIND HIS HEAD  ONCE SUB  WAS OUT OF THE VEH I THEN BEGAN TO CONDUCT A SEARCH THE PASSENGER SIDE AREA WHERE SUB  WAS LEANING TOWARD  I OBSERVED THE SUB  STANDING IN FRONT OF OUR SCT CAR BREATHING HEAVY AS PO MORENO  ASKED ME TO GET HIS INHALER  PO MORENO  ATTEMPTED THE INHALER MULTIPLE TIMES THEN SUB  STATES   ITS NOT WORKING IM GOING TO PISS ON MYSELF    I THEN IMMEDIATELY NOTIFIED DISPATCH FOR MEDICS AND GAVE OUT OUR LOCATION AND CIRCUMSTANCES  SUB  IS NOW SITTING DOWN AND PO MORENO IS REMOVING THE CUFFS WHILE PO CARTHAN IS HOLDING SUB  FROM FALLING OVER PREVENTING  IN  URY  I THEN IMMEDIATELY NOTIFIED DISPATCH FOR MEDICS AND GAVE OUT OUR LOCATION AND CIRCUMSTANCES  SUB  IS NOW SITTING DOWN AND PO MORENO IS REMOVING THE CUFFS WHILE PO CARTHAN IS HOLDING SUB  FROM FALLING OVER PREVENTING  IN  URY  I THEN IMMEDIATELY NOTIFIED DISPATCH FOR MEDICS AND GAVE OUT OUR LOCATION AND CIRCUMSTANCES  SUB  IS NOW SITTING DOWN AND PO MORENO IS REMOVING THE CUFFS WHILE PO CARTHAN IS HOLDING SUB  FROM FALLING OVER PREVENTING  ON THE SUB   AT WHICH TIME I COULD NOT FIND ONE  I RADIOED DISPATCH TO INQUIRE MEDICS LOC AND WAS GIVEN A 3 MINUTE ETA   I THEN  YELLED TO PO MORENO   WE NEED TO DO CPR   AS I WENT TO THE TRUNK TO RETRIEVE MY DEPT ISSUED CPR MASK AND PROTECTIVE GLOVES  PO MORENO BEGAN TO ADMINISTER CHEST COMPRESSIONS AS I INFORMED RADIO WE WERE STARTING CPR AND BEGAN TO PUT MY MASK TOGETHER  WITH THE HELP OF MY PARTNERS  WE ROLLED SUB  ON HIS BACK AND I CLEARED HIS AIR WAY WHILE PO CARTHAN MOVED THE SCT CAR BACK TO GIVE US ROOM TO WORK  PO MORENO APPLIED CHEST COMPRESSIONS WHILE I GAVE RESCUE BREATHS REPEATEDLY  TILL MEDIC  MADE OUR LOC TO TAKE OVER CPR  MEDIC  CONVEYED VIC TO DRH WHILE WE HELD THE SCENE FOR EVIDENCE TECHS

O) OBSERVED MONEY IN THE CENTER CONSOLE AND DRIVERS DOOR

T) SEE PROPERTY

## Offense Detail:   54  MISCELLANEOUS  GENERAL NON CRIMINAL

| | | | |
|---|---|---|---|
| Offense Description | **54  MISCELLANEOUS  GENERAL NON CRIMINAL** | Location | **13  HIGHWAY/ROAD/ALLEY** | No. Prem. Entered |
| IBR Code | | Offense Completed | **YES** | Entry Method |
| IBR Group | | Hate/Bias | **00  NONE (NO BIAS)** | |
| Crime Against | | | | |

NetRMS_MICR.rtf v2f

Printed For: _____

# DETROIT POLICE DEPARTMENT FOLLOW UP REPORT

**DETROIT POLICE DEPARTMENT**

Case No. **1503300406**
Report No. **1503300406 6**
Report Date: **3/31/2015**

# 2

Page 2 of 2

| Offense File Class | 00 | Domestic Violence | NO | Type Security |
| PACC | | | | Tools Used |
| Local Code | | | | |

Using
Criminal Activity
Weapons

## Victim V1: CLARK REED  ANTHONY

| | | | | | |
|---|---|---|---|---|---|
| Victim Code | **V1** | Victim Of | **54  MISCELLANEOUS  GENERAL NON CRIMINAL** | | |
| Victim Type | **I  INDIVIDUAL** | | | | |
| Name | **CLARK REED  ANTHONY** | DOB | **1/22/1   1** | Place of Birth | |
| AKA | | Age | **24** | SSN | |
| Alert(s) | | Sex | **M  MALE** | DLN | |
| | | Race | **B  BLACK** | DLN State | |
| Address | | Ethnicity | **U  UNKNOWN** | DLN Country | |
| CSZ | | Ht. | | Occupation/Grade | |
| | | Wt. | | Employer/School | |
| Home Phone | | Eye Color | | Employer Address | |
| Work Phone | | Hair Color | | Employer CSZ | |
| Email Address | | Facial Hair | | Res. County | |
| | | Complexion | | Res. Country | |
| Attire | | | | Resident Status | **U  UNKNOWN** |
| Injury | | | | Testify | |
| Circumstances | | | | | |

| Law Enforcement Officer Killed or Assaulted Information | Type | | Justifiable Homicide Circumstances | |
|---|---|---|---|---|
| | Assignment | | | |
| | Activity | | | |
| | Other ORI | | | |

Victim Offender Relationships
Offender          Relationship

Victim Notes

# EXHIBIT C

# EXHIBIT D



# OFFICE of the WAYNE COUNTY MEDICAL EXAMINER

1300 East Warren Avenue
Detroit, MI 48207

### POST MORTEM REPORT

M.E. CASE NUMBER
15-3837
COUNTY OF DEATH
WAYNE
TOWN OF DEATH
DETROIT
DATE PRONOUNCED DEAD
Mar 30, 2015

No abnormality is noted in the cervical muscles, hyoid bone, laryngeal cartilages, trachea, or the cervical vertebral column.

Cardiovascular System:
The 600 gram enlarged heart has a normal configuration with a moderate amount of epicardial fat. The coronary arteries have no significant atherosclerotic disease. There are no acute thrombi. The hypertrophic left ventricular free wall is 2 centimeters thick. The hypertrophic interventricular septum is 1.5 centimeters thick. There are no focal endomyocardial lesions. The papillary muscles and chordae tendineae are thickened, and the heart valves are unremarkable. The aorta has no significant atherosclerosis. The major arteries and great veins have a normal distribution.

Respiratory System:
The larynx and trachea are unremarkable. The right and left lungs are 575 grams and 425 grams, respectively. The lungs are hyperinflated, edematous, and congested. There are no neoplastic masses, focal lesions, infarcts, or hemorrhages. There are no pulmonary emboli.

Hepatobiliary System:
The 2575 gram enlarged liver has a smooth serosal surface. The parenchyma is firm and has a diffuse brown to green discoloration. There are no neoplastic masses, focal lesions, infarcts, or hemorrhages. The gallbladder and biliary tracts are unremarkable.

Hemolymphatics:
The 350 gram spleen has a smooth surface. The parenchyma has no neoplastic masses, focal lesions, infarcts, or hemorrhages. Lymphadenopathy is not appreciated.

Alimentary System:
The tongue, esophagus, stomach, small bowel, appendix and colon are unremarkable. The stomach is devoid of gastric contents. The lining of the stomach has a normal rugal pattern.

Pancreas:
The pancreas has a normal lobulated pattern.

Endocrine System:
The thyroid gland has a normal bilobed configuration. The adrenal glands are unremarkable.

Genitourinary System:
The right and left kidneys are each 200 grams. Both kidneys have smooth cortical surfaces and normal cortico-medullary regions. There are no abnormalities in the calyceal systems, pelves, ureters, or bladder.

Musculoskeletal System:
Except for the above noted injuries, all the muscles and axial skeleton are free of any significant abnormalities.

Routine tissue specimens are retained in formalin for one year after autopsy in accordance with the current record retention schedule.

10-1C



## OFFICE of the WAYNE COUNTY MEDICAL EXAMINER

1300 East Warren Avenue
Detroit, MI 48207

### POST MORTEM REPORT

M.E. CASE NUMBER
15-3837
COUNTY OF DEATH
WAYNE
TOWN OF DEATH
DETROIT
DATE PRONOUNCED DEAD
Mar 30, 2015

MICROSCOPIC DESCRIPTION

Cassette Summary:
1 to 2. Brain
3. Heart
4. Lung
5. Kidney
6. Heart
7. Liver
8. Kidney
9 to 10. Lungs

Heart: Hypertrophic cardiac myocytes with enlarged nuclei.

Lungs: Vascular congestion, pulmonary edema, mucus plugging of bronchi, and smooth muscle hypertrophy of bronchiole walls associated with goblet cell metaplasia of respiratory epithelium, submucosal inflammation, and thick basement membranes.

Liver: Focal areas of macrovesicular and microvesicular steatosis; Postmortem autolysis.

Kidneys: No significant histopathologic findings.

Brain: No significant histopathologic findings.

**(End of Report)**

10-14

# EXHIBIT E

1

1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3     LEDA REED, as the Personal
      Representative of the Estate
4     of Anthony Demone Clark-Reed,

5                      Plaintiff,

6        -vs-                           No. 4:18-cv-10427-LVP-EAS

7                                       Hon. Linda V. Parker
                                        Mag. Elizabeth A. Stafford
8
      THE CITY OF DETROIT, OFFICER
9     TRACY MORENO, OFFICER ROBIN
      CARVER, OFFICER ERIC CARTHAN,
10    Detroit Police Officers, in
      their official capacities and
11    individually, jointly and severally,

12                     Defendants.
      _____/
13

14                   The deposition of LEDA REED, taken at 2

15    Woodward Avenue, Detroit, Michigan, on Monday,

16    October 8, 2018, commencing at 10:24 p.m., before

17    Reporter LaVerne M. Reinhardt, CSR-2305.

18

19

20

21

22

23

24

25

                           RELIANCE COURT REPORTING
                                (313) 964-3611

7

 1   Q.   Okay.  All right, and are you still at that
 2        address?
 3   A.   Yes.
 4   Q.   Okay.  Who else lives there at Willette?  Who else
 5        was living at Willette at that time, Ms. Reed?
 6   A.   My daughters.
 7   Q.   Daughters.  Are they adult daughters?
 8   A.   Yes.
 9   Q.   Okay.  How old?
10   A.   They about, they're a year younger than Anthony.
11   Q.   And he was?
12   A.   He was 24 so they was 23 at the time.  They're
13        twins.
14   Q.   Oh, twins, okay.  What's their name?
15   A.   Dashal, D-a-s-h-a-l, and Dashawna, D-a-s-h-a-w-n-a.
16   Q.   And the last name Reed?
17   A.   The same as Anthony, Clark-Reed.
18   Q.   Okay.  The hyphenated last name, is that a more --
19   A.   Their father.
20   Q.   Father's name.  Okay.  Let's go into the incident.
21        So Ms. Clark -- I'm sorry, Ms. Reed, you were not
22        present at the time of the -- when your son was
23        stopped?
24   A.   That's correct.
25   Q.   Okay.  Where were you at the time?

23

```
1   Q.   Okay.  And this was all within the same week of

2        this?

3   A.   Yes.

4   Q.   Okay.  So hearing the illegal tint did you form the

5        idea that that tint was illegal on your own or did

6        someone tell you no, that's not illegal?

7   A.   Well, that's no easy way to answer it.  Everyone in

8        the neighborhood is constantly pulled over for

9        illegal tint so they make it a purpose not to have

10       anything too dark so they don't get pulled over.

11  Q.   Okay.  So that's the answer to that is that

12       immediately when you saw the news story about the

13       illegal tint and the newspapers on illegal tint you

14       formed that understanding on your own that your

15       son's tint wasn't illegal?

16  A.   No, that's what they said, it's not illegal.  When

17       they put it on there they said it's not illegal.

18  Q.   When they put it on you mean the installers of the

19       tint?

20  A.   Yes.

21  Q.   Okay.  Were you there with him when he got it

22       installed?

23  A.   No.

24  Q.   Okay.  How do you know that they said that then?

25  A.   Quandra.
```

1    Q.   You didn't but you know someone else did?

2    A.   I'm not sure.

3    Q.   Okay.  So you say you're not sure, you think

4         someone may have?

5    A.   May have.

6    Q.   Who?

7    A.   I'm not sure.

8    Q.   Okay, well, what makes you think -- what leads you

9         to say someone may have?

10   A.   A bunch of us went over there that day.

11   Q.   Okay.  So this is information that -- so what day

12        was that?

13   A.   The next day.

14   Q.   The next day, okay.  And you say a bunch of you

15        went over there.  Who all was involved in that

16        group?

17   A.   The neighborhood.

18   Q.   The entire neighborhood?

19   A.   (Nodding yes.)

20   Q.   Okay.  And so you went into the food center and --

21        I'm sorry, you were with the neighborhood people

22        but didn't go in?

23   A.   We was in the area.  Everybody went in the area and

24        everybody spreaded out.

25   Q.   Okay, well, tell me what happened exactly in your

53

```
 1          own words.
 2    A.    Everybody just went over in the neighborhood to see
 3          if they could find anyone that seen anything.
 4    Q.    Okay.  So what did you find, if anything?
 5    A.    I went to the liquor store, that's the only place I
 6          went.
 7    Q.    Okay.  So Tropicana didn't -- you didn't find
 8          anything at Tropicana or you found out there was a
 9          video but that the police had already seized the
10          video?
11    A.    (Nodding yes.)
12    Q.    So did any of the other people find out anything
13          that were canvassing?
14    A.    I don't know, we didn't talk later.
15    Q.    So no one came to you and said Ms. Clark -- excuse
16          me -- Ms. Reed, I found out this person, that
17          person saw something?
18    A.    No.
19    Q.    About how many people were involved in the canvass?
20          Ten, 20, 30?
21    A.    Maybe about 30.
22    Q.    Did you know all of these people?
23    A.    They knew me.
24    Q.    How do you know that they knew you?
25    A.    Everybody know me.
```

# EXHIBIT F

1                    UNITED STATES DISTRICT COURT,
                     EASTERN DISTRICT OF MICHIGAN,
2                          SOUTHERN DIVISION

3   Leda Reed, as the Personal
    Representative of the Estate of
4   Anthony Demone Clark-Reed

5               Plaintiff,              Hon. Linda Parker
    vs.                                 Case No. 18-10427
6
    The City of Detroit, a Michigan
7   Municipal Corporation,
    Officer Tracy Moreno,
8   Officer Robin Carver,
    Officer Eric Carthan, in their
9   official capacities and individually,
    Jointly and Severally,
10
                Defendants.
11  _____/

12        DEPOSITION OF POLICE OFFICER TRACY MORENO,

13  Taken by the Plaintiff on the 9th day of January, 2019,

14  at the offices of City of Detroit Law Department, at

15  Suite 500, CAYMC, 2 Woodward Avenue, Detroit, Michigan,

16  at 11:00 a.m.

17  APPEARANCES:

18  For the Plaintiff:       Mr. Herbert A. Sanders - P43031
                             The Sanders Law Firm
19                           615 Griswold St., Ste. 913
                             Detroit MI  48226
20                           (313) 962-0099
                             haslawpc@gmail.com
21
    For the Defendant:       Ms. Crystal B. Olmstead - P69202
22                           City of Detroit Law Dept.
                             2 Woodward Avenue, Suite 500
23                           Detroit MI  48226
                             (313) 237-5051
24                           olmsteadc@detroitmi.gov

25  Reported by:             Shalaan K. Fisher, CSR-2284
                             (313) 881-3380

                                1

```
 1   Q     All right.  So, this 300 pound man has his hands on his
 2         head and he is getting out of a charger?
 3   A     I'm sorry.  Can I backtrack?
 4   Q     Okay.
 5   A     I had him shut the vehicle off.
 6   Q     You had him shut the vehicle off?
 7               Now, you have him step out of the vehicle while
 8         maintaining his hands on his head; is that accurate?
 9   A     That is correct.
10   Q     What happens next?
11   A     I had him get onto the ground after he exited the
12         vehicle.
13   Q     Okay.  And his hands are still interlocked behind his
14         head; is that accurate?
15   A     Yes.
16   Q     All right.  And when you say, you had him get on the
17         ground, how is he on the ground?
18   A     First, he went to his knees and then onto his belly or
19         his stomach or chest.
20   Q     And at this time, his fingers are still interlocked
21         behind his head; is that accurate?
22   A     I believe, he might have had one hand out to lower
23         himself to the ground, but that was it.
24   Q     You indicated in your report that he put one hand out
25         to lower himself to the ground?
```

 1   A   I don't believe so.

 2   Q   Okay.  I don't believe so, either.

 3           So, he goes to his knees and then he goes to

 4       his stomach on the ground.

 5           Then what happens next?

 6   A   I began to stand over him.

 7   Q   Okay.

 8   A   And I ended up taking his left and right hand, pulling

 9       them back to his small of his back area, because he was

10       a very large individual.  For a brief moment, I was on

11       him, going from left to right to secure his left and

12       right wrist with handcuffs.

13   Q   Okay.  What do you mean, you were on him?

14   A   I might have sat on the small of his back area right

15       above the buttocks.

16   Q   And you sit on the small of his back, above his

17       buttocks.

18           What happens next?

19   A   He was handcuffed --

20   Q   Okay.

21   A   -- once.

22   Q   Let me stop you right there.

23           During the process of you handcuffing him, he

24       requested that you give him his inhaler.

25           Isn't that accurate?

33

```
 1  A    Yes.
 2  Q    Okay.  And would it be accurate that he was laboring to
 3       breathe at that time --
 4  A    Not at that time.
 5  Q    -- in your observation?
 6  A    Correct.
 7  Q    So, before he is handcuffed, he indicates that he would
 8       like his inhaler.
 9            You continued to handcuff him, correct?
10  A    Correct.
11  Q    What happens next?
12  A    After he was handcuffed, I, along with Officer Carthan,
13       assisted him in getting him back up to his feet.  He
14       was not on the ground more than five to eight seconds.
15       He was searched for weapons.  None were found, and we
16       walked back to the passenger's side front tire of our
17       scout car.
18            (At 11:39 a.m., Plaintiff's Exhibit #2 was
19             marked for identification.)
20  Q    I would like to show you what's been marked as
21       Deposition Exhibit #2.
22            Are you familiar with that document?
23  A    This appears to be a copy of my report.
24  Q    And it appears that there were some highlights made on
25       the report that alternately resulted in redactions when
```

34

# EXHIBIT G

**680 Fed.Appx. 362**
**This case was not selected for publication in West's**
**Federal Reporter.**
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
**United States Court of Appeals,**
**Sixth Circuit.**

ESTATE OF Leon BRACKENS, Plaintiff,
Odell **Brackens**, Jr., as Personal Representative
of the **Estate** of Leon **Brackens**,
Plaintiff-Appellant,

v.

LOUISVILLE JEFFERSON COUNTY METRO
GOVERNMENT, dba **Louisville** Metro Police
Department; Sam Madison; Kevin Hamlin; Brian
Gillock; Nathaniel Hernandez; James Steffan;
Robert Ashenfelter; Robert Ward; Matthew Glass;
Christopher Meredith; Stu Hamilton, Sergeant, in
their individual capacities, Defendants-Appellants,
and
Emily Lettie, et al., Defendants.

No. 15-6142
|
Filed February 21, 2017

**Synopsis**
**Background:** African-American passenger in vehicle
involved in high-speed chase with police officers filed §
1983 action against officers, asserting claims for
excessive force in violation of Fourth Amendment, §
1985 conspiracy to violate his constitutional rights and to
conceal evidence, and violations of state law, and seeking
damages for femoral and humeral fractures sustained as
result of officers forcibly removing him from vehicle,
pinning him to ground until he was handcuffed, and then
conducting pat down, after they had received inaccurate
communications from dispatchers regarding details of
passenger's 911 calls stating he was being held against his
will and could not escape from vehicle. The United States
District Court for the Western District of Kentucky,
David J. Hale, J., 2015 WL 5786818, granted officers
summary judgment based on qualified immunity. Appeal
was taken.

**Holdings:** The Court of Appeals, Boggs, Circuit Judge,
held that:

[1] officers did not use excessive force during seizure of
passenger;

[2] officers did not conspire to deprive passenger of equal
protection;

[3] district court did not abuse discretion by ruling on
pendent state law claims;

[4] officers did not act in bad faith; and

[5] officers did not tamper with physical evidence.

Affirmed.

West Headnotes (5)

[1]  **Arrest**
     Duration of detention and extent or conduct
     of investigation

     Police officers used only reasonable force, not
     excessive force in violation of Fourth
     Amendment, in neutralizing perceived threat of
     potentially dangerous passenger by forcibly
     removing him from vehicle, pinning him to
     ground until he was handcuffed, and conducting
     pat down, after vehicle had been in 20-minute
     high-speed chase with officers through two
     states, driving in wrong direction on highway at
     one point, and trying to ram police cruiser;
     although officers received inaccurate
     communications from dispatchers regarding
     details of passenger's 911 calls stating he was
     being held against his will and could not escape
     from vehicle, officers had no reason to question
     that inaccurate information in midst of tense,
     uncertain, and rapidly evolving car chase. U.S.
     Const. Amend. 4.

     Cases that cite this headnote

[2]  **Conspiracy**
     Rights or privileges involved

There was no evidence that police officers conspired to deprive African-American passenger of equal protection of laws or that officers were motivated by racial or other class-based animus in carrying out alleged conspiracy to violate his constitutional rights and to conceal evidence, as required to support his § 1985 conspiracy claim arising from officers' conduct in removing him from vehicle that had been in high-speed chase with officers and pinning him to ground until he was handcuffed. U.S. Const. Amends. 4, 14; 42 U.S.C.A. § 1985(3).

Cases that cite this headnote

[3]    **Federal Courts**
👈Effect of dismissal or other elimination of federal claims

District court did not abuse its discretion in ruling on passenger's pendent state law claims, after dismissing his § 1983 claims, against police officers who forcibly removed him from vehicle, pinned him to ground until he was handcuffed, and then conducted pat down, since court did not have to blaze new trails in state law and could resolve claims with facts and findings before it, as qualified immunity for § 1983 claims was essentially identical to qualified official immunity inquiry under Kentucky law. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[4]    **Arrest**
👈Duration of detention and extent or conduct of investigation

Under Kentucky law, police officers did not act in bad faith by forcibly removing passenger from vehicle, pinning him to ground until he was handcuffed, and conducting pat down, after vehicle had been in 20-minute high-speed chase with officers through two states, driving in wrong direction on highway at one point, and

trying to ram police cruiser, since officers' actions were not objectively unreasonable, and they did not willfully or malicious intend to harm passenger, but rather, they behaved with permissible intention of abating what they reasonably perceived as immediate safety threat.

Cases that cite this headnote

[5]    **Municipal Corporations**
👈Police and fire
**Public Employment**
👈Law enforcement personnel

There was no evidence that police officers altered physical evidence with intent to impair its availability in official proceeding, as required to support passenger's claim that officers tampered with physical evidence, in violation of Kentucky law, after removing him from vehicle that was involved in high-speed chase with officers. Ky. Rev. Stat. Ann. § 524.100(1)(a).

Cases that cite this headnote

**\*363** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

**Attorneys and Law Firms**

Daniel J. Canon, Law Offices, **Louisville**, KY, Garry Richard Adams, Jr., Clay, Daniel, Walton & Adams, **Louisville**, KY, for Plaintiff

Daniel J. Canon, Law Offices, **Louisville**, KY, Garry Richard Adams, Jr., Clay, Daniel, Walton & Adams, **Louisville**, KY, for Plaintiff-Appellant

Lisa A. Schweickart, **Jefferson** County Attorney's Office, **Louisville**, KY, for Defendants-Appellants **Louisville/jefferson** County Metro Government, Sam Madison, Kevin Hamlin, Nathaniel Hernandez, James Steffan, Robert Ashenfelter, Robert Ward, Matthew Glass, Christopher Meredith, Stu Hamilton

Nicholas Ryan Hart, Phillips, Parker, Orberson & Arnett,

Louisville, KY, for Defendant-Appellee Brian Gillock

BEFORE: GUY, BOGGS, and MOORE, Circuit Judges.

**Opinion**

BOGGS, Circuit Judge.

Leon Brackens brought a § 1983 claim against the Louisville/Jefferson County Metro Government, Louisville Metro Police Department (LMPD) officers, and Jeffersonville (Indiana) Police Department (JPD) officers seeking damages for injuries that Brackens sustained as a result of his forcible removal from the passenger *364 side of a minivan following a car chase. He also brought a "conspiracy to interfere with civil rights" claim and state-law evidence-tampering and tort claims. The district court granted summary judgment to the defendants on qualified-immunity grounds. The only defendants remaining on appeal are the LMPD police officers in their individual capacity. Because the officers' forcible removal of Brackens from the vehicle was objectively reasonable in light of the facts and circumstances confronting them on the scene, we affirm the district court's grant of summary judgment.

## I

A late-night traffic stop in Jeffersonville, Indiana spiraled into a twenty-minute, cross-state car chase that ended in Leon Brackens sustaining femoral and humeral fractures after being forcibly removed from the vehicle. Brackens, a middle-aged black man who suffered from sickle-cell anemia, severe osteopenia, and hypertension, needed a ride to the store. Rhonda Sullivan, a white woman in her mid-thirties, drove him. JPD detective Samuel Moss spotted Sullivan's minivan leave a motel parking lot at approximately 1:15 a.m. in an allegedly "high crime, high drug area." He ran her license plates, cross-referenced the registered owner with the FBI's National Crime Information Center database, and discovered that Sullivan had a pair of outstanding warrants. Moss signaled for backup. JPD officers Chris Ueding and Joshua Schiller soon arrived. Seconds after Moss stopped Sullivan's van and asked Sullivan to get out of the vehicle, she sped off.

JPD officers followed Sullivan through residential areas to New Albany, Indiana and then onto an interstate highway. During the chase, Sullivan drove across a median, entered a highway in the wrong direction, and later raced along at speeds exceeding ninety miles per hour. At one point, Sullivan tried to "ram" the cruiser of JPD Officer Chris Grimm who had pulled alongside her on a major highway. When Sullivan crossed into Kentucky, LMPD officers joined in pursuit.

During the chase, Brackens made two frantic 911 calls, at least one of which was routed to the New Albany Police Department. On both calls, Brackens managed to convey that Sullivan had fled the police, and that he was trapped in her minivan and feared for his life. Despite his agitated state, Brackens clearly communicated that he was being held against his will and could not escape.

Unfortunately, the officers responding to the emergency were provided a different picture. As Sullivan led JPD cruisers along interstate highways in Louisville, LMPD dispatchers advised their officers that both Sullivan *and* Brackens had felony warrants, Brackens for second-degree escape with prior handgun charges. They were initially described as acting in concert. Minutes later, dispatch backpedaled and informed officers that "the female's not involved but she is in the vehicle ... yelling that she's scared to death." Five times during the ten-minute communication, LMPD officers were told that the vehicle's occupants were "suicidal and homicidal." When Sullivan finally pulled over, dispatch twice warned "[a]ll units [to] use extreme caution."

JPD officers also received distorted information. The JPD dispatcher advised that the van's occupants were "saying stuff about how *they're* gonna die." Some accurate information was provided: Sullivan was driving and had outstanding warrants. Just before Sullivan pulled over, dispatch warned JPD officers to use "caution" and told them that the van's occupants were "trying to negotiate" with LMPD over the *365 phone. At no point did either dispatch accurately communicate to its officers the details of Brackens's 911 calls.

The chase ended after twenty minutes when Sullivan stopped on a highway exit ramp in Louisville and her van was surrounded by JPD and LMPD cruisers. Two cruiser dashboard cameras captured the ensuing scene. JPD officers approached the driver's side of the van with weapons drawn and ordered Sullivan out. She quickly complied, exiting the driver-side door with her arms raised and dropping to the ground. Schiller and Moss placed her in wrist restraints. As Sullivan was secured, LMPD officers approached the passenger side of the van. Grimm pointed his firearm at Brackens through the driver-side window and Schiller moved from the rear of the van to the passenger side.

LMPD officers ordered Brackens out of the van. When he did not immediately comply, Schiller opened the passenger-side door, unbuckled Brackens, and dragged him to the ground with LMPD Officer Brian Gillock's assistance. They rolled Brackens onto his stomach and held him to the pavement with the help of LMPD Officers James Steffan and Christopher Meredith. At least one officer restrained Brackens by applying force to his head with a knee. Once Brackens was handcuffed, the officers stood him up to search for a weapon, but he was unable to remain standing. Brackens told the officers that he was disabled and they briefly propped him against the van to conduct the pat down. Brackens was then seated on the ground and remained handcuffed.

EMTs were called to the scene as a precaution and transported Brackens to the hospital. He sustained several injuries during the incident. Radiographs of Brackens showed fractures to his left femur and left humerus as well as " 'severe' and 'diffuse' osteopenia and demineralization of his bones." Brackens died over a year later, apparently of causes unrelated to this event. His estate was substituted as plaintiff in this suit.

Brackens brought a lawsuit against the Louisville/Jefferson County Metro Government and individual JPD and LMPD officers, seeking damages in connection with the incident.[1] He claimed that the defendants: (1) used excessive force against him in violation of the Fourth Amendment; (2) conspired to violate his constitutional rights and to conceal evidence; and (3) violated Kentucky law on tort and evidence tampering. After discovery, the defendants moved for summary judgment on qualified-immunity grounds. The district court granted their motions. It found that the evidence showed that most of the officers were not in physical contact with Brackens. Although JPD Officer Schiller and LMPD Officers Gillock, Steffen, and Meredith did come into contact with Brackens, the court reasoned that they were protected by qualified immunity. It found no evidence to support the alleged conspiracy and state-law claims. The Brackens Estate appeals the grant of summary judgment to the LMPD officers in their individual capacity.

## II

When there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law,

summary judgment is appropriate. Fed. R. Civ. P. 56(a). We review a district court's grant of summary judgment de novo, construing all reasonable inferences in favor *366 of the nonmoving party, Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014), "to the extent supportable by the record," Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (emphasis omitted). To the extent that record is supported by video evidence, we view the facts in the light depicted by that evidence. Id. at 381, 127 S.Ct. 1769.

## A

The Brackens Estate asserts a Fourth Amendment claim under 42 U.S.C. § 1983. To succeed on a § 1983 claim, a plaintiff must prove that a person acting under color of law deprived him of a right protected by the Constitution or laws of the United States. Robertson, 753 F.3d at 614. It is undisputed that the LMPD officers seized Brackens under color of law. At issue is whether they deprived him of a constitutional or federally protected right when doing so.

Qualified immunity protects government officials from suit under § 1983 if (1) their conduct does not violate a clearly established right (2) of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The district court concluded that the Brackens Estate did not show that the LMPD officers violated a clearly established constitutional right when they forcibly removed Brackens from the van and pinned him to the ground.

A claim that law enforcement used excessive force during a seizure is analyzed under the Fourth Amendment "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them...." Id. at 397, 109 S.Ct. 1865. "[A] reasonable officer on the scene" is "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97, 109 S.Ct. 1865. "Relevant considerations include 'the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

The Sixth Circuit has had several occasions to consider whether forcibly removing the occupant of a vehicle following a high-speed chase violates the Fourth Amendment. In *Dunn v. Matatall*, for example, a motorist sped through a residential area at fifty miles per hour after an officer tried to initiate a stop. 549 F.3d 348, 350–51 (6th Cir. 2008). After two minutes, the motorist pulled over and complied with an order to place his keys outside the car, but a struggle ensued after he did not immediately comply with a command to get out of the car. (The delay may have been caused by the motorist's becoming stuck in his seatbelt rather than any intentional disobedience.) Two officers pulled him out of the car and forced him to the ground. He suffered a femoral fracture during the arrest. We held that the use of force was objectively reasonable "given the heightened suspicion and danger brought about by the car chase and the fact that an officer could not know what other dangers may have been in the car." *Id.* at 355, 106 S.Ct. 1092.

In other circumstances, we have similarly found that in light of the potential safety **\*367** threat to officers in such cases, the force required to remove from a vehicle a motorist who does not comply with police commands following a chase is not excessive under the Fourth Amendment. *See Blosser v. Gilbert*, 422 Fed.Appx. 453, 458 (6th Cir. 2011); *Williams v. Ingham*, 373 Fed.Appx. 542, 547–48 (6th Cir. 2010).

[1]Although the facts and circumstances that inform an excessive-force claim will inevitably vary, our precedents are instructive. Taking the evidence as depicted in the dashcam videos and, otherwise, in the light most favorable to the Brackens Estate, the facts do not show that the LMPD officers used excessive force. The car chase here was far more dangerous than that in *Dunn*. For twenty minutes, Sullivan led police through two states at excessive speeds, drove in the wrong direction on U.S. Route 31 at one point, and tried to ram a police cruiser. Not only does a car chase reasonably bring about "heightened suspicion and danger," *Dunn*, 549 F.3d at 355, but the LMPD officers had additional information that reasonably created an even greater safety concern.

According to dispatch, the male in the vehicle had a felony warrant for handgun possession, the female was "not involved," the vehicle's occupants were "suicidal or homicidal," and responding officers should "use extreme

caution." Although much of that information was wildly and unforgivably inaccurate, no evidence suggests that *the officers*, in the midst of a "tense, uncertain, and rapidly evolving" car chase, had any reason to question it at the time. *Graham*, 490 U.S. at 397, 109 S.Ct. 1865; *cf. White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) ("No settled Fourth Amendment principle requires [an] officer to second-guess the earlier steps already taken by his or her fellow officers in instances like the one ... confronted here."). Nor does any law impute the dispatch's errors to the officers individually.

It was reasonable for the LMPD officers to consider Brackens a safety threat. He was sitting in the front seat of a vehicle that had only just stopped after a twenty-minute chase. Unlike Sullivan, who immediately exited the vehicle and dropped to the ground when ordered to do so, Brackens did not respond. When Schiller opened the passenger door, Brackens's seatbelt was fastened. Given the information at the LMPD officers' disposal, the few seconds that elapsed between the order and Brackens's removal gave them little opportunity to appreciate fully that Brackens was disabled and unarmed, let alone that he had no felony warrants and was caught up in the chase involuntarily.

The force used must be objectively reasonable under the circumstances, and Brackens suffered serious injuries during the incident. Yet " '[n]ot every push or shove ... ' violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Here, the officers used only reasonable force in neutralizing the perceived threat of a potentially dangerous passenger by removing him from the vehicle, pinning him to the ground until he was handcuffed, and conducting a pat down. There is no indication that the force applied would have seriously harmed a person without Brackens's conditions, of which the officers had no reason to know.

Since the LMPD officers who made physical contact with Brackens did not use unconstitutional force in restraining him, adjudication of the Brackens Estate's argument that it need not "identify his assailants with absolute certainty" is unnecessary. Appellant Br. at 25. Similarly, no LMPD officer can be held liable for failure **\*368** to supervise or intervene because the underlying conduct was not unconstitutional. *Cf. Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

## B

[2]Summary judgment was also warranted for the conspiracy claim. The Brackens Estate points to its difficulty in obtaining certain records and to several officers' slightly divergent accounts of the information that dispatch relayed to them. Appellant Br. at 32. Standing alone, those facts do not show that LMPD officers conspired to deprive Brackens of "the equal protection of the laws," let alone that they were "motivated by racial, or other class based animus" in carrying out such a conspiracy. *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996); *see also* 42 U.S.C. § 1985(3).

## C

[3]The Brackens Estate also asserted several state-law claims. "[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Rouster v. County of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014) (citation omitted). But a federal court may choose to exercise jurisdiction if "the interests of judicial economy and the avoidance of multiplicity of litigation" outweigh the serious concern of "needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Here, it was not an abuse of discretion to rule on the pendent state-law claims, as the district court did not have to blaze new trails in state law and could resolve the claims with the facts and findings before it. Qualified immunity for purposes of § 1983 "is essentially identical to the qualified official immunity inquiry under [Kentucky] law." *Jefferson Cty. Fiscal Court v. Peerce*, 132 S.W.3d 824, 837 (Ky. 2004). When sued in their individual capacity, public officers are protected by qualified immunity "for negligent performance of: '(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority.' " *T.S. v. Doe*, 742 F.3d 632, 641 (6th Cir. 2014) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)).

[4]The district court's dismissal of the Brackens Estate's state-law tort claims was appropriate. The LMPD officers did not act in bad faith. As discussed, their actions were not "objective[ly] unreasonable[ ]," and the facts do not support an argument that they "willfully or maliciously intended to harm" Brackens. *Yanero*, 65 S.W.3d at 523. Rather, they behaved with the "permissible intention[ ]" of abating what they reasonably perceived as an immediate safety threat. *Bryant v. Pulaski Cty. Det. Ctr.*, 330 S.W.3d 461, 466 (Ky. 2011) (quoting *Yanero*, 65 S.W.3d at 523).

[5]The Brackens Estate also claims that LMPD officers tampered with physical evidence. *See* Ky. Rev. Stat. § 524.100. However, the facts do not support the argument that any officer "alter[ed] physical evidence ... with intent to impair ... availability in the official proceeding." *Id.* at § 524.100(1)(a). Absent any such proof, the claim cannot be supported and accordingly the district court's grant of summary judgment on it was not in error.

## III

The facts of this case play out like a tragic performance of the party game of telephone: Brackens clearly indicated that he was being held against his will in the speeding car while Sullivan was refusing to cooperate with police, but his message was **\*369** contorted and reported to responding officers as the exact opposite. Yet because the officers operated with the shockingly false information provided to them (information that they had no reason to doubt), their actions in removing Brackens—a man they were told was "suicidal and homicidal" and apparently willing and able to force an uninvolved party to drive recklessly to escape police—were reasonable. We therefore **AFFIRM** the district court's grant of summary judgment.

**All Citations**

680 Fed.Appx. 362

Footnotes

1    The Louisville/ efferson County Metro Government and JPD officers have been dismissed as parties. The LMPD officers have been dismissed in their official capacities only. The Brackens Estate did not bring suit against the police dispatchers.