# EXHIBIT 1

1                    UNITED STATES DISTRICT COURT,
                     EASTERN DISTRICT OF MICHIGAN,
2                         SOUTHERN DIVISION

3   Leda Reed, as the Personal
    Representative of the Estate of
4   Anthony Demone Clark-Reed

5              Plaintiff,              Hon. Linda Parker
    vs.                               Case No. 18-10427
6
    The City of Detroit, a Michigan
7   Municipal Corporation,
    Officer Tracy Moreno,
8   Officer Robin Carver,
    Officer Eric Carthan, in their
9   official capacities and individually,
    Jointly and Severally,
10
               Defendants.
11  _____/

12        DEPOSITION OF POLICE OFFICER ERIC D. CARTHAN,

13  Taken by the Plaintiff on the 8th day of October, 2018,

14  at the offices of City of Detroit Law Department, at

15  Suite 500, CAYMC, 2 Woodward Avenue, Detroit, Michigan,

16  at  1:00 p.m.

17  APPEARANCES:

18  For the Plaintiff:      Mr. Herbert A. Sanders - P43031
                            The Sanders Law Firm
19                          615 Griswold St., Ste. 913
                            Detroit MI  48226
20                          (313) 962-0099
                            haslawpc@gmail.com
21
    For the Defendant:      Ms. Crystal B. Olmstead - P69202
22                          City of Detroit Law Dept.
                            2 Woodward Avenue, Suite 500
23                          Detroit MI  48226
                            (313) 237-5051
24                          olmsteadc@detroitmi.gov

25  Reported by:            Shalaan K. Fisher, CSR-2284
                            (313) 881-3380

                                 1

*Ex 1*

1                          TABLE OF CONTENTS

2        <u>WITNESS</u>:                                           PAGE

3    POLICE OFFICER ERIC D. CARTHAN,

4    Cross-Examination by Mr. Sanders                        3

5

6        <u>EXHIBITS</u>:

7    Plaintiff's Exhibit #1                                  12

8    Plaintiff's Exhibit #2                                  21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                2

```
 1                                 Detroit, Michigan

 2                                 Monday, October 8, 2018

 3                                 1:00 p.m

 4                          -   -   -

 5              POLICE OFFICER ERIC D. CARTHAN,

 6  HAVING BEEN CALLED BY THE PLAINTIFF AND SWORN:

 7                    CROSS-EXAMINATION

 8  BY MR. SANDERS:

 9  Q     State your name full for the record.

10  A     Eric Dwayne Carthan, sir.

11  Q     What is your date of birth?

12  A     10/8/71.

13  Q     Today is your birthday?

14  A     Hm-hmm.   Yes.

15  Q     Happy Birthday!

16              Let the record reflect that this is the

17        deposition taken pursuant to Notice, to be used for all

18        intents and purposes in the United States District

19        Court, Eastern District of Michigan, Southern Division,

20        in the case of Leda Reed as the personal representative

21        of the Estate of Anthony Demone Clark-Reed versus City

22        of Detroit, et al, case number:  18-10427.

23              What is your current rank, Officer?

24  A     Police Officer.

25  Q     Officer Carthan, I'm going to ask you a series of
```

3

1       questions as it relates to the lawsuit that I just

2       referenced.  If at any time you do not understand my

3       question, feel free to ask me to repeat the question or

4       to rephrase it.  If you give an answer, it will be

5       presumed that you did understand the question.  I'm

6       sure, you testified on numerous occasions before, so,

7       you understand that I need to be able to complete my

8       question before you give an answer so that the

9       Court Reporter can accurately record what is being

10      said.  If at any time you need or wish to take a break,

11      I'm happy to accommodate that.  I don't anticipate we

12      will be very long, but I would ask, if there is a

13      question pending that you answer that question before

14      we break.

15  A   Sure.

16  Q   Okay.  And how are you currently employed?

17  A   City of Detroit Police Officer.

18  Q   How long have you been employed with the City of

19      Detroit as a Police Officer?

20  A   Fourteen-and-a-half years.

21  Q   What is your educational background beginning with high

22      school?

23  A   Associate's Degree.

24  Q   What high school did you attend?

25  A   Beacher High School.

4

1    Q    Where is that located?

2    A    Flint, Michigan.

3    Q    And did you graduate from Beacher?

4    A    Yes.

5    Q    What year?

6    A    '89.

7    Q    And you testified that you have an Associate's Degree

8         from where?

9    A    Mott College.

10   Q    When did you obtain that?

11   A    I don't recall that one.  That's like '98, '99.  I

12        can't really recall.

13   Q    And where did you -- What did you attain your

14        Associate's Degree in?

15   A    Applied Science Automotive.

16   Q    Did you review anything in preparation for your

17        deposition today?

18   A    Yes.  A little bit of stuff.

19   Q    What did you review?

20   A    Just a video.

21   Q    Did you review any written reports?

22   A    No.

23   Q    I want to take you back to the date of the incident

24        that is at question in the lawsuit.  My recollection is

25        that was on or about March 31st, 2015.

5

```
 1              Is that what your recollection is?
 2   A    Yes.
 3   Q    And do you recall approximately what time it is that
 4        you encountered the decedent, Anthony Reed?
 5   A    No.  I do not.
 6   Q    Let me ask you:  On that day, what type of vehicle were
 7        you travelling in?
 8   A    Crown Victoria.
 9   Q    Was it marked?
10   A    I believe, it was semi-marked.
11   Q    What is?
12              So, my marked --
13   A    You have a Detroit emblem, maybe, on the trunk or
14        passenger's side.
15   Q    A Detroit emblem or Detroit Police Officer emblem?
16   A    Detroit Police Officer.
17   Q    But you have no specific recollection as to whether or
18        not there were any markings on the vehicle identifying
19        you as a Police Officer; would that be accurate or
20        inaccurate?
21   A    I don't recall.  It has been a while.
22   Q    And what color was the vehicle?
23              Do you recall?
24   A    White.
25   Q    Who was in the vehicle with you?
```

| | | |
|---|---|---|
| 1 | A | Tracy Moreno and Robin Carver. |
| 2 | Q | And at the time of the occurrence, I would assume, your |
| 3 | | ranking was "Police Officer"? |
| 4 | A | Yes. |
| 5 | Q | At the time of the occurrence, do you know what ranking |
| 6 | | was Tracy Moreno? |
| 7 | A | Police Officer. |
| 8 | Q | And at the time of the occurrence, do you know what |
| 9 | | ranking was Robin Carver? |
| 10 | A | Police Officer. |
| 11 | Q | What equipment did you have on your person on that day? |
| 12 | A | I don't recall. |
| 13 | Q | Did you have a firearm? |
| 14 | A | Yes. |
| 15 | Q | Okay.  What type? |
| 16 | A | All my firearms is Smith and Wesson. |
| 17 | Q | Smith and Wesson, it's automatic? |
| 18 | | I mean, semi-automatic, but -- |
| 19 | A | Semi-automatic.  Yes. |
| 20 | Q | What caliber? |
| 21 | A | .40. |
| 22 | Q | Did you have one firearm on you or on your person or |
| 23 | | more than one? |
| 24 | A | I had my firearm on me. |
| 25 | Q | Did you have any other equipment on you? |

7

```
 1   A    Handcuffs, my spray, chemical spray, flashlight. Bowie

 2        Belt.

 3   Q    Anything else?

 4   A    As far as --

 5   Q    Equipment that you had on you.

 6   A    That's about it.  Radio.

 7   Q    Now, the Bowie Belt, would be utilized to carry these

 8        items that you have described, right?

 9   A    Yes.  Yes.

10   Q    There was nothing on the Bowie Belt that you haven't

11        testified to already, correct?

12   A    Correct.

13   Q    What type of equipment did the vehicle possess?

14   A    Police radio, I believe.  It had an indoor camera, I

15        believe.

16   Q    What do you mean by an "indoor camera"?

17   A    Mounted to the front windshield, I believe.

18   Q    Anything else?

19   A    Spotlights, two spotlights, driver's side, passenger's

20        side.  I believe, we had some dashboard lights, too.

21   Q    Anything else?

22   A    Nothing I recall besides that.

23   Q    Was there a shotgun in the vehicle or any other type of

24        firearm?

25   A    That, I don't recall.
```

8

```
 1   Q   Do you have any personal knowledge as to any of the
 2       equipment that Tracy Moreno possessed?
 3   A   Same as me, standard.
 4   Q   And let me ask you this:  Is the .40 caliber Smith and
 5       Wesson a standard issue gun or --
 6   A   Yes.
 7   Q   Okay.
 8   A   Yes.
 9   Q   And to your knowledge, Moreno would have had that same
10       type of fire arm?
11   A   Yes.
12   Q   What about Robin Carver?
13   A   Same.
14   Q   You also used the term "standard" as it relates to
15       equipment.
16           Is there some type of policy or that
17       constitutes what the standard equipment is that an
18       officer will have with them at all times?
19   A   Yes.
20   Q   Okay.  And what is that standard equipment?
21   A   Your service weapon, pepper spray, handcuffs, your
22       PR 24, prep. radio.
23   Q   What is PR 24?
24   A   Collapsible stick.
25   Q   Okay.  You had PR 24 with you on that date, accurate?
```

9

```
 1   A   Correct, in my back -- personal backpack.
 2   Q   Anything else in your personal bag that would be
 3       considered equipment of something you would use to do
 4       your job that you hadn't told us about?
 5   A   No.
 6   Q   Okay.  Were you in uniform or plain clothes on the date
 7       of the occurrence?
 8   A   Plain clothes, semi-plain clothes, green pants, black
 9       shirt, marked black shirt.
10   Q   When you say, "marked black shirt," what do you mean by
11       that?
12   A   You had your name and badge number, brought it and a
13       police -- Detroit police emblem on here and then a
14       patch.
15   Q   Embroidered in the shirt?
16   A   Hm-hmm.
17   Q   The green pants, were they green jean pants, khakis?
18   A   Green tactical pants.
19   Q   Do you recall how the other officers were dressed?
20   A   Same.
21   Q   Was there a name for the detail that you were a part of
22       on that evening?
23   A   I'm special ops.
24   Q   What does that mean?
25   A   Your in some semi-plain clothes mostly response to high
```

                                   10

```
 1        priority runs, high crime areas, warrant pick-ups.
 2   Q    Who was driving the vehicle?
 3               Do you recall?
 4   A    Tracy Moreno.
 5   Q    Where were you seated?
 6   A    Passenger rear.
 7   Q    Is there a policy, practice or procedure as it relates
 8        to unmarked vehicles making traffic stops at the City
 9        of Detroit?
10   A    Same as probably marked vehicles.
11   Q    I'm sorry?
12   A    Same as the marked vehicles.
13   Q    So, there is no particular policy, to your knowledge,
14        as it relates to unmarked vehicles?
15   A    No.
16   Q    Do you recall at what street this -- the occurrence was
17        on?
18   A    Martin and West Vernor.
19   Q    Okay.  And at the time you encountered Mr. Reed, your
20        vehicle was travelling which way or Vernor?
21   A    Eastbound.
22   Q    Would it be correct that Mr. Reed was travelling west
23        on Vernor?
24   A    Yes.
25   Q    Do you recall whether it was dark outside or light?
```

11

```
 1   A    I believe, it was light.

 2   Q    And at some point, someone in your vehicle sees

 3        Mr. Reed's vehicle; would that be accurate?

 4   A    Yes.

 5   Q    Do you recall who it was?

 6   A    I believe, Tracy spotted it, but we all -- Tracy

 7        spotted --

 8   Q    Okay.  Officer Moreno spotted the vehicle and said

 9        what, if anything?

10   A    He has tinted windows.

11   Q    And that is as you were approaching the vehicle; would

12        that be accurate?

13   A    Yes.

14                (At 1:25 p.m., Plaintiff's Exhibit #1 was

15                marked for identification.)

16   Q    I'm handing you what has been marked as

17        Deposition Exhibit #1.

18                You can give another copy to your counsel, if

19        you would like, so, she can follow along with us.

20                Are you familiar with that document?

21   A    Yes.

22   Q    What is it?

23   A    That's our Activity Log for --

24   Q    I'm sorry?

25   A    Our activity log for the day.
```

```
 1   Q   Now, is there one Activity Log per vehicle?

 2   A   Yes.

 3   Q   Okay.  And I would like for you to take a look at the

 4       second page, one, two -- about three lines down.  It

 5       starts with "Vernor".

 6   A   Yes.

 7   Q   Do you see that?

 8   A   Yes.  Vernor, Lawndale.

 9   Q   Yes.

10   A   Hm-hmm.

11   Q   Who wrote that?

12   A   Carver.

13   Q   Okay.  And Carver was in the front passenger's seat?

14   A   Passenger's seat.  Yes.

15   Q   And that line says, "Vernor," and what street is that?

16   A   Lawndale.

17   Q   Lawndale, I and V, for investigation, I would presume?

18   A   Correct.

19   Q   For tinted front windows; is that accurate?

20   A   Correct.

21   Q   Okay.  So, it was the observation of the front tinted

22       windows that caused you and the other officers to begin

23       your investigation; is that accurate?

24   A   Yes.

25   Q   Okay.  After observing the front tinted windows, what
```

13

1     happened next?

2  A   Tracy made a U-turn to get behind him to attempt a

3     traffic stop.

4  Q   And what happened next?

5  A   He activated his overhead lights and he was kind of

6     slow to stop.

7  Q   Was he speeding?

8  A   About posted speeds.

9  Q   Was he attempting to elude you?

10  A   Not so far.  No.  He just was slow to a stop.

11  Q   Okay.  Is it possible?

12         MS. OLMSTEAD:  Objection; calls for

13     speculation.

14  BY MR. SANDERS:

15  Q   You can answer the question, if you can.

16         You have no idea whether or not he initially

17     observed you when he put on his lights; is that

18     correct?

19  A   I'm sure, he did from his actions.

20  Q   But you don't know?

21  A   I'm sure, he did.  Yes.  I don't know, but I was not in

22     the car with him, so, yes.

23  Q   And after you activated the lights, approximately, how

24     long was it before he pulled over?

25  A   Probably, about two or three blocks.

```
 1    Q    And when the car pulled over, it was parked near the
 2         curb on Vernor?
 3    A    Yes.
 4    Q    Was it legally parked?
 5    A    Yes.
 6    Q    After the car was pulled over, what happened next?
 7    A    Officer Moreno approached the driver's side and Officer
 8         -- me and Carver approached the passenger's side.
 9    Q    Moreno, I presume, went to the front driver's door?
10    A    Yes.
11    Q    Carver went to what door, if any?
12    A    Front passenger.
13    Q    And what did you do?
14    A    Rear passenger.
15    Q    What happened next?
16    A    Officer -- I mean, Officer Moreno got him up, out of
17         the car.
18    Q    At some point, isn't it accurate that someone ordered
19         Mr. Reed to put his hands on his head while he was in
20         the car?
21    A    Most likely so, but I don't recall at all.
22    Q    So, you testified that Officer Moreno, and I'm
23         paraphrasing, got him out of the car?
24              Would that be accurate?
25    A    Yes.
```

```
 1   Q    How did he accomplish that?

 2   A    He still was -- and escort him to the ground -- to the

 3        ground.

 4   Q    And what was the purpose of escorting him to the

 5        ground, as you describe?

 6   A    From his actions, from reactivating our lights to him

 7        stopping his body movements in the car.

 8   Q    Okay.

 9   A    He pursued.  Maybe, he had a weapon.  That's all.

10   Q    Why didn't you have him lean against the car and pat

11        him down?

12             MS. OLMSTEAD:  Objection; assumes the facts not

13        in evidence at this point.  He has got to get him out

14        of the car before he can lean him against the car.  I

15        guess, I really don't understand the question.

16             MR. SANDERS:  He said, she got him out of the

17        car and escorted him to the ground.

18   BY MR. SANDERS:

19   Q    Let me back up and ask you, when you say, "escorted him

20        to the ground," what happened?

21   A    Handcuffed him.

22   Q    What do you mean by "escorted him to the ground"?

23   A    Or down to -- orders down to the ground, assist him

24        down to the ground, so, we can safely cuff him.

25   Q    How was he down to the ground?
```

16

```
 1               Was he on his stomach?

 2               Was he on his knees?

 3   A    Stomach.

 4   Q    Now, again, my question is, why was he ordered to the

 5        ground and handcuffed as opposed to if you thought, he

 6        had a weapon, simply patting him down while he was

 7        standing in an upright position?

 8   A    Something --

 9   Q    Pardon me?

10   A    Something Officer Moreno did.

11   Q    I understand, and you were there, and you were

12        assisting him.

13               My question is, do you know why?

14   A    For me, safety.  For me, safety.

15   Q    And what do you mean by that?

16   A    He did a lot of movements in that car from the time we

17        activated the lights until the time he finally pulled

18        over later was drawing our suspicions and awareness

19        of --

20   Q    So, you put him on the ground.  You handcuff him.

21               Who handcuffs him?

22   A    Tracy and I assisted.

23   Q    Is there a policy, practice or a procedure as relates

24        to removing an individual from a vehicle?

25   A    Depends on the situation.
```

17

1    Q    Okay.  What do you mean, the policy, practice or

2         procedure to be?

3    A    Safely as possible, if he is not cooperating, so,

4         sometimes that's -- Oh, go ahead.  Go ahead.  So,

5         sometimes that requires to take a person on the ground

6         safely to properly handcuff him, search him and then

7         get him up.

8    Q    This gentleman was very cooperative, correct?

9              He put his hands on his head when he was asked

10        to do so?

11   A    I don't recall.

12   Q    He did not try to flee or elude you, correct?

13   A    Correct.

14   Q    He didn't resist when he was asked to get out of the

15        vehicle, correct?

16   A    No.  He did not.

17   Q    And he is placed to the ground face down, handcuffed

18        and then what happened?

19   A    Brought him back up to the -- brought him back --

20        standing back up.

21   Q    How did you do that?

22   A    Assist him one on one side, one on the other and help

23        him get up.

24   Q    When you say, "assisted him," what did you have a hold

25        of?

18

| | | |
|---|---|---|
| 1 | A | Right on the arm. |
| 2 | Q | Then what happened? |
| 3 | A | Then he had him, I guess, probably took him back to the |
| 4 | | car.  I'm not sure.  Somebody probably patted him down. |
| 5 | | I don't recall.  Then walked him back to the scout car. |
| 6 | Q | And he was not free to leave, correct? |
| 7 | A | Correct. |
| 8 | Q | So, he would have been considered under arrest, |
| 9 | | correct? |
| 10 | A | Detained. |
| 11 | Q | And what is your position as the basis for him being |
| 12 | | detained? |
| 13 | A | Tinted windows is why we investigated him. |
| 14 | Q | What type of offense is tinted windows, assuming there |
| 15 | | were tinted windows? |
| 16 | A | Civil infraction. |
| 17 | Q | Is it the norm for a person to be removed from their |
| 18 | | vehicle for a simple infraction? |
| 19 | A | No, unless something else is involved, maybe, just if |
| 20 | | you smell some Marijuana or so, but I don't know.  Not |
| 21 | | always.  A lot depends on the circumstances. |
| 22 | Q | Now, do I understand you to say that after you |
| 23 | | handcuffed him for what you described as your safety |
| 24 | | purposes, the policy, practice or procedure would have |
| 25 | | been to pat him down? |

19

1   A      Yes.

2   Q      And assuming that you patted him down and found no

3          weapons on him, what would be the basis for keeping a

4          person who has been cooperative with you in handcuffs?

5                  MS. OLMSTEAD:   Objection; assumes facts not in

6          evidence at this point.

7   BY MR. SANDERS:

8   Q      You can answer.

9   A      To see why he was reaching down prior to activating a

10         light, so, he could come to a complete stop a few

11         blocks later.

12  Q      Okay.  How does handcuffing him help you to determine

13         why he was reaching down, assuming he was?

14  A      Still has investigation, so, he might be -- get irate.

15  Q      But he had not shown you ever any evidence that he was

16         irate, correct?

17  A      He was hostile a little bit.  Not as far as hostile,

18         but he was breathing effusively.

19  Q      He was breathing heavily?

20                 In fact, when you first took him out of the

21         vehicle, he said, he was having problems breathing,

22         correct?

23  A      I don't recall.

24  Q      You don't recall?

25

                            20

```
 1                    (At 1:37 p.m., Plaintiff's Exhibit #2 was

 2                    marked for identification.)

 3                    I'm handing you Deposition Exhibit #2.

 4                    Are you familiar with that document?

 5   A    Yes.

 6   Q    What is it?

 7   A    Police Report.

 8   Q    Whose report is it?

 9   A    Let me see.  Should be mine.

10   Q    It says in the right, near the top, "reporting

11        officer."

12   A    Yes.

13   Q    And whose name is there?

14   A    Eric, mine.

15   Q    I want to direct you to midway, it says, "Ordered him

16        to the ground and he complied.  (No force used.)".

17             Do you see that?

18   A    Yes.  I see it.

19   Q    Then the next sentence reads, "I'm standing in front of

20        John Doe," assuming referring to Officer, reads "as

21        Officer Moreno was handcuffing him and then John Doe

22        asked him to do him a favor.  Get his,,," and it looks

23        like it was highlighted, and I can't read what that

24        word is.

25   A    Probably.
```

21

1    Q    "... having trouble breathing and having an ..." --

2         Something else there; do you see that?

3    A    Yes.

4    Q    Okay.  Do you know what that word is where it says,

5         "Get his..." --

6    A    Should be "inhaler".

7    Q    And then it says, "Having trouble breathing and having

8         an..." --

9              What is that?

10   A    That, I don't know.

11   Q    Could it be "asthma attack"?

12   A    Could be.

13   Q    So, does that refresh your recollection that at the

14        time he was initially out of the car and handcuffed, he

15        indicated, he was having problems breathing?

16   A    Yes.

17   Q    And what, if anything, did you do at that time?

18   A    Help him walk back to the car, and I believe -- I

19        believe, Officer Carver went and retrieved his inhaler

20        for him.

21   Q    Who administered the inhaler to him?

22             MS. OLMSTEAD:  Objection; states facts not in

23        evidence, but go ahead.

24             THE WITNESS:  I don't recall.

25

22

1  BY MR. SANDERS:

2  Q      What?

3               Did someone administer the inhaler to him?

4  A      I'm sure, they did.  I would assume, Officer Carver did

5         since he went to retrieve it.

6  Q      Okay.  And -- but you didn't observe that?

7  A      I don't recall.

8               (At 1:40 p.m., a break was taken to have

9               another Court Reporter report the rest of the

10              deposition.)

11                             -   -   -

12              CERTIFIED SHORTHAND REPORTER (CSR)

13      State of Michigan)
                         ):SS
14      County of Wayne  )

15              I certify that this transcript, consisting of
        23 pages is a complete, true, and correct record of the
16      testimony of POLICE OFFICER ERIC D. CARTHAN held in this
        case on October 8, 2018.
17              I also certify that prior to taking this
        deposition, POLICE OFFICER ERIC D. CARTHAN was duly sworn
18      to tell the truth.

19      January 8, 2018

20              _____/s/ Shalaan K. Fisher_____
                SHALAAN K. FISHER CSR-2284
21              Certified Shorthand Reporter
                Notary Public for the County of Wayne, MI
22              (Acting in the County of Wayne, MI)
                My Commission Expires:  5/7/19

23

24

25

                             23