# EXHIBIT 2

1

break, I

1  Q.   Back on the record.  Officer, while we were on

2       believe you had an opportunity to review Exhibit 2,

3       which was your police report.  Is that right?

4  A.   Yes.

as

5  Q.   Okay.  And does that help refresh your recollection

6       to the events on the date in question?

7  A.   Yes.

the

8  Q.   All right.  And what is the purpose of Exhibit 2,

9       police report?

10 A.   What's the purpose of this?

11 Q.   Yes.

something,

12 A.   Every time you have a violation or death or

13       you have to do a police report.

14 Q.   Okay.  What kind of information do you put in the

15       report?

cause for

16 A.   Pretty much from start to finish, the probable

And to

17       whatever.  Was it a police run, a traffic stop.

18       -- from the beginning to end, what happened.

19 Q.   Okay.  So any information that was important to the

*1*

*Ex 2*

20    occurrence, you would put it in the report,
correct?

21  A.   Yes.

22  Q.   And you would agree that your recollection on the
day of

23    the event and at the time you made the report is
better

24    than what it would be today, correct?

25  A.   Yes.


2


1  Q.   Okay.  Now, I think we've discerned that while Mr.
Reed

2    was on the ground, he indicated that he was having

3    trouble breathing, is that accurate?

4  A.   Yes.

5  Q.   And that would have been as soon as he was removed
from

6    the vehicle, is that correct?

7  A.   No.

8  Q.   How long did he remain on the ground?

9  A.   Just long enough to put the handcuffs on him and he
was

10    back up in less than a minute.

11  Q.   Okay.  So within a minute of being removed from the

12    vehicle, he began to complain of breathing
problems,

13    would that be accurate?

asked

14   A.    He asked me to do him a favor.  If I recollect, he

15        me to do him a favor.

16   Q.    And that favor was what?

17   A.    To get his inhaler.

the

18   Q.    All right.  Now, based upon your observation, once

19        inhaler was retrieved, he was only allowed to take

one

20        puff of the inhaler, is that accurate?

21            MS. OLMSTEAD:  I'll object, assumes facts

not

22        in evidence.

23            MR. SANDERS:  No, it doesn't assume facts

in

24        evidence.  It assumes the facts the he reported in

his

25        report.


3


1   BY MR. SANDERS:

2   Q.    So I'm asking you for your recollection.  If you

don't

3        have a recollection, let me know and I don't have a

4        problem with you looking at your report.  I'd just

like

5        it to be reflected on the record that you are

6        referencing your report.


3

7  A.   I don't recall that.

8  Q.   Okay.  Do you want to look at your report and take

a

9       look?

10 A.   Okay.

11            Yes.  He took one puff.

12 Q.   Okay.  And you don't recall observing him being

13      administered or being allowed to take more than one

puff

14      from the inhaler, would that be accurate?

15 A.   Yes, sir.  That's accurate.

16 Q.   All right.  And at the time he took the one puff,

he was

17      still handcuffed, is that correct?

18 A.   Correct.

19 Q.   And his hands were cuffed behind his back, is that

20      accurate?

21 A.   Correct.

22 Q.   Okay.  At the time that he took the one puff from

the

23      inhaler, what was the position of his body?

24 A.   Standing up.

25 Q.   Okay.  Where was he at when he was standing up?

4

1  A.   Passenger side, front fender.

2   Q.   Of?

3   A.   The scout car.

4   Q.   Of the scout car.  Okay.  Does your report help your

5        recollection in terms of how he was administered the

6        inhaler?

7   A.   Let's see.  I can look at the report.  How did he

8        administer the inhaler, is that what you're saying?

9   Q.   Yes.  My question is, he's got his hands cuffed behind

10       his back, but you said that he took a puff from the

11       inhaler.

12                    My question is, how do you do that with your

13       hands cuffed behind your back?

14  A.   Well, I assume one of the officers did it for him.

15  Q.   My question is, do you know who did it for him?

16  A.   No.  I don't recall.

17  Q.   Did you do it for him?

18  A.   No, I didn't do it.

19  Q.   Okay.  Now, would it be accurate that immediately after

20       taking the one puff from the inhaler, Mr. Reed said that

21       he needs an ambulance?

22  A.   Yes.

23  Q.   After Mr. Reed -- well, let me back up.  After you

what,                24          observed him take the one puff from the inhaler,

                     25          if, anything did you do?


5

                     1    A.    Stand there and monitor.

                     2    Q.    Monitor what?

                     3    A.    Him.  Monitoring him.  Just monitoring.

                     4    Q.    Okay.  What else did you do, if anything?

                     5    A.    Nothing.  Just stand there and monitor.  And make
sure

-- I                 6          he's comfortable, like, as far as -- I think he is

against              7          believe he put it on the car.  He was leaning

                     8          the car a little bit there.

you do               9    Q.    Okay.  At some point, other than monitoring, did

                     10         anything else associated with this occurrence?

                     11   A.    After he asked for an ambulance, they got him an

                     12         ambulance coming, then he passed out.

                     13   Q.    Okay.

                     14   A.    And I assisted --

                     15   Q.    Do you know who called for the ambulance?

                     16   A.    Carver.

monitoring, did      17   Q.    Okay.  Again, my question is, other than

6

18     you do anything else as it relates to this occurrence?

19  A.  Yes.

20  Q.  What?

21  A.  Checked his pulse.

22  Q.  And what was the purpose of you checking his pulse?

23  A.  Because he fell.  He fell unconscious in my arms.

24  Q.  And you checked his pulse and determined what?

25  A.  He was kind of weak.


6

1  Q.  What, if anything, did you do as a result of that?

2  A.  They took the cuffs off of him.  We placed him on the

3    ground, kind of made him comfortable.  Got the seat out

4    the back seat to kind of help prop him on his side.

5  Q.  Okay.  I want to be -- I appreciate the information, but

6    I want to be specific as to you.

7         What, if anything, did you do after checking

8    his pulse?

9  A.  Stood by and assisted Officer Carver.

10  Q.  How?

11  A.  Kept checking his pulse, relaying information, rolled

7

```
            12         him over to his side.

            13    Q.   Relaying what information to him?

            14    A.   Officer Carver, that his pulse was getting weak.

            15    Q.   What else, if anything, did you do?

  I         16    A.   Tried to keep him on his side.  He's a big guy, so

  seat      17         tried to keep him on his side.  I tried to keep the

            18         from falling back.  Trying to keep him --

            19    Q.   When you say he was a big guy, how tall was he,

            20         approximately?

            21    A.   I'm not sure, but he weighed a lot.

  that      22    Q.   When you say he weighed a lot, would it be accurate

            23         he weighed over 300 pounds?

            24    A.   I'd say 4, but, yes.

            25    Q.   Between 3- and 400 pounds?


  7


            1     A.   Yes.

            2     Q.   All right.  It would be a pretty strenuous thing

  for a     3          man close to 400 pounds to get out of a vehicle and

  get       4          down on the ground on his stomach, would it not?

            5     A.   No.
```

8

```
 6              MS. OLMSTEAD:  Objection, calls for

 7       speculation.  No personal knowledge --

 8              THE WITNESS:  No.

 9              MS. OLMSTEAD:  No personal knowledge --

10       finish with the objection.

11              No personal knowledge as to what a 400

12       man and what is strenuous for him, as well as to

13       officer.  But go ahead, you can answer it, if you

14              THE WITNESS:  No.  Because I seen some in

15       life that could move.

16   BY MR. SANDERS:

17   Q.   But this guy, it was pretty strenuous for him,

18        it?

19   A.   As far as breathing, yes.

20   Q.   Okay.  Now, you testified that you attempted to

21        on his side?

22   A.   Yes.

23   Q.   Did you do anything else; you, personally?

24   A.   No.  As far as -- what you mean?  Like, as far as

25   Q.   Anything.
```

*(Handwritten margin notes:)* let me / pound / the / can. / my / wasn't / keep him / --

*(Handwritten at bottom:)* 9

8

1  A.    I kept checking his pulse.

2  Q.    Okay.  At some point, an ambulance arrived on the
scene,

3         is that accurate?

4  A.    Yes.

5  Q.    Between what you described as checking his pulse
and the

6         arrival of the ambulance, did you do anything that
you

7         haven't already described to me?

8              MS. OLMSTEAD:  Just foundation.  Anything
--

9         are you referring with regard to Mr. Reed, or are
you

10        referring to was he checking his -- any other

11        activities?

12             MR. SANDERS:  I'm referring to what he
was

13        doing on the scene at the time.  What I've
discerned is

14        that, based upon his testimony, he checked his
pulse,

15        assisted him to his side and he was monitoring him.
I

16        believe that's his testimony.

17  BY MR. SANDERS:

18  Q.    Is that accurate?

19  A.    Yes.  Until the EMS arrived, yes.

10

than

20   Q.   And monitoring, I presume, means observing other

Would

21        checking his pulse and rolling him to his side.

22        that be accurate?

side.

23   A.   Yes.  Checking his pulse and rolling him to the

24        Keeping him maintained on his side.

25   Q.   Now, once the EMS arrives, what happens next?

9

1    A.   They administer medical treatment to him.

2    Q.   Okay.  What did you do, if anything?

3    A.   Helped them load him up.  Like, as far as the back

door,

4         whatever.

5    Q.   Okay.  You helped them load him up.  Then what

happens,

6         if anything?

7    A.   Stood by for the supervisor.

8    Q.   All right.  Up to the point that you get him loaded

into

9         the ambulance -- and forgive me if I already asked

this

10        question.

11             Did you, at any time, search Mr. Reed?

12   A.   I don't recall.

11

13   Q.   Did you observe anyone else search Mr. Reed?

14   A.   I don't recall.

15   Q.   At any time, did you search his vehicle?

16   A.   I don't recall -- I seen a few things, but I don't

17        recall searching his vehicle.

18   Q.   I'm sorry?

19   A.   I said I don't recall searching his vehicle.

20   Q.   Did you observe either of the two officers that were

21        with you in your vehicle that night search the vehicle?

22   A.   No, I don't recall.

23   Q.   Okay.  Is that a no, or you don't recall?

24   A.   I don't recall.

25   Q.   Now, you waited for the supervisor to arrive?

10

1   A.   Uh-huh.

2   Q.   Did that eventually occur?

3   A.   Yes.

4   Q.   Who was that person?

5   A.   Sergeant Hammoud.

6   Q.   After Sergeant Hammoud arrives, what happens next, if

7        anything?

8   A.   Explained the situation.

12

 9  Q.   Okay.  Did you observe anyone search the vehicle?

10           MS. OLMSTEAD:  All right.  Asked and
answered.

11           MR. SANDERS:  Well, I believe that was
before

12      the Sergeant's arrival.

13  BY MR. SANDERS:

14  Q.   Now the Sergeant is there.  Did you observe anyone

15      search the vehicle?

16  A.   Evidence techs processed him.  Whatever they find
is in

17      the vehicle.

18  Q.   So you observed evidence techs search the vehicle?

19  A.   Their findings, yes.

20  Q.   I'm sorry, my question is, did you observe the
evidence

21      techs search the vehicle?

22  A.   I didn't observe them search the vehicle, but I
observed

23      them process the scene.  So I'm assuming somebody
went

24      up and two officers searched the vehicle.

25  Q.   What do you mean by processed scene?


11


 1  A.   Take pictures, recover the false bottoms from the

 2      bottles, narcotics, money, et cetera.


13

3   Q.   I'm sorry.  You're saying narcotics were recovered at

4        the scene of the ––

5   A.   I didn't say recovered at the scene.  I'm just saying

6        paraphernalia, like false –– like what you call it?

7        Like water bottles with removable bottoms.

8   Q.   All right.  But my question is, again, you didn't

9        observe a search, is that accurate?

10  A.   Correct.

11  Q.   All right.  Now, on Exhibit 2, there are areas that are

12       apparently redacted.  It may have been highlights that

13       didn't come through in the copy.

14            Do you see where I'm referring to?  Two of

15       them, you've already testified to.

16            You stated that that –– you believe that was:

17       Get his inhaler.  Having trouble breathing.

18            Do you recall testifying to that?

19  A.   Yep.  Get his inhaler.

20  Q.   And you said this –– having trouble breathing.  And you

21       said that may be an asthma attack or something similar?

22  A.   May be asthma, yes.

23  Q.   Okay.  Then we continue reading.  The next line

says:

24        John Doe took one hit from his ──

25   A.   It should be inhaler.


12

1    Q.   Inhaler.  That's what's blackened there, correct?

2    A.   Correct.

3    Q.   Okay.  Do you know where the inhaler was found in the

4         vehicle?

5    A.   That, I don't know.

6    Q.   Who is David Andrews?

7    A.   Crime scene technician at the time.

8    Q.   Okay.  He was not in the vehicle with you that night

9         when you observed ──

10   A.   No.

11   Q.   Let me finish my question.

12   A.   Sorry about that.

13   Q.   He was not in the vehicle with you that night when you

14        first observed Mr. Reed's vehicle, is that accurate?

15   A.   Correct.

16   Q.   He came on the scene thereafter?

17   A.   Correct.

that

18   Q.   Okay.  Let me ask you this question:  You indicated

turn,

19        when you pulled behind Mr. Reed after making a u-

vehicle, is

20        that you could observe him moving within the

21        that accurate?

22   A.   Correct.

no

23   Q.   So in consideration of that, apparently, there was

24        issue with the tint of his rear window, correct?

back,

25   A.   Yes.  You could have -- from the passenger side on

13

can

1        you can have as much tint as you want to.  But you

you

2        see his -- you can see the frame of the person.  So

3        can see the statue of the person.

frame

4   Q.   So are you maintaining that you could only see his

5        through the rear window?

6   A.   Correct.

7   Q.   All right.  And so it was like a shadow, so to

8        speak --

9   A.   Yes.

10   Q.   -- is what you're maintaining you could see.  And

you

14

11      saw that shadow move?

12   A.   Yes.

13   Q.   Okay.

14              DEPOSITION EXHIBIT NO. 3

15              MARKED FOR IDENTIFICATION

16              2:12†P.M.

17   BY MR. SANDERS:

18   Q.   I'm showing you what's been marked as Deposition
Exhibit

19      3.   Are you familiar with the vehicle that's in the

20      photo?

21   A.   The Dodge Charger?

22   Q.   Yes.

23   A.   Yes.

24   Q.   Okay.   Is that the vehicle that Mr. Reed was
driving on

25      the night in question?


14

1   A.   I don't recall.

2   Q.   That photo was provided to me by your Counsel with
a

3      litany of other photos.

4   A.   Okay.

5   Q.   Do you recall the color of the vehicle?

know    6   A.   Red, orange.  I don't recall, specifically, but I

        7        it was a Dodge Charger.

see     8   Q.   Well, why don't you take a look at your report and

the     9        if that helps refresh your recollection as to what

       10        vehicle looked like.

       11   A.   Burgundy Dodge Charger.

       12   Q.   Okay.  All right.  So did your Counsel get it wrong

       13        giving me that photo?

       14   A.   No.  It's burgundy.

over   15   Q.   All right.  So that is the vehicle that you pulled

       16        on that day, is that accurate?

she    17   A.   It's a burgundy vehicle.  If that's the one that

       18        marked, then that's it.

that you 19 Q.   Okay.  And from the photograph, you would agree

       20        can clearly see through the front windows, correct?

       21   A.   It looks down, to me.

       22   Q.   The front windows?

see    23   A.   You're talking about the —— oh, the front.  You can

       24        the front.

be     25   Q.   Okay.  You're right, the side windows do appear to

15

of the    1    down. Do you know if there were any photos taken

2    side windows up?

3   A.   I don't.

purposes,    4   Q.   Okay. I want to show you, for identification

it.    5    the video that we have and see if you can identify

it    6    This video says Camera 2, 3/30/2015. And

can    7    begins at 9:31:27. And it says a.m. But as you

8    see, there's a streetlight there.

9    Does your report help refresh your

10    recollection as to what time the occurrence was?

But    11   A.   Since that shift starts at 7:00, it was after 7:00.

12    the report says --

13   Q.   Your shift starts at 7:00 p.m.?

14   A.   Yes. 7:00 p.m. So it was after 7:00 p.m.

it    15   Q.   Okay. So your -- let me ask you the question: Is

and    16    possible this time of 9:31, thereabout, is accurate

17    it should be p.m. instead of a.m.?

18   A.   It should be p.m.

you    19   Q.   Okay. Well, let's see if you can -- if we can get

20        to identify what's happening here.

21             If you can take a look at the video --

22             THE WITNESS:  I'm just trying to update
my

23        parking.

24             MR. SANDERS:  Sure.  I'll pause it.

25   BY MR. SANDERS:


16


1  Q.   Did you say this looks like the video that you
looked at

2        earlier when you said you observed a video?

3  A.   Yes.

4  Q.   Okay.  I'm going to pause it at approximately
9:33:03.

5        We see a burgundy vehicle enter into the side of
the

6        video.  Would that be accurate?

7  A.   Yes.

8  Q.   Okay.  And it's pulling under or near a
streetlight.

9        Would that be accurate?

10 A.   Yes.  I just thought it was a little lighter than
that,

11       but, yes.

12 Q.   So do you believe this time to be approximately the
time

20

13      of the occurrence, 9:33, probably p.m.?

14  A.   Maybe p.m.

15  Q.   Okay.  Now, I'm going to keep rolling it and then
I'm

16      going to pause it and ask you some questions.

17  A.   Okay.

18  Q.   Now, we see two individuals approaching the
vehicle.  Do

19      you know who those individuals are?

20  A.   Yes.

21  Q.   Who is the person -- and we're at 9:33:08.

22          Who is the person at the front passenger?

23  A.   Officer Carver.

24  Q.   Okay.  Now, there's someone at 9:33:13 who appears
to be

25      the rear passenger.


17

1  A.   That's me.

2  Q.   Now, someone approaches at driver's door.  Who is
that?

3  A.   Moreno.

4  Q.   And that is 9:33:20.

5          Now at 9:33:42, you'd agree with me that
both

6      front doors have been opened?

7  A.   Yes.

21

from

8   Q.   And it appears as though Mr. Reed is being removed

9        the vehicle.  Would that be accurate?

10  A.   Or actually gets out, yes.

with

11  Q.   Okay.  It appears as though there are two officers

accurate

12       their hands on him at this time.  Would that be

13       or inaccurate?

moved

14  A.   I don't know about hands on him, but I'm over -- I

15       from the passenger side to the driver's side.

you or

16  Q.   Okay.  And you have no recollection as to whether

time?

17       the other officer had your hands on him at this

18  A.   Correct.

19  Q.   So you would have allowed him to exit the vehicle

20       without placing your hands on him?

complied, I

21  A.   If we told him to get on the ground and he

and

22       wouldn't put my hands on him.  If he's getting out

23       crawling on the ground.

24  Q.   And he was doing this with his hands on his head?

25  A.   Well, I'm sure he took them off, but --

18

22

1   Q.   Did you order him to take his hands off his head?

2   A.   I didn't order anything.

3   Q.   Did you hear anyone else order him to take his

hands off

4        his head?

5   A.   I don't recall.

6   Q.   Looking at your report, you do agree that at some

point

7        while he was in the vehicle he was ordered to put

his

8        hands on his head, correct?

9   A.   Yes.

10  Q.   Okay.  I'm looking at the vehicle.

11            Now, at 9:33:56, would you agree with me

that

12       while someone's hands were on him, he was placed to

the

13       ground facedown?

14  A.   That he was on the ground?  I can't really tell

from

15       that photo.

16  Q.   Okay.

17  A.   I don't know if he's getting up or he's still down

18       there.  I can't really tell.

19  Q.   All right.  You couldn't tell whether or not he was

20       being placed to the ground?

21  A.   Well, I know he went to the ground.  But I just

can't --

23

```
22        I'm kind of having a hard time seeing it.

23   Q.   And who is that over by him as he's placed to the

24        ground?

25   A.   Officer Moreno.  And I made my way over there.
```

19

```
             1   Q.   One person is standing further away from the
vehicle
             2        than the other.  Is that you or Officer Moreno?

             3   A.   That's me further away.

             4   Q.   Now we're at 9:34:15.  What's going on here?

             5   A.   Probably double cuffing him or getting him up off
the
             6        ground.

             7   Q.   What do you mean by double cuffing?

             8   A.   Two sets of cuffs.  He's a big guy.  Some of them
aren't
             9        flexible.

problems    10   Q.   And was that –– had he told you he was having

            11        breathing before or after you cuffed him?

a           12   A.   I think while he was getting cuffed, he said, do me

            13        favor.

            14   Q.   Do him a favor and what?

now         15   A.   While he was on the ground, he said, do me a favor
```

24

16    and get his inhaler.

17  Q.   Okay.  Now, refresh my memory.  Who did you say got the

18    inhaler?

19  A.   I didn't really say.  I said I assumed, because he asked

20    Officer Carver to get it.

21  Q.   Okay.  So it's you and Moreno that's over here cuffing

22    him now?

23  A.   Yes.

24  Q.  So why do you say he asked Officer Carver to get it?

25    Because when he was on the ground with you and Moreno,

20

1    he said, do me a favor and --

2  A.   No.  He asked Officer Moreno, do me a favor and get my

3    inhaler.

4  Q.   Okay.  So he was speaking to --

5  A.   Officer Moreno.

6  Q.   In your opinion, Officer Moreno?

7  A.   Yes.

8  Q.   Okay.  Now, I just saw -- it looks like Carver going to

9    the backseat of the vehicle.

10  A.   Yes.

11  Q.   Why is he going into the backseat of the vehicle?

12  A.   Maybe checking for ──

13            MS. OLMSTEAD:  Objection, calls for

14   speculation.  But go ahead and finish the answer.

15            MR. SANDERS:  Well, they were acting together

16   as a team.

17            MS. OLMSTEAD:  Again, I just placed my

18   objection.  For the record, I can place my objection.  I

19   don't argue with attorneys.  I just ──

20            MR. SANDERS:  I'm not arguing with you.

21            MS. OLMSTEAD:  You're talking over me.

22            MR. SANDERS:  I'm just giving you the basis

23   for my ──

24            MS. OLMSTEAD:  Hold on.

25            MR. SANDERS:  I thought you were finished.


21


1            MS. OLMSTEAD:  I wasn't, because you were

2   interrupting me.  I'm placing an objection on the record

3   and you interrupted my objection.  I'm not ── I don't

26

4          —— for the record, I do not argue with attorneys at

5          depositions.  The purpose of me to place my

objection on

6          the record is for, if necessary, a judge to rule on

said

7          objection.  So please let me finish placing my

objection

8          on the record and I will, likewise, let you finish

9          placing any objections that you may have on the

record.

10         Thank you, sir.

11              MR. SANDERS:  Go ahead.

12              MS. OLMSTEAD:  I'm done.

13              MR. SANDERS:  I thought so.

14   BY MR. SANDERS:

15   Q.   Now, as I was saying, we're at 9:34:30 ——  and we

see

16         Carver in the backseat.

17              Do you have any knowledge as to why

Carver is

18         in the backseat?

19   A.   Maybe because he was reaching —— between activating

the

20         lights and him finally coming to a stop, he dipped

down

21         like three or four times to the right.

22   Q.   Is that illegal?

23   A.   No, it's not illegal.

24   Q.   Could he have been looking for his inhaler?

27

for          25                    MS. OLMSTEAD:  Objection.  Again, calls

22

             1     speculation.
the          2                    MR. SANDERS:  That's what he was doing in
             3     first place.
             4            THE WITNESS:  Who?
             5            MR. SANDERS:  You.
             6            THE WITNESS:  What?
             7  BY MR. SANDERS:
             8  Q.   You don't know what he was doing, do you?
what he      9  A.   I don't know what he was doing, but I can assume
             10    was doing.
             11 Q.   Okay.  But at this point, you have him handcuffed?
             12 A.   Uh-huh.
Why is       13 Q.   And he's saying he's having problems breathing.
him          14    Carver searching the vehicle, as opposed to getting
             15    some first aid?
             16            MS. OLMSTEAD:  Objection, calls for --
             17            THE WITNESS:  Maybe because --
now.         18            MS. OLMSTEAD:  I don't want to get at you

28

19          THE WITNESS:  Okay.

20          MS. OLMSTEAD:  Objection.  He lacks

personal

21     knowledge as to why Carver is doing whatever Carver

we

22     will see doing.  And so it calls for speculation.

23          You have Carver noticed up for a dep.

Ask

24     Carver.

25          You can speculate on why Officer Carver

was


23


1     doing what Officer Carver was doing, if you can.

2          THE WITNESS:  I don't know.  I didn't

even

3     know he was in the vehicle until you showed me the

4     video, so I don't know.

5  BY MR. SANDERS:

6  Q.   Really?  You had no idea what he was doing?

7  A.   No.  My focus was on the --

8          MS. OLMSTEAD:  Objection, asked and

answered.

9     At this point, you are badgering my witness.

10         MR. SANDERS:  Not at all.  It's cross

11     examination.

12         MS. OLMSTEAD:  This we will see a

29

discovery

13      dep, sir.  So you're doing a direct examination of
the

14      witness.

15                  MR. SANDERS:  This is cross exam.  He's
an

16      adverse witness.

17  BY MR. SANDERS:

18  Q.   Now, what's going on at this point, 9:34:50?  It
looks

19      like you and Moreno are doing what with --

20  A.   Helping him up to his feet.

21  Q.   Okay.  Are you able to identify on the video at
what

22      point the inhaler was retrieved?

23  A.   Once he got back to the car.

24                  MS. OLMSTEAD:  He asked on the video.

25                  THE WITNESS:  On the video, no, I don't.
I


24


1       can't.  On video, I can't.

2   BY MR. SANDERS:

3   Q.   Okay.  So we know that there was no inhaler
retrieved at

4       this point because he's not back to the car,
correct?

5   A.   Not off that, I don't know yet.  I don't know.


30

the

6  Q.  Well, I believe your testimony is the inhaler was

7      retrieved once he was back to the car, referring to

8      police vehicle, is that accurate?

9  A.  Yes.

10  Q.  All right.  He's not back to the car yet, correct?

11  A.  Correct.

12  Q.  And this is at 9:34:50.

13          Now, at 9:35:00, Mr. Reed we will see no

14      longer in our view, is that accurate?

15  A.  Yes.

16  Q.  Are you in the view?

17  A.  No.

18  Q.  Is Officer Moreno in the view?

19  A.  No.

20  Q.  Okay.  What are you all doing at this point?

21  A.  Back at the passenger side of the scout car.

22  Q.  Doing what?

23  A.  Waiting for his inhaler to get there.

24  Q.  And at 9:35:00, do we see Officer Carver?

25  A.  Yes.

25

1  Q.  Do you know what he's doing at that point?

31

2  A.   No.

see

3  Q.   So would it be accurate that at some point we will

are

4      Officer Carver leave our view and go to where you

5      with the inhaler?

I

6  A.   I believe he retrieved it, yes.  I don't recall —

7      believe he retrieved the inhaler.

video.

8  Q.   All right.  I'm going to continue to play the

know.

9      When you see that happening, I want you to let me

10  A.   Okay.

and

11          MS. OLMSTEAD:  I'm sorry.  Can we go back

at

12      verify exactly what time did you ask Officer to —

13      what point in the video did you ask him —

14          MR. SANDERS:  Well, I'm still waiting for

him

15      to identify when he sees Moreno going back to the

car

16      with the inhaler.

17          MS. OLMSTEAD:  Okay.  At what point did

you

18      ask him to start?

19          THE WITNESS:  I think we went back a long

time

20      ago.

21          MS. OLMSTEAD:  Yes.  Because we were

32

looking

22      for a long time.

23              THE WITNESS:  You went back a long time

ago.

24      He left a long time ago.

25  BY MR. SANDERS:


26

1  Q.   Okay.  Well, you didn't identify that for me.

2              MS. SIMMONS:  9:35.  He went to 9:35,

then

3      worked back.

4              MS. OLMSTEAD:  Thank you.

5  BY MR. SANDERS:

6  Q.   I believe I asked you at the point that we see you

leave

7      our view with Mr. Reed.  You're still in the view

with

8      Mr. Reed?

9  A.   Correct.  Leaving now.

10 Q.   Leaving now at 9:34:56.

11              MS. OLMSTEAD:  Where are you at, for

purposes

12      of the video.  Can you tell me, is that you,

Officer?

13              THE WITNESS:  No.  That's Carver.

14              MR. SANDERS:  He's outside.

15          MS. OLMSTEAD:  So that's Carver all in
the

16      back of the vehicle?

17          THE WITNESS:  Yes.

18          MS. OLMSTEAD:  Go ahead.

19  BY MR. SANDERS:

20  Q.  I want you to identify for me when you see what you

21      believe him bringing the inhaler that he took one
puff

22      from.

23  A.  I'll try.  It looks like he handed off and tossed
it

24      off.  I'm not sure, but it's kind of hard to tell.

25  Q.  So you don't know?


27


1  A.  I really don't know.  He might have tossed it to
him. I

2      don't know.

3  Q.  What you're saying is you cannot identify ——

4  A.  I cannot identify.

5  Q.  Let me finish my question.  You cannot identify in
this

6      video Officer Carver or anyone else retrieving the

7      inhaler for Mr. Reed?

8  A.  Correct.

9  Q.  All right.  Now, it's accurate that you did not

34

find any

10     weapons on Mr. Reed, correct?

11 A.   No weapons.

12 Q.   Nor did you find any weapons in the vehicle,

correct?

13 A.   Correct.

14 Q.   Now, what was the degree of the tint of the front

15     window?

16 A.   I don't recall.  I don't recall.

17 Q.   What do you mean?  You knew at some point, but you

don't

18     recall now?

19 A.   I don't recall.  He had tinted windows, but I don't

20     recall the darkness or the percent of it.

21 Q.   So you knew the percentage of the darkness at one

time?

22 A.   No.  I don't recall the percentage of it.  I just

know

23     he had tint on the windows.

24 Q.   Right.  So what I'm saying when you're telling me

you

25     don't recall, that means, to me, that at some point

you

28

1    knew, but now you can't remember.

2      You never knew, correct?

35

```
3   A.    Yes.

4             MS. OLMSTEAD:  Objection.  Asked ——

5             THE WITNESS:  I knew he had tint on the

6        windows.  But you asked me what was the percentage
 of

7        it.

8             MR. SANDERS:  Right.

9             THE WITNESS:  I don't know the percentage
 of

10       it.

11  BY MR. SANDERS:

12  Q.   And you never knew the percentage of it, correct?

13  A.   Correct.  I don't know the percentage of it.

14  Q.   And you had no basis or way of determining the

15       percentage of it at the time you pulled him over,

16       correct?

17  A.   No. Just tint.  Just tint on the windows.

18  Q.   You didn't have a meter that could read the tint on
 the

19       windows, did you?

20  A.   No.

21  Q.   Nor was anyone else equipped with such a meter,
 correct?

22  A.   Correct.

23  Q.   Okay.  And you didn't issue him a citation for
 that,

24       correct?

25  A.   I didn't issue no citation.
```

29

1   Q.   And truthfully, you couldn't have, because you
couldn't

2        determine whether or not he had an illegal tint.

3   A.   Yes, you can.  He had tint on the windows.  So,
yes, you

4        can.

5   Q.   How do you know that it's an illegal tint, unless
you

6        have --

7   A.   Because you can't have no tint on the passenger or

8        driver's side windows.  There's a strip -- unless
you

9        got a doctor's --

10  Q.   But the basis for you pulling him over was because
his

11       front window was tinted.

12  A.   Driver and passenger side window.  Not the
windshield.

13  Q.   Show me where that's in your report, or the PCR,

14       something about the driver and passenger side
windows.

15  A.   Might not be in mine.

16  Q.   All right.

17  A.   Right there.  Front driver.  Right there.  Front
driver

18       and passenger side.

19  Q.   Do you have any photos of that?

20  A.   No.

21  Q.   Okay.  And looking at your activity log, you

indicate

22      that it was the front window that was the basis for

23      pulling him over, right?

24  A.   Front driver/passenger side windows.

25  Q.   Wait.  I'm talking about --

30

1  A.   Right here.

2  Q.   Where it says investigating for tinted front

windows,

3      correct?

4  A.   Correct.

5  Q.   Okay.

6           MS. OLMSTEAD:  Where are you?  Was it

window

7      or windows?

8              THE WITNESS:  Windows.

9  BY MR. SANDERS:

the

10  Q.   But you still have no idea as to what the degree of

11      tint was, if at all?

12  A.   Correct.  I just know it was tint on there.

13  Q.   Correct.  And you would have no way of proving

38

that?

14  A.  As of now, no.  Unless they took photos of the

driver

15      front windows.

16  Q.  Okay.  And you had no tint meter on the day in

question?

17  A.  Correct.

18  Q.  All right.  And no citation was issued for tinted

19      windows?

20  A.  I have —— I think he was deceased, so it would be

kind

21      of ——

22  Q.  Right.

23  A.  You know.  It would be kind of disrespectful to do

that.

24              MS. OLMSTEAD:  Just answer the question

that

25      was asked.  No, no tint.


31

1              THE WITNESS:  No.  No.

2              MS. OLMSTEAD:  No tint violation ticket.

3  BY MR. SANDERS:

4  Q.  If the basis for pulling him over was his side

windows,

5      why wouldn't that evidence be preserved?

6              MS. OLMSTEAD:  Objection, calls for

35

7      speculation.   This Officer is not the officer that
was

8      the evidence tech.

9              MR. SANDERS:  Well, now you're
testifying.  If

10     that calls for speculation, that's fine enough.

11             MS. OLMSTEAD:  Okay.

12             THE WITNESS:  I wasn't the evidence tech.
I

13     don't know.

14  BY MR. SANDERS:

15  Q.   Did you tell the evidence tech the basis as to why
you

16     pulled him over?

17  A.   I don't recall.

18  Q.   Is it part of the policy, practice and procedure to

19     preserve the evidence that would, in your opinion,

20     constitute probable cause?

21             MS. OLMSTEAD:  Objection.  Again, lacks

22     personal knowledge.  He's not the officer that was

23     responsible for preservation of the evidence.

24             MR. SANDERS:  I understand that.  I'm
asking

25     him about the policy, practice and procedure for
the

32

40

```
 1          City of Detroit.

 2  BY MR. SANDERS:

 3  Q.   Do you preserve evidence that would have
constituted

 4          probable cause for your stop, particularly, in a
case

 5          where someone has died during the process?

 6  A.   You would preserve evidence.

 7  Q.   That would constitute probable cause, correct?

 8  A.   Probable cause for the stop was for the tint, yes.

 9  Q.   So that evidence should have been preserved,
correct?

10  A.   I assume.

11  Q.   All right.  And if it wasn't preserved, that would
be

12          contrary to the policy, practices and procedures of
the

13          City of Detroit?

14  A.   I don't know.  I wasn't the evidence tech.

15  Q.   I understand that, but you're a police officer.

16  A.   Uh-huh.

17  Q.   You can't have a case without evidence, right?

18  A.   They do -- they dust up -- best as most.

19  Q.   They do what with stuff?

20  A.   They have -- you can as much as possible, you know.
You

21          preserve as much as possible.  Nothing is perfect,
but

22          you can preserve evidence as much as possible.
```

41

23   Q.   Okay.   So you —— let's go off the record a minute.

24               MS. OLMSTEAD:   Okay.

25               (Recess at 2:41 p.m.)


33

1   MR. SANDERS:

2   Q.   Let me do one other thing.   My video that I have is
in

3        two parts, Video A and Video B.   I believe you

4        identified Video A.   I just want to show you what I

5        marked as B and see if you can identify this video.

6        This video starts ——

7               The video for the occurrence seems to be
in

8        two parts.   A part A and a part B.   I'm playing
part B

9        now, which begins at 10:00:07.   And I have it on
pause.

10              Do you see that?   And it looks like this
video

11       begins with the ambulance having arrived.   Do you
see

12       that?

13   A.   Yes.

14   Q.   Is this the occurrence on the date in question?
Can the

15       you identify that vehicle —— or this video?   And
let me

42

16     play it for you.

17  A.  Are you talking about the car, itself?

18  Q.  Yes.

19  A.  It looks like the same car.

20  Q.  Okay.  Does this look like the date of the

occurrence

21     that we've been discussing?

22  A.  Yes.

23  Q.  Do you recall that ambulance being parked there in

front

24     of the car?

25  A.  That, I don't recall.


34

1  Q.  You don't know?

2  A.  I don't know.

3  Q.  All right.  Were you on the scene when the

ambulance

4     arrived?

5  A.  Yes.

6  Q.  Because I think you previously testified you helped

put

7     the Plaintiff on the stretcher, is that right?

8  A.  By the car.  Not like -- like helping -- you know,

9     giving him the backboard.

10  Q.  Okay.

43

that 11          MR. SANDERS:  I'm going to mark or ask

12     these Videos A and B be marked as Exhibits 4 and 5.

Videos 13          Better yet, they're on one flash drive,

knowing 14     A and B.  Why don't we mark that as Exhibit 4,

drive. 15     that there's a part A and a part B to the flash

16          DEPOSITION EXHIBIT NO. 4

17          MARKED FOR IDENTIFICATION

18          2:45†P.M.

further 19          MR. SANDERS:  Back on the record.  No

20     questions.

21          MR. OLMSTEAD:  Okay.  No follow-ups.

22

23

24

25


35

1                    CERTIFICATE OF NOTARY

2

3     STATE OF MICHIGAN          )

4                              ) SS

5      COUNTY OF OAKLAND            )

6          I, Carol Dillon, Certified Shorthand Reporter,
a

7      Notary Public in and for the above county and
state, do

8      hereby certify that the above deposition was taken

9      before me at the time and place hereinbefore set
forth;

10     that the witness was by me first duly sworn to
testify

11     to the truth, and nothing but the truth, that the

12     foregoing questions asked and answers made by the

13     witness were duly recorded by me stenographically
and

14     reduced to computer transcription; that this is a
true,

15     full and correct transcript of my stenographic
notes so

16     taken; and that I am not related to, nor of counsel
to

17     either party nor interested in the event of this
cause.

18

19

20     _____

21     Carol Dillon RPR, CSR 2950

22     Notary Public,

23     Oakland County, Michigan

24  My Commission expires:  9-3-2022

25

45