# EXHIBIT 3

1                         UNITED STATES DISTRICT COURT,
2                         EASTERN DISTRICT OF MICHIGAN,
                                SOUTHERN DIVISION

3   Leda Reed, as the Personal
    Representative of the Estate of
4   Anthony Demone Clark-Reed

5              Plaintiff,
    vs.                                   Hon. Linda Parker
6                                         Case No. 18-10427

7   The City of Detroit, a Michigan
    Municipal Corporation,
    Officer Tracy Moreno,
8   Officer Robin Carver,
    Officer Eric Carthan, in their
9   official capacities and individually,
    Jointly and Severally,
10
               Defendants.
11   _____/

12          DEPOSITION OF POLICE OFFICER TRACY MORENO,

13   Taken by the Plaintiff on the 9th day of January, 2019,

14   at the offices of City of Detroit Law Department, at

15   Suite 500, CAYMC, 2 Woodward Avenue, Detroit, Michigan,

16   at 11:00 a.m.

17   APPEARANCES:

18   For the Plaintiff:     Mr. Herbert A. Sanders - P43031
19                          The Sanders Law Firm
                            615 Griswold St., Ste. 913
20                          Detroit MI  48226
                            (313) 962-0099
21                          haslawpc@gmail.com

22   For the Defendant:     Ms. Crystal B. Olmstead - P69202
                            City of Detroit Law Dept.
23                          2 Woodward Avenue, Suite 500
                            Detroit MI  48226
24                          (313) 237-5051
                            olmsteadc@detroitmi.gov

25   Reported by:           Shalaan K. Fisher, CSR-2284
                            (313) 881-3380

                                1

EX 3

1

TABLE OF CONTENTS

2        <u>WITNESS</u>:

PAGE

3    POLICE OFFICER TRACY MORENO

4    Cross-Examination by Mr. Sanders

3

5

6        <u>EXHIBITS</u>:

7    Plaintiff's Exhibit #1

28

8    Plaintiff's Exhibit #2

34

9    Plaintiff's Exhibit #3

37

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

```
 1                                Detroit, Michigan
 2                                Wednesday, January 9, 2019
 3                                11:00 a.m
 4                            -   -   -
 5                    POLICE OFFICER TRACY MORENO,
 6    HAVING BEEN CALLED BY THE PLAINTIFF AND SWORN:
 7                        CROSS-EXAMINATION
 8    BY MR. SANDERS:
 9    Q    Let the record reflect that this is the deposition of
10         Police Officer Tracy Moreno, taken pursuant to Notice,
11         to be used for all intents and purposes in the
12         United States District Court for the Eastern District
13         of Michigan, Southern Division, case number:  18-10427,
14         Leda Reed, et al versus City of Detroit, et al.
15              Good morning, Officer Moreno.
16    A    Good morning.
17    Q    I'm going to ask you a series of questions as it
18         relates to the lawsuit that I just referenced.  If at
19         any time you don't understand my question, please
20         indicate so, and if you need, I can rephrase or repeat
21         the question.  To the extent you do give an answer,
22         I will presume that you did understand the question.
23         I don't anticipates that we will be very long, however,
24         if at any time you would like to take a break, let me
25         know and I would be happy to accommodate that.
```

3

```
1              I would ask that if there is a question
2         pending, you would answer the question before we break,
3         okay?
4    A    All right.
5    Q    Excuse me.  I'm sure, you testified before.  So, I'm
6         sure, you understand that I need you to give verbal
7         responses to my inquiries.  To the extent you do as we
8         all occasionally do respond to the question by nodding
9         your head, shaking your head, saying "hm-hmm,"
10        "unh-unh," there is a potential that it won't be
11        recorded appropriately by the Court Reporter.
12   A    Understand.
13   Q    All right.  Would you state your full name for the
14        record?
15   A    Tracy Lee Moreno.
16   Q    And what is your date of birth?
17   A    March 4th, 1985.
18   Q    How long have you been employed with the City of
19        Detroit?
20   A    Since 7-Eleven of '08.
21   Q    And when you first became employed with the City of
22        Detroit, was that in the capacity of a Police Officer?
23   A    I was in the Detroit Police Academy --
24   Q    Okay.
25   A    -- as a student Police Officer.
```

4

| | | |
|---|---|---|
| 1 | Q | Okay.  Have you ever held any other title or position |
| 2 | | with the City of Detroit other than Police Officer? |
| 3 | A | No. |
| 4 | Q | What is your current rank? |
| 5 | A | I'm a Police Officer. |
| 6 | Q | And what is your current assignment? |
| 7 | A | Fourth Precinct. |
| 8 | Q | Patrol? |
| 9 | A | Special Operations for the Fourth Precinct. |
| 10 | Q | What does that mean? |
| 11 | A | Special Operations, it's a pro-active unit.  It usually |
| 12 | | -- |
| 13 | Q | It usually what? |
| 14 | | I am -- or sorry.  I didn't hear you. |
| 15 | A | Out of service. |
| 16 | Q | What does out of service mean? |
| 17 | A | Normally, we do not handle police runs unless it |
| 18 | | involves some sort of robbery or shooting. |
| 19 | Q | What does Pro-active Unit mean? |
| 20 | A | We are looking for narcotics, gang activity, weapon |
| 21 | | offenses. |
| 22 | Q | Did you review anything in preparation for your |
| 23 | | deposition today? |
| 24 | A | I looked at my report that I prepared for this |
| 25 | | incident. |

5

1  Q    Did you review anything else?

2  A    I reviewed a video of the stop.

3  Q    Anything else?

4  A    No.

5  Q    I believe, the date of the occurrence was on or about

6       March 30th, 2015.

7            Was that accurate to the best of your

8       recollection?

9  A    I believe so.

10 Q    What capacity were you working in on that day?

11 A    I was working Special Operations Code 433.

12 Q    And what does that mean?

13           Is that what you previously described to me?

14 A    Yes.

15 Q    Okay.  So, it was the same?

16 A    Same job function.

17 Q    Same job function.  All right.

18           What does Code 433 --

19 A    Car #33 from the Fourth Precinct.

20 Q    Now, you said that in that capacity, you are looking

21      for narcotics gangs, weapons.

22           Explain to me how you are doing that or

23      performing that function.

24 A    Well, from our observations, sometimes we drive down

25      the street.  We can see hand-to-hand transactions or

6

1       investigate for traffic offenses and conduct street

2       investigations.

3    Q  So, do I understand by your testimony that part of your

4       function in the capacity of a Special Ops. Officer is

5       to look for traffic violations and investigate traffic

6       violations?

7    A  It's still part of the laws.  Yes.

8    Q  I'm sorry?

9    A  Yes.

10   Q  And pursuant to looking for traffic violations, do I

11      understand, your testimony would be that you would be

12      pursuant to a traffic stop seeking to find narcotics

13      and/or weapons violations?

14   A  If the investigation lead that way.  Yes.

15   Q  But that was your function in the capacity that you

16      were serving, correct?

17   A  I'm sorry.

18   Q  I guess, I'm having a problem distinguishing your

19      capacity on that day from that of a regular Patrol

20      Officer.

21          Can you help me with that distinction?

22   A  I guess, you could say, my primary function would be to

23      do those weapon, narcotics, wanted person

24      investigations, and yes, I can use traffic to do that.

25   Q  Okay.

7

1   A   If that --

2   Q   And how would you use traffic to do that?

3   A   You would stop people pursuant to defective plates,

4       lamps, taillights, failing to use turn signals, tinted

5       windows, disregarding stop signs or red light.

6   Q   Okay.

7   A   That gives you the legal stop.

8   Q   And then what?

9   A   Depends on the observations.

10  Q   So, in other words, you are looking for a legal basis

11      in which to stop individuals and then based upon your

12      observations, you are attempting to investigate whether

13      or not they have committed other crimes such as a

14      weapons or narcotics offense; would that be accurate?

15  A   That's possible.  Yes.

16  Q   That's possible, or is that accurate?

17  A   I would say, it's accurate.

18  Q   I'm looking at your report, which I believe, you

19      indicated, you previously reviewed, and as you

20      testified, it says Scout 433 in marked scout car.

21          Can you describe to me the vehicle you were in?

22          What does it mean when it says, "marked Scout

23      car"?

24          Is that a car that had lights on the top of it

25      and "Detroit Police" written on the side or is it a --

8

1     one of the black vehicles that we might be familiar

2     with that has lights on the front?

3          What were you in?

4  A  On that particular day, we were using the traffic

5     vehicle.  I can't remember the code of that vehicle,

6     but you do know, it was a white Ford, Crown Victoria.

7     It had "Detroit Police" on both, the driver's side door

8     and passenger's side front door.  I believe, it may

9     have said, "Traffic Enforcement" on one of the -- or

10    both of the front quarter panels.  It did have lights

11    that were inside the vehicle as opposed to a light-bar

12    on top.

13  Q  And refresh my memory:  Were you the driver on that

14    day?

15  A  I was.

16  Q  If I'm not mistaken, your encounter with the Decedent

17    was at or about 9:00 p.m.

18          Was that accurate?

19          Does that refresh your recollection?

20  A  I believe, it was a little closer to 9:30, but yes.

21  Q  And what time did your shift begin on that day?

22  A  I believe, 7:00 p.m.

23  Q  Now, your report indicates that you were in a modified

24    uniform.

25          What does that mean?

1   A   Typical patrol uniform is the blue shirt, blue pants.
2       At that time, I can't remember if we had gone to the
3       felt patches or the -- or still had a name tag and
4       badge affixed.  Special Operations Uniform is black
5       Polo shirt, short or long sleeve, and green cargo
6       pants.
7   Q   With the shirt, was your badge sewn onto the shirt?
8   A   Yes.  Name.  Name, badge number.  It's a belt badge,
9       patch, I guess, you could say.
10  Q   And how were you equipped?
11  A   Can you further explain your question?
12  Q   Sure.  Did you have handcuffs?
13          Did you have firearm on you?
14          What other type of equipment, if any, did you
15      have?
16  A   I had my duty belt -- duty belt which had department
17      issued side arm, handcuffs, pepper spray and a radio.
18  Q   What type of firearm did you have?
19  A   I believe, we had made the transition Smith and Wesson,
20      M & P40.
21  Q   Now, there were two other officers in the vehicle with
22      you, correct?
23  A   Correct.
24  Q   Okay.  Other than the weapons that the other officers
25      may have had on their person, did you have any other

10

1     weapons in the vehicle?

2  A  No.  Maybe, a shotgun in the trunk.  I can't recall.

3  Q  Now, would it be accurate that at the time you

4     encountered the Decedent, he was traveling west on

5     Vernor Street?

6  A  The first time I viewed him, he was actually stopped at

7     a stop light, facing west.

8  Q  Okay.

9  A  On Vernor at --

10 Q  At what?

11 A  At Mullane, M-u-l-l-a-n-e.

12 Q  Okay.  He was at the stop light, heading west on

13    Vernor.  I assumed, the light was red for him, and he

14    was stopped at that light.

15        Would that be accurate?

16 A  That is correct.

17 Q  Okay.  Would it be also accurate that you were driving

18    east on Vernor when you first observed him?

19 A  No.

20 Q  Which direction were you headed?

21 A  I was on Mullane Street travelling north.  I made a

22    right turn, heading east on Vernor, at which time, I

23    observed his vehicle with the tinted windows and I made

24    a U-turn behind him.

25 Q  And what about observing his vehicle with tinted

11

1      windows caused you to make a U-turn?

2  A   The tinted windows on the front two windows,

3      specifically, the driver's side window which is what I

4      could see is in violation of city and state ordinance

5      which is that only the top 4" can be tinted whereas his

6      entire window was tinted.

7  Q   You observed --

8         Well, was this a two-door or four-door car?

9  A   Four.

10  Q   And you made an observation of the driver's side

11      windows and which window are you maintaining was not in

12      compliance with the law?

13  A   Driver's side.  Driver's side front window.

14  Q   And what degree of tint did this window allegedly have?

15  A   I'm not a tint expert.  It was tinted more than the top

16      4" which is in violation.

17  Q   It was tinted more than the top 4", so, are you saying,

18      the window below 4" was darker than the window at the

19      top?

20  A   The entire window was tinted, I don't know what

21      percentage, I guess, you could say, is the tint.  I'm

22      not familiar with tints.

23  Q   Okay.  And based upon -- well, reviewing the report and

24      taking Eric Carthan's deposition, would you agree with

25      me that you, nor anyone else had any device in which to

1    measure the tint on the windows?

2  A    I know that an entire window is more than 4" and if an

3       entire window is tinted, it is in violation.  So, I did

4       not need to measure it.

5  Q    Just answer the question.

6  A    I'm sorry.

7  Q    What I need is -- and I'm not talking aobut the number

8       of inches that may have been tinted, I'm asking, did

9       you have any device in which to measure the degree of

10      the tint of the windows?

11 A    No.

12 Q    And you have no idea what degree the tint of that front

13      passenger window was, correct?

14 A    The front passenger window?

15 Q    The front driver's side window.  Excuse me.

16 A    No.  I don't know what degree it was.

17 Q    Okay.  And do you have any knowledge as to what degree

18      of tint would be considered illegal?

19 A    Degree, no.

20 Q    You would agree with me that having a driver's side

21      front tinted window, as you have described, is a civil

22      infraction?

23 A    That's correct.

24 Q    And what is the penalty for that civil infraction?

25 A    I'm not sure what the fine is.  I know, it is a fine.

13

1           Whether it's a --

2                   MS. OLMSTEAD:  Just answer the question he is

3           asking you.

4                   THE WITNESS:  It's a fine.

5   BY MR. SANDERS:

6   Q    Is it an arrestable offense?

7   A    No.

8   Q    Now, it's my understanding that you made a U-turn and

9        got behind the charger; is that accurate?

10  A    That's correct.

11  Q    From your report, it appears as though once you got

12       behind the charger that you did not immediately

13       activate your light and/or siren.

14                   Is that accurate?

15  A    That's correct.

16  Q    At the time you got behind the charger, was the light

17       still red heading west on Vernor?

18  A    Correct.

19  Q    All right.  How long were you behind the charger while

20       the light was red?

21  A    I can't say for sure.  No more than a minute, maybe.

22  Q    What is the speed limit on Vernor?

23  A    In that area, I believe, it's 30.

24  Q    Now, the charger, I presume, the light turned green at

25       some point?

14

1  A    Correct.

2  Q    And the charger began to pull away.

3            Would that be accurate?

4  A    Correct.

5  Q    How long after the charger began to pull away did you

6       activate your siren and/or lights?

7  A    Within three to five seconds.  I waited for us to clear

8       the intersection.

9  Q    Before the charger pulled away from the red light, how

10      close were you to the vehicle?

11 A    I'm sorry.

12 Q    Before the charger pulled away from the green light,

13      how close were you to the vehicle?

14 A    We were right behind it.  I was not on it's bumper, but

15      --

16 Q    Was there a car lane, two car lanes between?

17 A    I would say, maybe, ten feet.

18 Q    Now, did you initially activate your lights or your

19      siren?

20            What did you initially do?

21 A    I initially activated the lights.

22 Q    And what does that consist of?

23 A    There is a toggle switch in the car, and I moved it all

24      the way over, so, all the lights would activate.

25 Q    And I believe, you have already testified to this, but

1    again, could you describe for us once you quote,

2    unquote (sic) activate the lights, what is going on

3    with the car?

4            Where are these lights and what are they doing?

5  A  They are on that particular vehicle, lights all along

6    the top of the windshield, red, blue and white.  The

7    lights in the head headlights and turn signal area also

8    flash back and forth and the rear of the vehicle is

9    very similar.

10 Q  At that time, when you activate the lights, how close

11   are you to the charger?

12 A  Maybe, a half car length to a car length.

13 Q  How many lanes are there on Vernor?

14 A  One lane each way and a parking lane on the side.

15 Q  So, I would presume, the charger was in the driving

16   lane; not the parking lane at the time it was at the

17   red light?

18 A  Correct.

19 Q  And after you -- Well, were there cars parked along the

20   parking lane?

21 A  I can't recall.  There may have been.

22 Q  Do you recall any particular businesses or landmarks

23   that were along in that area?

24 A  There is a school right there, at Vernor and Mullane

25   where the red light is.  It just changed, but there was

16

1      a CVS right near that corner and an O'Reilly's on the

2      corner, across the street and that as you continue

3      westbound, there is a liquor store right there, on

4      Lawndale, Vernor and Lawndale and some apartments and

5      libraries, a library.

6  Q  You said, the liquor store was on Vernor and --

7  A  The liquor store is just at Vernor and Lawndale,

8      L-a-w-n-d-a-l-e.

9  Q  The charger pulls away from the green at the

10     intersection when the light turns green.  You testified

11     that the first thing you do thereafter is activate your

12     lights.

13           How long after activating your lights do you

14     activate your siren or do you activate your siren?

15  A  I activated the siren and probably had gone about a

16     block-and-a-half.  When the vehicle did not stop, I

17     activated my siren.

18  Q  From the time you activated your lights until the time

19     you activated your siren, did the vehicle change lanes?

20  A  No.

21  Q  Would it be accurate that during that stint in time,

22     the vehicle was driving at the speed limit or less?

23  A  That's accurate.

24  Q  Would it be accurate that from the time in which you

25     activate your lights, the vehicle did not attempt to

17

1       elude you?

2   A   I can't be sure, because it did not stop for about six

3       blocks, and I know, within that six blocks, he could

4       have pulled over at any time.

5   Q   Is it possible that he did not know that it was him,

6       you were seeking to pull over?

7   A   We were the only cars.  Traffic was very light and we

8       were directed behind him.

9   Q   Couldn't activating your lights mean that you are

10      attempting to make a run somewhere else?

11  A   Yes.

12  Q   Could activating your lights mean that there is some

13      hazard that you have become aware of on the road?

14  A   Yes.

15  Q   But he didn't accelerate, correct?

16  A   Not excessively.  No.

17  Q   Not above the speed limit, correct?

18  A   Correct.

19  Q   He didn't turn down any side streets, correct?

20  A   Correct.

21  Q   All right.  Now, after you activate your lights, would

22      it be accurate that pursuant to your police report, you

23      can clearly see inside the vehicle?

24          MS. OLMSTEAD:  Objection.  I'm just going to

25      say that it lacks foundation, but you can answer the

1          question, if you can.

2                 THE WITNESS:  Can you repeat that?

3     BY MR. SANDERS:

4     Q     Let me just characterize and say, any question I ask

5           you, I only want you to answer it if you can.

6     A     Okay.

7     Q     You know, sometimes we use that as code words that

8           says, "Don't answer the question."

9                 If you can, there is not a --

10                "I don't want you to answer."

11                MS. OLMSTEAD:  I'm just going to place an

12          objection on the record as to Counsel's

13          characterization and attempt to --

14                In my opinion --

15                Let's move on.  Go ahead.

16    BY MR. SANDERS:

17    Q     I don't want you to answer any question if you can't

18          answer the question.  I'm anticipating, you are going

19          to say, "I don't know," or "I don't..." -- I cannot

20          answer the question.

21    A     Could you reask your question?

22                I'm sorry.

23    Q     Sure.  You could clearly see within the vehicle once

24          you got behind the charger, correct?

25    A     Clearly?

19

1          No.

2    Q    You made some observations in your report as to what

3         was allegedly going on inside the vehicle; is that

4         accurate?

5    A    Yes.

6    Q    So, you saw well enough to make observations as to what

7         you believe was going on inside the vehicle, correct?

8    A    Yes.

9    Q    Do you have an opinion as to whether --

10             Let me ask you this:  The observations that you

11        made as it relates to what was going on inside of the

12        vehicle, through what window did you observe that

13        activity?

14   A    The rear windshield.

15   Q    Do you have an opinion as to whether or not the rear

16        windshield was the same tint as the side window that

17        caused you to pull the vehicle over, darker or lighter?

18   A    I can't answer that, because I don't know.

19   Q    Do you have an opinion as to whether or not the rear

20        window was an illegal tint?

21             MS. OLMSTEAD:  Asked and answered.

22             MR. SANDERS:  That's a different question.

23             THE WITNESS:  As the rear window is concerned,

24        I don't know.

25   BY MR. SANDERS

20

```
 1  Q    Once you get behind the vehicle, what, if anything, do
 2       you observe in going on inside the vehicle?
 3  A    I was able to use my spotlight to flash or to
 4       illuminate or to attempt to illuminate the vehicle
 5       also.
 6  Q    All right.  Let me ask you a question about that.
 7  A    I'm sorry.
 8  Q    You turned on a spotlight to illuminate the vehicle
 9       when?
10  A    When the vehicle did not stop, I couldn't tell you.
11       I'm not sure if it was the second block, third block,
12       but --
13  Q    Okay.  So, the stop light was not turned on before the
14       lights that you would put on that you described, a red,
15       white and blue?
16  A    Correct.
17  Q    Okay.  The stop light or the -- Excuse me.  The
18       spotlight was not turned on before the siren was turned
19       on, correct?
20            Or was it?
21  A    I can't recall.  I believe, the siren was first.
22  Q    And then based upon your belief and recollection, the
23       spotlight was turned on and what, if any, observation
24       did you make?
25  A    I was able to see a shadow from inside of the vehicle,
```

21

1         a silhouette, if you would, of reaching motions coming
2         from the driver's seat over toward the passenger area
3         of the vehicle.
4    Q    Did you observe anything else?
5    A    It looked that he -- the driver had done this at least
6         three to four times before pulling over.
7    Q    Anything else you observed?
8              Did you observe anything else?
9              I just want to make sure, I have exhausted your
10        recollection as to what you observed when you were in
11        your vehicle, behind the charger.
12   A    Just the reaching motions, several reaching motions
13        several times over to the passenger compartment.  Like
14        I said, I only saw a shadow.
15   Q    All right].  And when you say, the "passenger
16        compartment," I assume, you are referring to what might
17        be commonly known as the "glove compartment"?
18   A    I can't say for sure.
19   Q    Okay.
20   A    But the passenger's side of the vehicle.
21   Q    To the passenger's side of the vehicle?
22             All right.  At some point, the vehicle comes to
23        a stop, the charger; is that accurate?
24   A    Yes.
25   Q    All right.  And did it come to a stop in the driving

                              22

1          lane or in the parking lane?

2     A    Parking lane.

3     Q    So, would it be accurate that the vehicle was legally

4          parked?

5     A    At that time, yes.

6     Q    After the vehicle comes to a stop, what happens next?

7     A    I, along with my partners exited our vehicle.  We began

8          to approach.

9     Q    Was your weapon drawn?

10    A    No.

11    Q    What happens next?

12    A    I shout verbal commands to the person inside the

13         vehicle, the driver.

14    Q    What was your verbal command that you shouted?

15    A    To put all the windows down.

16    Q    Did he comply?

17    A    Yes.

18    Q    Where were you at when you were giving these commands?

19    A    Near the front, the front tire, quarter panel of my

20         vehicle.

21    Q    Where were your partners?

22    A    They were -- Officer Carver was on the passenger's side

23         of our vehicle near the front half and I'm not exactly

24         sure where Officer Carthan was at the time, but he was

25         behind both of us, I can tell you.

23

1    Q    Now, you have shouted a command to roll down the
2         window.  You indicated, he complied.
3              What next?
4    A    I slowly began to approach the vehicle, still giving
5         verbal commands.
6    Q    What verbal commands were you giving as you approached
7         the vehicle?
8    A    I asked the driver to place his hands on the back of
9         his head and interlock his fingers.
10   Q    Did he comply?
11   A    At first.
12   Q    What happened next?
13   A    I began to approach, and as I approached, the driver
14        moved his right hand down, out of view.  So, I stopped
15        and gave verbal commands, again.
16   Q    And you gave a verbal command to do what?
17   A    To place his hands on the back of his head.
18   Q    What happened next?
19   A    He put his hands on the back, both hands on the back of
20        his head.
21   Q    Then what happened?
22   A    I again slowly approached the vehicle.
23   Q    Where were you at when you gave the second verbal
24        commands to place your hands on the back of your head?
25   A    I was about the rear tire of his charger.

                            24

1  Q    Okay.

2  A    Rear driver's side tire.

3  Q    You then approached the vehicle and what happened next?

4  A    I made contact with the driver.

5  Q    Okay.  So, when you made contact with the driver, would

6       it be accurate that you were at the driver's side door?

7            Would that be accurate?

8  A    Pretty close to it.  Yes.

9  Q    What is the lighting on the street at this time?

10 A    It's -- the sun was setting.  It was dark lighted.  The

11      sun was going down to the west.

12 Q    Was there a street light in the area?

13 A    I believe so.

14 Q    Okay.  And did you still have your spot light on the

15      vehicle?

16 A    Yes.

17 Q    So, would it be accurate that at that moment when you

18      are standing next to the vehicle and the driver is

19      there with his hands on his head, that you can clearly

20      see inside the vehicle?

21 A    Using a flashlight, yes.

22 Q    Did you have a flashlight?

23 A    Yes.

24 Q    Did you use your flashlight?

25 A    Yes.  I believe so.

25

1   Q   Did you look inside the vehicle?

2   A   I was more focused on him at the time.

3   Q   Okay.

4   A   I was looking at the driver.

5   Q   All right.  Did you look inside the vehicle?

6   A   Just the driver.

7   Q   All right.  So, you made no observation as to their

8       surroundings, but kept your eyes pinned on his head?

9   A   Hands and head for the most part.

10  Q   On his hands and his head, and his hands were on his

11      head?

12  A   Correct.

13  Q   And you had your flashlight shining where?

14  A   In his direction.  It was -- It's a pretty big beam, so

15      --

16  Q   Okay.  In his face?

17  A   No.  From behind.

18  Q   From behind?

19  A   Yes.

20  Q   All right.  Where are your partner's at this time?

21  A   The passenger's side of his vehicle.

22  Q   And when you say, "passengers side," at the front of

23      the vehicle or the rear of the vehicle?

24  A   I believe, the side doors near the passenger's side

25      doors.

26

1    Q    Passenger's side doors, so that would be the front

2         passenger's side and the rear passenger's side; is that

3         accurate?

4    A    That would be accurate.

5    Q    Okay.  Did your partners have their flashlights, also?

6    A    Yes.

7    Q    And where would their flashlights shine?

8    A    I can't answer that.

9    Q    All right.  If you had been in their position, where

10        would your flashlights have been shining?

11   A    All throughout the vehicle.

12   Q    All right.  And what would the purpose of them standing

13        on the side of the vehicles have been while you were

14        standing next to the driver's side?

15   A    Providing cover for me.

16   Q    And as they shine their flashlights all throughout the

17        vehicle, what would they be looking for, if anything?

18   A    Weapons and/or narcotics.

19   Q    And would it be accurate that through their observation

20        and your observation of the vehicle, there were no

21        weapons and/or narcotics found?

22   A    I'm sorry.  Say that, again.

23   Q    Sure.  There are three officers standing next to the

24        vehicle.  You are at the driver's side with your

25        flashlights shining inside, two other officers with

27

1     their flashlights shining inside.

2          My question is did either of you see any

3     weapons or narcotics?

4  A   I do not believe so.

5  Q   And we are still at the point that this person is being

6     pulled over for a civil infraction, correct?

7  A   Correct.

8  Q   All right.  What happens next?

9  A   Due to his action, of him reaching over to the

10    passenger's side compartment of the vehicle and --

11  Q  Okay.  Go ahead.  I'm sorry.

12  A  And him not stopping for six blocks and his inability

13    to comply with my verbal commands of keeping his hands

14    behind his head, I had him step out of the vehicle.

15  Q  You just described some things that you say caused you

16    to have him step out of the vehicle.

17         Did any of those things you described

18    constitute a crime?

19  A  No.

20  Q  Which streets were you between at the time the vehicle

21    stopped?

22  A  Lawndale and Cabbot.

23        (At 11:33 a.m., Plaintiff's Exhibit #1 was

24          marked for identification.)

25  Q  I would like to show you what has been marked as

1          Deposition Exhibit #1.

2                  Can you take a look at that?

3                  MS. OLMSTEAD:  Do you have copies for me?

4                  MR. SANDERS:  No.  I don't.  I'm sorry.

5                  Do you mind sharing or do you want to take a

6          break and make a copy?

7                  MS. OLMSTEAD:  Yes.  I'll take a break.

8                  (At 11:34 a.m., a break was taken.)

9   BY MR. SANDERS:

10  Q     Okay.  Are you familiar with that document?

11  A     It is the first time seeing this document, but it's a

12        map.

13  Q     Okay.  And are you familiar with the area that appears

14        to be a map of?

15  A     Yes.

16  Q     Does it appear to be an accurate map?

17  A     That is what I'm looking at, but yes.

18  Q     Okay.  If you see Vernor Highway, correct?

19  A     Hm-hmm.

20  Q     And you see Lawndale Street, correct, which intersects

21        with Vernor?

22  A     Hm-hmm.

23  Q     All right.  Can I ask you to draw on the map an arrow

24        and pointing which way west would be?

25                 Do you need a pen?

29

```
 1              You got it?
 2  A    Points which way?
 3              West is --
 4  Q    Yes.  Now, can I ask you to mark an "A" where the
 5       charger was when it was sitting at the red light and
 6       you were sitting behind it?
 7              And then can I ask you to mark a "B" where the
 8       charger ultimately pulled over?
 9              Can I take a look at what you have done?
10              Do you want to take a look now?
11              MS. OLMSTEAD:  Is this -- I don't even see any
12       marks, okay?
13              THE WITNESS:  See, right here, A and B?
14              MS. OLMSTEAD:  Okay.
15  BY MR. SANDERS:
16  Q    Now, I believe when we last left off and we were
17       discussing, you and your partners were out of the
18       vehicle.  I had your flashlights shining within the
19       vehicles.  You had already given a command to roll down
20       all the windows and place your hands on your head?
21  A    Correct.
22  Q    What happened next?
23  A    After the verble commands were given for him to place
24       his hands on his head and he had moved his hands back
25       -- his right hand back down, I gave him a second verbal
```

30

1       command to put it back.

2    Q  Did he comply?

3    A  Yes.

4    Q  But then you testified about that.

5            What happened next?

6    A  He did one more time where he just moved his right

7       hand, so, I had to tell him the second time to put it

8       back.

9    Q  Okay.  And where were you at when this was occurring?

10   A  Closing distance from the back rear tire of the charger

11      to the door.

12   Q  All right.  Well, I want to talk about now from the

13      point in which you are, I believe, at the driver's side

14      window, all right?

15           When you are at the driver's side window, his

16      fingers are in an interlock and his hands are on his

17      head, right?

18   A  Correct.

19   Q  What happens next?

20   A  I did see that the driver was a very large individual.

21   Q  When you say, "very large," how would you describe him?

22           Would you agree with me, he was over 300

23      pounds?

24   A  Yes.

25   Q  Morbidly obese?

                              31

1   A   Yes.

2   Q   What happens next?

3   A   I had him step out of the vehicle.

4   Q   All right.  So, this 300 pound man has his hands on his

5       head and he is getting out of a charger?

6   A   I'm sorry.  Can I backtrack?

7   Q   Okay.

8   A   I had him shut the vehicle off.

9   Q   You had him shut the vehicle off?

10          Now you have him step out of the vehicle while

11      maintaining his hands on his head; is that accurate?

12  A   That is correct.

13  Q   What happens next?

14  A   I had him get onto the ground after he exited the

15      vehicle.

16  Q   Okay.  And his hands are still interlocked behind his

17      head; is that accurate?

18  A   Yes.

19  Q   All right.  And when you say, you had him get on the

20      ground, how is he on the ground?

21  A   First, he went to his knees and then onto his belly or

22      his stomach or chest.

23  Q   And at this time, his fingers are still interlocked

24      behind his head; is that accurate?

25  A   I believe, he might have had one hand out to lower

32

1      himself to the ground, but that was it.

2   Q   You indicated in your report that he put one hand out

3      to lower himself to the ground?

4   A   I don't believe so.

5   Q   Okay.  I don't believe so, either.

6          So, he goes to his knees and then he goes to

7      his stomach on the ground.

8          Then what happens next?

9   A   I began to stand over him.

10  Q   Okay.

11  A   And I ended up taking his left and right hand, pulling

12     them back to his small of his back area, because he was

13     a very large individual.  For a brief moment, I was on

14     him, going from left to right to secure his left and

15     right wrist with handcuffs.

16  Q   Okay.  What do you mean, you were on him?

17  A   I might have sat on the small of his back area right

18     above the buttocks.

19  Q   And you sit on the small of his back, above his

20     buttocks.

21         What happens next?

22  A   He was handcuffed --

23  Q   Okay.

24  A   -- once.

25  Q   Let me stop you right there.

33

1           During the process of you handcuffing him, he
2      requested that you give him his inhaler.
3           Isn't that accurate?
4   A   Yes.
5   Q   Okay.  And would it be accurate that he was laboring to
6      breathe at that time --
7   A   Not at that time.
8   Q   -- in your observation?
9   A   Correct.
10  Q   So, before he is handcuffed, he indicates that he would
11     like his inhaler.
12          You continued to handcuff him, correct?
13  A   Correct.
14  Q   What happens next?
15  A   After he was handcuffed, I, along with Officer Carthan,
16     assisted him in getting him back up to his feet.  He
17     was not on the grounds more than five to eight seconds.
18     He was searched for weapons.  None were found, and we
19     walked back to the passenger's side front tire of our
20     scout car.
21          (At 11:39 a.m., Plaintiff's Exhibit #2 was
22           marked for identification.)
23  Q   I would like to show you what's been marked as
24     Deposition Exhibit #2.
25          Are you familiar with that document?

34

1  A    This appears to be a copy of my report.

2  Q    And it appears that there were some highlights made on

3       the report that alternately resulted in redactions when

4       the report was copied?

5  A    Okay.

6  Q    Do you agree with me?

7  A    I'll agree with you.

8            MS. OLMSTEAD:  Objection; lacks foundation.

9            Go ahead.

10           MR. SANDERS:  I mean, Counsel, you would

11      stipulate that there are some redactions on the report,

12      correct?

13           MS. OLMSTEAD:  I'm going to say, lacks

14      foundation.  I'm not going to argue with you, but I'm

15      going to say, lacks foundations.

16           Who made the redactions?

17           Does he know what a redaction is?

18           I want to lay the foundation for that.

19           MR. SANDERS:  I think, he knows who made it.

20      He answered the question.  So, I assume, he knows what

21      it is.  Remember what he first said.  I said, if you

22      answer a question, my assumption is you understood the

23      question.  So, all right.

24           MS. OLMSTEAD:  Hm-hmm.

25

35

1   BY MR. SANDERS:

2   Q     The first area where I see a redaction, I'm going to

3         begin to read that sentence that -- and I want you to

4         assist me to the best of your recollection of telling

5         you what that --

6               MS. OLMSTEAD:  Can we -- Let me take a quick --

7         Sorry to interrupt.  Is this copy of this document the

8         copy that you received from my office in response to

9         discovery request?

10              MR. SANDERS:  I don't know.

11              MS. OLMSTEAD:  Because if you need an

12        unredacted copy, this is an --

13              The issue I take with your line of questioning

14        as far as foundation --

15              MR. SANDERS:  Sure.

16              MS. OLMSTEAD:  I don't know where this came

17        from and you should not have received a redacted copy.

18        There is no reason for anything to be.

19              MR. SANDERS:  Well, if you have a copy that is

20        not redacted, that would save us a lot of time.

21              MS. OLMSTEAD:  You could have simply asked that

22        question, because you don't -- I don't know where this

23        came from, foundation.  I don't know if your office did

24        this.

25              MR. SANDERS:  We are at that point.

                              36

1            Do you have a copy that's not redacted?

2            MS. OLMSTEAD:  I do.

3            MR. SANDERS:  Can we have it?

4            MS. OLMSTEAD:  That would have been a much

5     easier question rather than asking my officer these

6     questions.

7            MR. SANDERS:  At that point, he has got to go,

8     I know.  If you have it, that's fine.

9            MS. OLMSTEAD:  12A.

10           (At 11:42 a.m., a break was taken.)

11           We can go back on.

12           Just let the record reflect that the full

13    police report -- all police reports that were

14    previously provided and discovered at least twice are

15    now being provided, again, for the purposes of the

16    deposition unredacted.

17           MR. SANDERS:  At least twice now.  I don't know

18    about that now, okay?

19           What I am going to --

20           (At 11:42 a.m., Plaintiff's Exhibit #3 was

21           marked for identification.)

22 BY MR. SANDERS:

23 Q    All right.  I'm going to show you what's been marked as

24      Deposition Exhibit #3.

25           Are you familiar with that document?

37

1    A    Yes.

2    Q    All right.  Would you agree or disagree that, that is

3         the same as Exhibit #2 except for the redactions?

4    A    Correct.

5    Q    All right.  Now, I believe, you previously testified

6         that Mr. Reed, the Plaintiff Decedent had requested his

7         inhaler during the time and stint that you were

8         attempting to handcuff him; would that be accurate?

9    A    Yes.

10   Q    All right.  It would also be accurate that he stated to

11        you, "I think, I'm having an asthma attack while you

12        were attempting to handcuff him?

13             Is that accurate?

14   A    Yes.

15   Q    All right.  You have described him being -- walk back

16        to your vehicle and after helping him to his feet,

17        patting him and checking him for weapons and then

18        walking him back to your vehicle, you then asked

19        someone to provide you with his inhaler; is that

20        accurate?

21   A    Correct.

22   Q    Who did you make that request of?

23   A    My partner, Officer Carver.

24   Q    After making that requestion, what happened next?

25   A    Officer Carver was able to find the inhaler from the

38

1      vehicle.

2   Q  Do you know where he found it at?

3   A  I do not.

4   Q  What did the inhaler look like?

5   A  I remember, it was gray.

6   Q  Do you happen to suffer from asthma?

7   A  No.

8   Q  All right.  Have you ever administered an inhaler to

9      anyone prior to this occurrence?

10  A  Yes.

11  Q  And whom would that have been?

12  A  Myself.

13  Q  And for what purpose?

14  A  I had an upper respiratory infection and it was for

15     chest congestion.

16  Q  Okay.  And when was that?

17  A  Sometime ago.  I cannot -- years.

18  Q  How many years prior to this occurrence?

19  A  I can't tell you.  I don't know exactly.

20  Q  After Officer Carver gave you the inhaler, you then

21     showed it to Mr. Reed; is that accurate?

22  A  Yes.

23  Q  You then asked Mr. Reed, "Is this yours?"

24         Is that correct?

25  A  Yes.

1  Q    And Mr. Reed was unable to provide you a verbal

2       response.  He simply nodded his head; is that accurate?

3  A    He nodded his head in an up and down motion commonly

4       known as a "Yes."

5  Q    Okay.  You had observed prior to then that he was

6       laboring to breathe; would that be accurate?

7  A    Correct.

8  Q    And would it be accurate that before you asked your

9       partner to provide you with an inhaler, Mr. Reed had

10      made a second request to you for his inhaler?

11 A    Correct.

12 Q    You then administered the inhaler to Mr. Reed while he

13      was standing next to your vehicle and handcuffed behind

14      his back; is that accurate?

15 A    Correct.

16 Q    You say, you activated the inhaler.

17           What does that mean?

18 A    I held the inhaler to his mouth.  He put his lips

19      around the inhaler.  I depressed the button, so, that

20      way, the medicine could exit the inhaler.  I observed

21      him inhale.  I waited another two, three seconds before

22      I did it, again.  I watched Mr. Reed inhale the

23      medicine a second time.

24 Q    You didn't indicate in your records that you had

25      administered the inhaler twice, did you?

40

| | | |
|---|---|---|
| 1 | A | Two puffs was what I depressed it for. |
| 2 | Q | Okay.  Did you indicate that in your report? |
| 3 | A | No. |
| 4 | Q | Then you indicated, quote, unquote (sic) that Mr. Reed |
| 5 | | said, "I'm going to piss on myself." |
| 6 | | Is that accurate? |
| 7 | A | Yes. |
| 8 | Q | And did he urinate on himself? |
| 9 | A | Yes. |
| 10 | Q | And at this time, it appears that Mr. Reed was not |
| 11 | | coherent enough to speak in complete sentences. |
| 12 | | Would that be accurate? |
| 13 | A | Yes. |
| 14 | Q | He then after urinating on himself said the word |
| 15 | | "ambulance"; is that accurate? |
| 16 | A | Yes. |
| 17 | Q | What happened next? |
| 18 | A | Shortly after saying "ambulance," his breathing which |
| 19 | | was labored and continued to get worse, it appeared as |
| 20 | | if he had passed out and had slumped leaning back |
| 21 | | against my scout car. |
| 22 | Q | When you say, "leaning back," his back is to the scout |
| 23 | | car or his front is to the scout car? |
| 24 | A | His back.  We were standing the entire time. |
| 25 | Q | Okay.  Okay. |

41

1   A       He was with his back to the scout car.

2   Q       What happens next?

3   A       Also, he appeared to pass out.  He leaned against the

4           scout car and slowly slid down onto the ground.

5   Q       What happened then?

6   A       I ended up uncuffing him while my partner,

7           Officer Carver requested EMS.  I placed him on his left

8           side with his arms outstretched above his head in a

9           rescue breathing recovery position.

10  Q       What happened next?

11  A       After that, his breathing began to get shallower to the

12          point where Officer Carver retrieved his pocket mask

13          from his duty bag from the trunk of our scout car.

14  Q       How long was that after he had appeared to have passed

15          out?

16  A       Everything seemed to happen really fast from the time

17          he had appeared to have passed out until the time the

18          pocket mask was retrieved, 45 seconds, maybe.

19  Q       Then what happens next?

20  A       Officer Carver began -- or excuse me.  Officer Carver

21          began giving rescue breaths while I began chest

22          compression.

23  Q       What happened next?

24  A       Officer Carthan was on the radio, updating dispatch of

25          the situation, continuously asking for an ETA on

                                    42

1   medics. and we continued breaths and chest

2   compressions.

3   Q   At any point, did you take his pulse?

4   A   I did not.

5   Q   Did anyone?

6   A   I don't believe so.

7   Q   And how long was it before the ambulance arrived?

8   A   Maybe, ten minutes.  I can't put the exact number.  I

9   know, we called out over the radio the time of their

10   arrival.  Show medics. on scene.

11   Q   At the time you were doing CPR, and attempting -- it

12   appears, though, you were attempting to resussitate;

13   would that be accurate?

14   A   Yes.

15   Q   So, in your opinion, would it be accurate that he was

16   dead at that point?

17   A   No.

18   Q   What is your opinion as to what his status was?

19   A   He was having trouble breathing.  We were trying to

20   assist with oxygen and blood flow.

21   Q   When did you conclude that he was dead?

22   A   I did not.

23   Q   Okay.

24       MS. OLMSTEAD:  Objection.

25

43

1   BY MR. SANDERS:

2   Q     At any point, did anyone make a conclusion on the scene

3         that he was dead?

4   A     No.

5   Q     Did you perform CPR and mouth-to-mouth resuscitation up

6         until the time the ambulance arrived?

7   A     Yes.

8   Q     So, that was over a period of at least, ten minutes?

9   A     Correct.

10  Q     And he was not responding?

11  A     No.

12  Q     I know, you have somewhere that you want to be.  Give

13        me one second.  I may be done.

14              (At 11:49 a.m., break was taken.)

15              The vehicle was ultimately searched; is that

16        accurate?

17              The red charger?

18  A     Yes.

19  Q     Who conducted that search?

20  A     I believe, evidence techs and Homicide's Task Force.

21  Q     And what was the purpose for doing that?

22  A     To inventory everything, to observe the scene.

23  Q     For what purpose?

24  A     To scene preservation for reports to document

25        everything.

                              44

```
1    Q    Then why would you want to do that, Officer?

2    A    Lawsuits.

3    Q    For lawsuits?

4    A    For the court.

5    Q    That's the only basis that you preserved the scene, to

6         protect yourself from lawsuits?

7    A    No, but property in the vehicle.

8    Q    What do you mean by that?

9    A    Any high valuable belongings, to insure there is no

10        theft.  When we tow a vehicle, we do an inventory

11        search.

12   Q    Aren't you also attempting to preserve evidence?

13   A    That's correct.

14   Q    Okay.  And what would be the purpose of preserving

15        evidence?

16   A    So, it would -- could be reviewed later.

17   Q    For what purpose?

18   A    Possible litigation or trial.

19   Q    And what happens if you don't preserve evidence?

20             MS. OLMSTEAD:  Objection.  Are we --

21        foundation, here?

22             Are we -- What are we saying?

23             For purposes of a lawsuit, or are we asking for

24        purposes of a -- of -- well, let's just say "a trial".

25             Can we just be more specific, here, at least?
```

45

1               These questions are so generic.

2  BY MR. SANDERS:

3  Q     I asked if he was a Police Officer.  If he does not

4        preserve the evidence pursuant to a stop, what happens?

5               MS. OLMSTEAD:  For purposes of what?

6               MR. SANDERS:  Well, that's what I am trying to

7        find out from him.  He is the officer.  I'm trying to

8        be educated.

9  BY MR. SANDERS:

10 Q     You said, you preserve evidence.

11              My question is, what happens if you don't

12       preserve evidence?

13 A     It could potentially be damaged, lost.

14 Q     I'm sorry.  Can you explain your answer?

15              My question is if you -- if there is evidence

16       on the scene, and you do not preserve it, what happens?

17 A     It could be lost.  I'm not sure how to further explain

18       that.

19 Q     It could be lost.  Okay.  And it could also mean that

20       your lawsuit gets dismissed, right?

21              You don't have sufficient evidence for a

22       criminal trial if there is a criminal trial.

23              Would you agree with all of that?

24 A     I can agree.

25 Q     All right.  The purpose of the stop or the initiation

                              46

1     of the stop was the front driver's window, correct?

2 A   Correct.

3 Q   All right.  And you say that, that window was in

4     violation of a civil infraction, correct?

5 A   Correct.

6 Q   All right.  Was that evidence preserved?

7          MS. OLMSTEAD:  Objection; calls for

8     speculation.  He testified that the evidence --

9          MR. SANDERS:  Now, you are testifying for him.

10         MS. OLMSTEAD:  -- that the evidence techs --

11    I'm NOT testifying for him.  I'm just missing my

12    objection.

13         MR. SANDERS:  If he knows, he knows.  If he

14    doesn't, he doesn't.  He can answer the question.  He

15    is a big boy.  Excuse me.  I don't mean that

16    offensively.

17         THE WITNESS:  Thank you.

18         MS. OLMSTEAD:  Let me finish my objection

19    before you answer the question.  -- testified to the

20    evidence techs.

21         MR. SANDERS:  His testimony is on the record,

22    Counsel.

23         MS. OLMSTEAD:  Therefore, my objection.

24         MR. SANDERS:  Now, you are testifying for him.

25         MS. OLMSTEAD:  My objection is on the record.

1          Go ahead.

2              THE WITNESS:  Repeat your question after.  I'm

3      sorry.

4  BY MR. SANDERS:

5  Q    If I can remember the question at this point, the

6      question is as it relates to the front driver's side

7      window.

8              That was the basis for the stop, correct?

9  A    Correct.

10 Q    My question is, was that evidence preserved?

11 A    I can't answer that.

12 Q    Okay.  The photos that were provided to me, I'm going

13     to show you what has previously been marked as

14     Exhibit #3 at Officer Carthan's deposition.

15             Do you recognize that photo?

16 A    That appears to be the vehicle that Mr. Reed was

17     driving.

18 Q    And in that photo, the windows are all rolled down,

19     correct?

20 A    Correct.

21 Q    And I was provided a litany of photos with the windows

22     rolled down.

23             Now, do you know of any photos that the Detroit

24     Police preserved as it relates to the basis for the

25     stop with the windows rolled up?

48

1  A     I don't know of --

2  Q     Okay.

3  A     -- to answer your question.

4  Q     And how long were the evidence techs at the scene?

5  A     Maybe -- I can't even answer that.

6  Q     They took a ton of photos?

7  A     Correct.

8  Q     They took a ton of things into the vehicle, into their

9        possession?

10 A     Yes.

11 Q     They marked all of these things?

12 A     Yes.

13 Q     And they never preserved the evidence that was the

14       basis for the stop?

15 A     Well, the windows were down, because I told him to put

16       the windows down, and if they took the pictures with

17       the windows down, that's because it was preserved, sir,

18       the way it was when they got there.

19 Q     All right.  But we don't have evidence of the basis of

20       the stop, correct?

21             MS. OLMSTEAD:  Objection.  Again, he is --

22       lacks personal --

23 BY MR. SANDERS:

24 Q     Don't you think that would be important to get to see

25       the windows?

49

1               MS. OLMSTEAD:  Lacks personal knowledge.

2               THE WITNESS:  I saw the windows.

3    BY MR. SANDERS:

4    Q     I understand that.

5    A     And that would be testimony for my self-infraction.

6    Q     I understand that.

7               How can we confirm that?

8    A     You have to see the video.

9    Q     Can you confirm that from the evidence that you took

10         into your possession?

11              MS. OLMSTEAD:  Objection.  States facts not in

12         evidence.  He did not take that into his possession.

13         The scene was preserved by evidence techs.

14   BY MR. SANDERS:

15   Q     By the City of Detroit?

16              MS. OLMSTEAD:  He is not the City of Detroit,

17         last thinG I checked.

18              Go ahead.

19   BY MR. SANDERS:

20   Q     As a representative of the City, did you ever

21         communicate to anyone what you thought was evidence as

22         relates to your stop?

23   A     No.  I explained to Homicide the basis for the stop and

24         the event.

25   Q     Okay.  Was Homicide the one that took the evidence into

1          possession?

2                    MS. OLMSTEAD:  Objection; asked and answered.

3          He already said, evidence techs; not Homicide.

4    BY MR. SANDERS:

5    Q    All right.  So, did Homicide communicate with the

6          evidence techs, or do you know?

7                    MS. OLMSTEAD:  Objection, lacks personal

8          knowledge.

9                    How would he know?

10   BY MR. SANDERS:

11   Q    Let him answer his question.  Maybe, he does know.

12                   Now, you are testifying for him, Counsel.  The

13         objection is foundation.

14                   MS. OLMSTEAD:  I'm going to be going back and

15         forth with you.  You don't get to tell me --

16                   MR. SANDERS:  If you are going to testify,

17         raise your hand and be sworn in.  I --

18                   MS. OLMSTEAD:  You don't get to tell me what

19         my objections are.

20                   MR. SANDERS:  Let him testify.

21   BY MR. SANDERS:

22   Q    Do you know if Homicide communicated with the evidence

23         techs?

24                   MS. OLMSTEAD:  That's not the proper question.

25                   If you ask your questions properly, I won't

                              51

1        have to make my objections.

2               MR. SANDERS:   There is a breakdown in

3        communication.   That's why we don't have a photo of the

4        window that led to the stop.

5               MS. OLMSTEAD:   Objection; states facts not in

6        evidence.

7               MR. SANDERS:   I have nothing further.

8               THE WITNESS:   I don't know.

9               (At 12:06 p.m., deposition concluded.)

10                       -   -   -

11                   CERTIFIED SHORTHAND REPORTER (CSR)

12

13      State of Michigan)
                         ):SS
14      County of Wayne  )

15          I certify that this transcript, consisting of

16      52 pages is a complete, true, and correct record of the

17      testimony of POLICE OFFICER TRACY MORENO held in this case

18      on January 9, 2019.

19          I also certify that prior to taking this deposition,

20      POLICE OFFICER TRACY MORENO was duly sworn to tell the

21      truth.

22      February 17, 2019

23                  ___/s/ Shalaan K. Fisher
                    SHALAAN K. FISHER CSR-2284
24                  Certified Shorthand Reporter
                    Notary Public for the County of Wayne, MI
25                  (Acting in the County of Wayne, MI)
                    My Commission Expires:  5/7/19

                             52

**0**

Objection 51:7
08 4:20

**1**

1 2:7, 20:23, 29:1
11:00 1:16, 3:3
11:33 20:23
11:34 29:8
11:39 34:21
11:42 37:10, 37:20
11:49 44:14
12th 37:9
12:06 52:9
17 5:12
18-10427 1:5, 3:13
1985 4:17

**2**

2 1:15, 1:22, 2:8,
34:21, 34:24, 38:3
2019 1:13, 3:2,
52:18, 52:22
237-5051 1:23
20 2:7

**3**

3 2:4, 2:9, 37:20,
37:24, 48:14
30 14:23
300 31:22, 32:4
30th 6:6
313 1:20, 1:23, 1:25
33 6:18
34 2:8
37 2:9

**4**

4 12:5, 12:16, 12:17,
12:18, 13:2
4033 6:11, 6:18
433 8:20
45 42:18
48226 1:19, 1:23
4th 4:17

**5**

5/7/19 52:25
500 1:15, 1:22
52 52:16

**6**

615 1:19

**7**

7-Eleven 4:20
7:00 9:22

**8**

881-3380 1:25

**9**

9 3:2, 52:18
913 1:19
962-0099 1:20
9:00 9:17
9:30 9:20
9th 1:13

**A**

a.m 1:16, 3:3, 20:23,
29:8, 34:21, 37:10,
37:20, 44:14
able 21:3, 21:25,
38:25
Academy 4:23
accelerate 10:15
accommodate 3:25
accurate 6:7, 8:14,
8:16, 8:17, 9:18,
11:3, 11:15, 11:17,
14:9, 14:14, 15:3,
17:21, 17:23, 17:24,
18:22, 20:4, 22:23,
23:3, 25:6, 25:7,
25:17, 27:3, 27:4,
28:20, 32:17, 34:11,
32:17, 32:24, 34:3,
34:5, 38:8, 38:10,
38:13, 38:20, 39:21,
40:2, 40:6, 40:8,
40:14, 41:4, 41:12,
41:15, 43:13, 43:15,
44:16
across 17:2
Acting 52:25
action 28:9
activate 14:13, 15:6,
15:16, 15:24, 16:2,
16:10, 17:11, 17:14,
17:14, 17:25, 18:21
activated 15:21,
17:15, 17:17, 17:18,
17:19, 40:16
activating 17:13,
18:9, 18:12
activity 5:20, 20:13
administered 39:8,
40:12, 40:25
affixed 10:4
against 41:21, 42:3
agree 12:24, 13:20,
31:22, 35:6, 35:7,
38:2, 46:23, 46:24
ahead 19:15, 28:11,
35:9, 48:1, 50:18
al 3:14, 3:14
allegedly 12:14, 20:3
already 15:25, 30:19,
51:9
alternately 35:3
ambulance 41:15,
41:18, 43:7, 44:6
and/or 7:13, 14:13,
15:6, 27:18, 27:21
answered 20:21,
35:20, 51:2
Anthony 1:4
anticipates 3:23
anticipating 39:18
aobut 13:7
apartments 17:4
appear 29:16
APPEARANCES 1:17
appeared 41:19, 42:3,
42:14, 42:17
appears 14:11, 29:13,
35:1, 35:3, 41:10,
43:12, 48:16
approach 23:8, 24:4,
24:13
approached 24:6,
24:13, 24:22, 25:3
appropriately 4:11
Aren't 45:12
argue 35:14
arm 10:17
arms 42:8
arrestable 14:6
arrival 43:10
arrived 43:7, 44:6
arrow 29:23
asking 13:8, 14:3,
37:5, 42:25, 45:23
assignment 5:6
assist 36:4, 43:20
assisted 36:16
assume 22:16, 35:20
assumed 11:13
assumption 35:22
attain 38:11, 39:6
attack 38:11
attempt 17:25, 19:13,
21:4
attempting 8:12,
18:10, 38:8, 38:12,
43:11, 43:12, 45:12
Avenue 1:15, 1:22

**B**

backtrack 32:6
badge 10:4, 10:7,
10:8, 10:8
bag 42:13
beam 24:11
became 4:21
become 18:13
begin 9:21, 36:3
behind 11:24, 14:9,
14:12, 14:16, 14:19,
15:14, 18:9, 19:24,
21:1, 22:11, 23:25,
26:17, 26:18, 28:14,
30:6, 32:16, 32:24,
40:13
belief 21:22

belly 32:21
belongings 45:9
belt 10:8, 10:16,
10:16
best 6:7, 36:4
birth 4:16
black 9:11, 10:4
block 11:11, 21:11
block-and-a-half
17:16
blocks 18:3, 18:3,
24:22
blood 43:20
blue 10:11, 10:11,
16:6, 21:15
break 3:24, 4:2,
29:6, 29:7, 29:8,
37:10, 44:14
breakdown 52:2
breathe 34:6, 40:6
breathing 41:18,
42:9, 42:11, 43:19
breaths 42:21, 43:1
brief 33:13
bumper 15:14
businesses 16:22
buttocks 33:18, 33:20
button 40:19

**C**

Cabbot 28:22
can't 9:5, 10:2,
11:2, 14:21, 16:21,
18:12, 19:17, 20:18,
21:21, 22:16, 27:8,
39:19, 43:8, 48:11,
49:15
cannot 19:19, 39:17
capacities 1:9
capacity 4:22, 6:10,
6:20, 7:4, 7:15, 7:19
cargo 10:15
Carthan 1:8, 23:24,
34:15, 42:24
Carthan's 12:24,
44:14
Carver 1:8, 23:22,
38:23, 38:25, 39:20,
42:7, 42:12, 42:20,
42:20
case 1:5, 3:13, 52:17
caused 12:1, 20:17,
28:15
CATMC 1:15
Certified 52:11,
52:24
certify 52:15, 52:19
change 17:19
changed 16:25
characterization
19:13
characterize 19:4
charger 14:9, 14:12,
14:16, 14:19, 14:24,
15:2, 15:5, 15:9,
15:12, 16:11, 16:15,
17:9, 19:24, 22:11,
22:23, 24:25, 30:5,
30:9, 31:10, 32:5,
44:17
checked 50:17
checking 38:17
chest 32:22, 39:15,
42:21, 43:1
city 1:6, 1:14, 1:22,
3:14, 4:18, 4:21,
5:2, 12:4, 50:15,
50:16, 50:20
civil 13:21, 13:24,
28:6, 47:4
Clark-reed 1:4
clear 15:7
clearly 18:23, 19:23,
19:25, 25:19
close 15:10, 15:13,
16:10, 25:8
closer 9:20
Closing 31:10
code 6:11, 6:18, 9:5,
19:17
coherent 41:11
comes 22:22, 23:6
coming 22:1
command 23:14, 24:1,
24:15, 24:24, 28:13,
30:23
Commission 52:25
committed 8:13
commonly 22:17, 40:3
communicate 50:21,
51:5
communicated 51:22
communication 52:3
compartment 22:13,
22:16, 22:17, 28:10

complete 41:11, 52:16
compliance 12:12
complied 24:2
comply 23:16, 24:10,
28:13, 31:2
compression 42:22
compressions 43:2
concerned 20:23
conclude 43:21
concluded 52:19
conclusion 44:2
conduct 7:1
conducted 44:19
confirm 50:7, 50:9
congestion 39:15
considered 13:18
consist 15:22
consisting 52:15
constitute 28:18
CONTENTS 2:1
continue 17:2
continued 34:12,
41:19, 43:1
continuously 42:25
copied 35:9
copies 29:3
corner 17:11, 17:12
Corporation 1:7
correct 7:16, 10:22,
10:23, 11:16, 13:13,
13:23, 14:10, 14:15,
14:18, 15:1, 15:4,
16:18, 18:15, 18:17,
18:18, 18:19, 18:20,
19:24, 20:7, 21:16,
22:9, 24:12, 28:16,
28:7, 29:18, 29:20,
30:21, 31:18, 32:12,
34:9, 34:12, 34:13,
35:12, 38:4, 38:21,
39:24, 40:7, 40:11,
40:15, 44:9, 45:13,
47:1, 47:2, 47:4,
47:5, 48:8, 48:9,
48:19, 48:20, 49:7,
49:20, 52:16
couldn't 38:9, 39:13
Counsel 35:10, 47:22,
51:12
Counsel's 19:12
County 52:13, 52:24,
52:25
court 1:1, 3:12,
4:11, 45:4
cover 27:15
covered 33:4, 44:5
crime 28:18
crimes 8:13
criminal 44:22, 46:22
Cross-examinatio 2:4,
3:1
Crown 9:6
Crystal 1:21
CSR 52:11
CSR-2284 1:25, 52:12
current 5:4, 5:6
CVS 17:1

**D**

damaged 46:13
dark 25:10
darker 12:18, 20:17
date 4:16, 4:5
dead 43:16, 43:21,
44:3
Decedent 9:16, 11:4,
36:8
defective 8:3
Defendant 1:21
Defendants 1:10
degree 12:14, 13:9,
13:12, 13:16, 13:17,
13:19
Demone 1:4
Department 1:14,
10:16
Depends 8:9
deposition 1:12, 3:9,
5:23, 12:24, 29:1,
34:24, 37:14, 37:24,
48:14, 52:9, 52:19
depressed 40:19, 41:1
Dept 16:22
describe 8:21, 16:1,
31:21
described 6:13,
13:21, 21:14, 28:15,
28:17, 38:15
Detroit 1:6, 1:14,
1:15, 1:19, 1:22,
1:23, 3:1, 3:14,
4:19, 4:22, 4:23,
5:2, 3:25, 9:7,
48:23, 50:15, 50:16
device 12:25, 13:3
directed 18:8
direction 11:20,

26:14
disagree 38:2
discovered 37:14
discovery 36:9
discussing 50:17
dismissed 46:20
dispatch 42:24
disregarding 8:5
distance 31:10
distinction 7:21
distinguishing 7:18
District 1:1, 1:1,
1:3, 3:12
Division 1:2, 3:13
document 29:10,
29:11, 34:25, 36:7,
36:25, 44:24
door 5:7, 9:8, 25:6,
31:11
drawn 26:24, 26:25,
27:1
draw 29:23
drawn 23:9
drive 6:24
driver 9:13, 22:5,
23:13, 24:8, 24:13,
25:4, 25:5, 25:18,
26:4, 26:6, 31:20
driver's 9:7, 12:3,
12:10, 12:13, 12:13,
13:15, 13:20, 21:2,
25:2, 25:6, 27:14,
27:24, 31:13, 31:15,
47:1, 48:6
driving 11:17, 16:5,
17:22, 22:25, 48:17
Due 28:9
duly 52:20
duty 10:16, 10:16,
42:13

**E**

easier 37:5
east 11:18, 11:22
Eastern 1:1, 3:12
educated 46:8
eight 34:17
either 28:2, 33:5
elude 16:1
employed 4:18, 4:21
EMS 42:7
encounter 9:16
encountered 11:4
ended 33:11, 42:6
Enforcement 9:9
entire 12:6, 12:20,
13:2, 13:3, 41:24
equipment 10:14
equipped 10:10
Eric 1:8, 12:24
Estate 1:3
et 3:14, 3:14
ETA 42:25
event 50:24
everything 42:16,
44:22, 44:25
evidence 46:20,
45:12, 45:15, 45:19,
46:4, 46:10, 46:12,
46:15, 46:21, 47:6,
47:8, 47:10, 47:20,
48:10, 49:4, 49:13,
49:19, 50:9, 50:12,
50:13, 50:21, 50:25,
51:3, 51:22, 52:16
exact 43:8
exactly 23:23, 39:19
except 38:3
excessively 18:16
excuse 4:5, 13:15,
21:17, 42:20, 47:15
exhausted 22:9
Exhibit 2:7, 2:8,
2:9, 28:23, 29:1,
34:21, 34:24, 37:20,
37:24, 38:3, 48:14
EXHIBITS 2:6
exit 40:20
exited 23:7, 32:14
expert 12:15
Expires 52:25
explain 6:22, 10:11,
44:14, 46:17
explained 50:23
extent 3:21, 4:7

**F**

face 26:16
facing 11:7
facts 50:11, 52:5
failing 8:4
familiar 9:1, 12:22,
29:10, 29:13, 34:25,
39:12
fast 42:16

**February** 52:22
felt 10:3
fine 13:25, 13:25,
14:4, 37:8
fingers 24:9, 31:16,
32:23
finish 47:18
firearm 10:13, 10:18
Firm 1:18
Fisher 1:25, 52:23,
52:23
five 15:7, 34:17
flash 16:8, 21:3
flashlight 25:21,
25:22, 25:24, 26:13
flashlights 27:5,
27:7, 27:10, 27:16,
27:25, 28:11, 30:18
flow 43:20
focused 26:2
Force 44:20
Ford 9:6
forth 16:8, 51:15
foundation 18:25,
35:8, 35:14, 35:16,
36:14, 36:25, 45:21,
51:13
foundations 35:15
four-door 12:18
Fourth 5:7, 5:9, 6:19
front 9:2, 9:8, 9:10,
12:2, 12:13, 13:12,
13:14, 13:15, 13:21,
23:19, 23:19, 23:23,
26:22, 27:1, 34:19,
41:23, 47:1, 48:6
full 4:13, 37:12
function 6:16, 6:17,
6:23, 7:14, 7:15, 7:22

**G**

gang 9:10
gangs 6:21
gave 24:15, 24:16,
24:23, 30:25, 39:20
generic 46:1
gets 46:20
given 30:19, 30:23
gives 8:7
giving 23:19, 24:4,
24:6, 42:21
glove 22:17
goes 33:6, 33:6
gone 10:2, 17:15
group 5:19
gray 39:5
green 10:5, 14:24,
15:12, 17:9, 17:10
Griswold 1:19
ground 32:14, 30:20,
32:20, 33:1, 33:3,
33:4, 42:1
grounds 34:17
guess 7:18, 7:22,
10:9, 12:21

**H**

half 16:12, 23:23
hand-to-hand 6:25
handcuff 34:12, 38:8,
38:12
handcuffed 33:22,
34:10, 34:15, 40:13
handcuffing 34:1
handcuffs 10:12,
10:17, 33:15
handle 51:17
hands 24:8, 24:17,
24:19, 24:24,
25:19, 26:9, 26:10,
26:10, 28:13, 30:20,
30:24, 30:24, 31:16,
32:4, 32:11, 32:16
happen 39:16, 42:16
happened 24:12,
24:18, 24:21, 25:3,
30:22, 31:5, 38:24,
41:17, 42:5, 42:10,
42:23
happens 23:6, 23:11,
28:8, 31:19, 32:12,
32:13, 33:18, 33:21,
34:14, 42:12, 43:19,
45:19, 46:4, 46:11,
46:16
happy 3:25
haslawpc@gmail.c 1:20
having 3:6, 7:18,
13:20, 38:11, 43:19
hazard 18:13
headed 11:20
heading 11:12, 11:22,
14:17
headlights 16:7
hear 5:14
held 5:1, 40:18,

52:17
helping 38:16
Herbert 1:18
highlights 35:2
Highway 29:18
himself 33:1, 33:3,
41:8, 41:14
h-m-hmm 4:19, 29:19,
29:22, 35:24
Homicide 50:23,
50:25, 51:3, 51:5,
51:22
Homicide's 44:20
Hon 1:5
however 3:23

**I**

idea 13:12
identification 28:24,
34:22, 37:21
illegal 13:18, 20:20
illuminate 21:4,
21:4, 21:18
immediately 14:12
inability 28:12
inches 13:8
incident 5:25
indicate 3:20, 40:24,
41:2
indicated 8:19, 24:2,
33:2, 41:4
indicates 9:23, 34:10
individual 31:20,
33:13
individually 19:9
individuals 8:11
infection 39:14
infraction 13:22,
13:24, 28:6, 47:4
inhale 40:21, 40:22
inhaler 34:2, 34:11,
38:7, 38:19, 38:25,
39:4, 39:8, 39:20,
40:9, 40:10, 40:12,
40:16, 40:18, 40:19,
40:20, 40:25
initially 15:18,
15:20, 15:21
initiation 46:25
inquiries 4:7
inside 9:11, 18:23,
20:3, 20:7, 20:11,
21:2, 21:25, 23:12,
25:20, 26:1, 26:5,
27:25, 28:1
insure 45:9
intents 5:11
interlock 24:9, 31:16
interlocked 32:16,
32:23
interrupt 36:7
intersection 15:8,
17:10
intersects 29:20
inventory 44:12,
45:10
investigate 7:1, 7:5,
8:12
investigation 7:14
investigations 7:2,
7:24
involves 5:10
isn't 34:3
issue 36:13
issued 10:17

**J**

January 1:13, 3:2,
52:18
job 6:16, 6:17
Jointly 1:9

**K**

keeping 28:13
kept 26:8
knees 32:21, 33:6
knowledge 13:17,
50:1, 51:8
known 22:17, 40:4
knows 35:19, 35:20,
47:13, 47:13

**L**

L-a-w-n-d-a-a-l-e 17:8
labored 41:19
laboring 34:5, 40:6
lacks 18:25, 35:8,
35:13, 35:15, 49:22,
50:1, 51:7
lamps 8:4

landmarks 16:22
lane 15:16, 16:14,
16:14, 16:16, 16:16,
16:23, 23:1, 23:1,
23:2
lanes 15:16, 16:13,
17:19
later 45:16
law 1:14, 1:18, 1:22,
12:12
Lawndale 17:4, 17:4,
17:7, 28:22, 29:20
laws 7:7
lawsuit 3:18, 45:23,
46:20
lawsuits 45:2, 45:3,
45:6
lay 35:18
lead 7:14
leaned 42:3
leaning 41:20, 41:22
least 22:5, 37:14,
37:17, 44:8, 45:25
led 52:4
Leda 1:3, 3:14
Lee 4:15
legal 8:7, 8:10
legally 23:3
length 16:12, 16:12
less 17:22
let's 19:15, 45:24
libraries 17:5
library 17:5
light-bar 9:11
lighted 25:10
lighter 20:17
lighting 35:9
lights 8:24, 9:2,
9:10, 15:6, 15:18,
15:21, 15:24, 16:2,
16:4, 16:5, 16:7,
16:10, 17:12, 17:13,
18:12, 18:19, 18:19,
18:21, 21:14
limit 14:22, 17:22,
17:17
Linda 1:5
lips 40:18
liquor 17:3, 17:6,
17:7
litany 48:21
litigation 45:18
looking 5:20, 6:20,
7:10, 8:10, 8:18,
26:4, 27:17, 29:17
lost 46:13, 46:17,
46:19
lower 32:25, 33:3

**M**

M-u-l-l-a-n-e 11:11
maintaining 12:11,
32:11
making 38:24
map 29:12, 29:14,
29:16, 29:23
March 4:17, 6:6
mark 30:4, 30:7
marked 8:20, 8:22,
28:24, 28:25, 34:22,
34:23, 37:21, 37:23,
48:13, 49:11
marks 30:12
mask 42:12, 42:18
maybe 11:12, 14:21,
15:17, 16:12, 42:18,
43:8, 49:5, 51:11
measure 13:1, 13:4,
13:9
medicine 40:20, 40:23
medics 43:1, 43:10
memory 9:13
MI 1:19, 1:23, 52:24,
52:25
Michigan 1:1, 1:6,
1:15, 3:1, 3:13,
52:12
mind 29:5
minute 14:21
minutes 43:8, 44:8
missing 47:11
mistaken 9:16, 45:14
modified 9:23
moment 25:17, 33:13
Morbidly 31:25
Moreno 1:7, 1:12,
2:3, 3:5, 3:10, 3:15,
4:15, 52:17, 52:20
morning 3:16, 3:19
motion 40:3
motions 22:1, 22:12,
22:12
mouth 40:18
mouth-to-mouth 44:5
move 11:15
moved 15:23, 24:14,
30:24, 31:6
Mullane 11:11, 11:21,

16:24
Municipal 1:7
myself 39:12, 41:5

**N**

narcotics 5:20, 6:21,
7:12, 7:23, 8:14,
27:18, 27:21, 28:3
nodded 40:2, 40:3
nodding 4:8
None 34:18
nor 12:25
Normally 5:17
north 11:21
Notary 52:24
nothing 52:7
Notice 3:10

**O**

O'Reilly's 17:1
obese 31:25
objection 18:24,
19:12, 35:8, 43:24,
45:20, 47:7, 47:12,
47:18, 47:23, 47:25,
49:21, 50:11, 51:2,
51:13, 52:5
objections 51:19,
52:1
observation 12:10,
21:23, 26:7, 27:19,
27:22, 34:18
observations 6:24,
8:9, 8:12, 20:2,
20:6, 20:10
observe 20:12, 21:2,
22:4, 22:8, 44:22
observed 11:18,
11:23, 12:7, 22:7,
22:10, 40:5, 40:20
observing 11:25
occasionally 4:8
occurrence 6:5, 39:9,
39:18
occurring 31:9
offense 8:14, 14:6
offenses 5:21, 7:1
offensively 47:16
office 36:9, 36:23
officer 1:7, 1:8,
1:8, 1:22, 2:3, 3:5,
3:10, 3:15, 4:22,
4:25, 5:2, 5:5, 7:4,
7:20, 23:22, 23:24,
34:15, 37:5, 38:23,
38:25, 39:20, 42:7,
42:12, 42:20, 42:20,
42:24, 45:1, 46:3,
46:7, 48:14, 52:17,
52:20
officers 10:21,
10:24, 27:23, 27:25
offices 1:14
official 1:9
Olmstead 1:21, 14:2,
18:24, 19:11, 20:21,
29:3, 29:7, 30:11,
30:14, 35:8, 35:13,
35:24, 36:6, 36:13,
36:16, 36:21, 37:3,
37:4, 37:9, 43:24,
47:7, 47:10, 47:17,
47:19, 47:23, 47:25,
47:25, 49:21, 50:1,
50:11, 50:16, 51:2,
51:7, 51:14, 51:18,
51:24, 52:5
olmsteadedmetroi 1:14
onto 10:7, 32:14,
32:21, 42:14
Operations 5:19, 5:11,
6:11, 10:14
opinion 19:14, 20:9,
20:15, 20:19, 43:15,
43:18
opposed 9:11
Ops 77:4
ordinance 12:14
outstretched 42:8
oxygen 43:20

**P**

p3,m 9:17
PCHO 10:20
p,m 9:22, 52:9
P43031 1:18
P69202 1:21
pages 52:16
panel 23:19
panels 9:10
panic 10:1, 10:6
parked 16:19, 23:4

Parker 1:5
parking 16:14, 16:16,
16:20, 23:1, 23:12
particular 9:4, 16:5,
16:22
partner 38:23, 40:9,
42:6
partner's 26:20
partners 23:7, 23:21,
27:15, 30:17
pass 42:1
passed 41:20, 42:14,
42:17
passenger 13:13,
13:14, 22:22, 22:13,
22:15
passenger's 9:8,
22:20, 22:21, 23:22,
26:21, 26:24, 27:1,
27:2, 27:12, 28:10,
34:19
passengers 26:22
patch 10:9
patches 10:3
patrol 5:8, 7:19,
10:1
patting 38:17
pen 29:25
penalty 13:24
pending 4:2
pepper 10:17
percentage 12:21
perform 44:5
performing 6:23
period 44:8
personal 1:3, 49:22,
50:1, 51:7
photo 40:15, 48:18,
52:3
photos 48:12, 48:21,
48:23, 49:6
pictures 49:16
pinned 26:10
pins 41:5
placed 42:7
Plaintiff 1:5, 1:13,
1:18, 3:6, 38:4
Plaintiff's 2:7, 2:8,
2:9, 28:23, 34:21,
37:20
plates 8:3
please 3:19
pocket 42:12, 42:18
point 14:25, 22:12,
28:5, 31:13, 36:25,
37:7, 42:12, 43:3,
43:16, 44:2, 48:5
pointing 29:24
Points 30:2
police 1:12, 2:3,
3:5, 3:10, 4:22,
5:17, 8:25, 9:7,
18:22, 37:13, 37:13
46:3, 48:24, 52:17,
52:20
Polo 10:5
pools 5:1, 27:9,
42:19
possession 49:9,
50:10, 50:12, 51:1
possible 8:15, 8:16,
18:5, 45:10
potential 4:10
potentially 46:13
pound 32:4
pounds 31:23
Precinct 5:7, 5:9,
6:13
preparation 5:22
prepared 5:24
preservation 44:24
preserve 45:12,
45:19, 46:4, 46:10,
46:12, 46:16
preserved 45:5, 47:6,
48:10, 48:24, 49:13,
49:17, 50:13
preserving 45:14
presume 3:23, 14:24,
16:11
previously 6:13,
8:19, 37:14, 38:5,
48:13
primary 7:22
prior 39:9, 39:18,
40:5, 52:19
pro-active 5:11, 5:19
probably 17:15
problem 7:18
process 34:1
proper 51:24
properly 51:25
property 45:7
protect 45:6
provide 38:19, 40:1,
40:5
provided 37:14,
37:15, 48:12, 48:21
Providing 27:15
Public 52:24

puffs 41:1
pull 15:2, 15:5,
18:6, 20:17
pulled 15:9, 15:12,
16:4, 28:6, 30:8
pulling 22:6, 33:11
pulls 17:9
pulse 43:3
purpose 27:12, 29:13,
44:21, 44:23, 45:14,
45:17, 46:25
purposes 3:11, 37:15,
45:23, 45:24, 46:8
pursuant 3:10, 7:10,
7:12, 8:3, 18:22,
46:4

**Q**

quarter 9:10, 23:19
questioning 36:13
quick 36:6
quote 16:1, 41:4

**R**

radio 17:7, 42:24,
43:9
raise 51:17
rank 5:4
rather 37:5
reaching 22:1, 22:12,
22:19, 28:9
really 42:16
rear 16:8, 20:14,
20:15, 20:19, 20:23,
24:25, 25:2, 26:23,
27:2, 31:10
reask 19:21
reason 36:18
received 36:8, 36:17
recognize 48:15
recollection 6:8,
9:19, 21:22, 22:10,
36:4
recoca 3:9, 4:14,
19:12, 37:12, 47:21,
47:25, 52:16
recorded 4:11
records 20:24
recovery 42:19
red 8:5, 11:13,
14:17, 14:20, 15:9,
16:6, 16:17, 16:25,
23:14, 30:5, 44:17
redacted 36:17,
36:20, 37:1
redaction 35:17, 36:2
redactions 35:3,
35:11, 35:16, 38:3
Reed 1:3, 3:14, 38:6,
39:21, 39:23, 40:1,
40:9, 40:12, 40:22,
41:4, 41:10, 48:16
referenced 5:18
referring 22:16
reflect 3:9, 37:12
refresh 9:13, 9:19
regular 7:19
relates 3:18, 20:11,
48:6, 48:24, 50:22
repeat 3:20, 19:2,
48:2
rephrase 3:20
report 5:24, 8:18,
9:23, 12:23, 14:11,
14:22, 38:2, 38:12,
38:22, 39:10, 39:11,
39:25, 40:11, 40:13,
41:10, 52:2
Reported 1:25
Reporter 4:11, 52:11,
52:24
reports 37:13, 44:24
rescue 42:9, 42:21
respiratory 39:14
respond 4:8
responding 44:10
response 36:8, 40:2
responses 4:7
restate 53:8
resuscitation 44:5
reassuciate 43:12
retrieved 42:12,
42:18
review 5:22, 6:1
reviewed 6:2, 8:19,
45:16
reviewing 12:23
road 18:13
robbery 5:18

Robin 1:8
roll 24:1, 30:19
rolled 48:18, 48:22,
48:25
run 18:10
runs 5:17

**S**

Sanders 1:18, 1:18,
2:4, 3:8, 14:5, 19:3,
19:16, 20:22, 20:25,
29:4, 29:19, 30:15,
35:10, 35:19, 36:1,
36:10, 36:15, 36:17,
37:17, 37:22, 44:1,
46:2, 46:6, 46:9,
47:9, 47:13, 47:21,
47:24, 48:4, 49:23,
50:3, 50:14, 50:19,
51:4, 51:10, 51:16,
51:20, 51:21, 52:2,
52:7
sat 33:17
save 36:20
saying 4:9, 12:17,
41:18, 45:22
says 8:20, 8:22, 19:8
scene 43:10, 44:2,
44:22, 44:24, 45:5,
46:16, 49:4, 50:13
scout 8:20, 8:20,
8:22, 30:20, 41:21,
41:22, 41:23, 42:1,
42:4, 42:13
search 44:19, 45:11
searched 34:16, 44:15
seat 22:12
seconds 15:7, 34:17,
40:11, 42:18
secure 33:14
seeing 29:11
seeking 7:12, 18:6
seemed 42:16
self-infraction 50:5
sentences 41:11
series 3:17
service 5:15, 5:16
serving 7:16
setting 25:10
several 22:12, 22:13
Severally 1:9
sevn 10:7
shadow 21:25, 22:14
shaking 4:9
Shalaan 1:25, 52:23,
52:23
shallower 42:11
sharing 29:5
shift 9:21
shine 27:7, 27:16
shining 26:13, 27:10,
27:25, 28:1, 30:18
shirt 10:13, 10:15,
10:7, 10:7
shooting 5:18
short 10:5
Shorthand 52:11,
52:24
Shortly 41:18
shotgun 11:2
shout 23:12
shouted 23:14, 24:1
showed 39:21
shut 32:18, 32:9
sic 16:2, 40:14
signal 16:7
signals 8:4
signs 8:5
silhouette 22:1
similar 16:13
simply 36:21, 40:2
siren 14:13, 15:6,
15:16, 17:14, 17:14,
17:15, 17:17, 17:19,
21:16, 21:21
sit 33:19
sitting 30:5, 30:16
situation 42:25
six 18:2, 18:3, 28:12
sleeve 10:15
slid 42:14
slowly 24:4, 24:22,
42:4
slumped 41:20
Smith 10:19
someone 38:19
Sometime 39:17
somewhere 18:10,
44:12
sorry 5:14, 7:8,
7:17, 13:6, 15:11,
19:22, 21:7, 27:22,
28:21, 29:12, 32:6,
36:7, 46:14, 48:3
sort 5:18
Southern 1:2, 3:13
speak 41:11

Special 5:9, 5:11, 6:11, 7:4, 10:4
specific 45:25
specifically 12:3
speculation 47:8
speed 14:22, 17:22, 18:17
spot 25:14
spotlight 21:3, 21:8, 21:18, 21:23
spray 10:17
SS 52:13
St 1:19
stand 33:9
standing 25:18, 27:12, 27:14, 27:23, 40:13, 41:24
state 4:13, 12:4, 52:12
stated 38:10
states 1:1, 3:12, 50:11, 52:5
status 43:18
Ste 1:19
step 28:14, 28:16, 32:3, 32:10
stint 17:21, 38:7
stipulate 35:11
stomach 32:22, 33:7
stop 6:2, 7:12, 8:3, 8:5, 8:7, 8:11, 11:7, 11:12, 17:16, 18:2, 21:10, 21:13, 21:17, 22:23, 22:25, 23:6, 33:25, 46:4, 46:25, 47:1, 48:8, 48:25, 49:14, 49:20, 50:22, 50:23, 52:4
stopped 11:6, 11:14, 24:14, 28:21
stopping 28:12
store 17:3, 17:6, 17:7
street 6:25, 7:1, 11:5, 11:21, 17:2, 25:9, 25:12, 29:20
streets 18:19, 28:20
student 4:25
suffer 39:6
sufficient 46:21
Suite 1:15, 1:22
sun 25:10, 25:11
surroundings 26:8
switch 15:23
sworn 3:6, 51:17, 52:20

## T

TABLE 2:1
tag 10:3
taillights 8:4
taken 1:13, 3:10, 29:8, 37:10, 44:14
taking 12:24, 33:11, 52:19
Task 44:20
techs 44:20, 47:10, 47:20, 49:4, 50:13, 51:3, 51:6, 51:23
telling 36:4
ten 15:17, 43:8, 44:8
testified 4:8, 8:20, 15:25, 17:10, 31:4, 38:5, 47:8, 47:19
testify 51:16, 51:20
testifying 47:9, 47:11, 47:24, 51:12
testimony 7:3, 7:11, 47:21, 50:5, 52:17
Thank 47:17
theft 45:10
thereafter 17:11
Therefore 47:23
thing 17:11, 50:17
third 21:11
though 14:11, 43:12
throughout 27:11, 27:16
tint 12:14, 12:15, 12:21, 13:1, 13:10, 13:12, 13:18, 20:16, 20:20
tinted 8:4, 11:23, 11:25, 12:2, 12:5, 12:6, 12:15, 12:17, 12:20, 13:3, 13:8, 13:21
tints 12:22
tire 23:19, 24:25, 25:2, 31:10, 34:19
title 5:1
today 5:23
toggle 15:23
ton 49:6, 49:8
top 8:24, 9:12, 12:5, 12:15, 12:17, 12:19, 16:6
tow 45:10

toward 22:2
Tracy 1:7, 1:12, 2:3, 3:5, 3:10, 4:15, 50:17, 52:20
traffic 7:1, 7:5, 7:5, 7:10, 7:12, 7:24, 8:2, 9:4, 9:9, 18:7
transactions 6:25
transcript 52:15
transition 10:19
traveling 11:4
travelling 11:21
trial 45:18, 45:24, 46:22, 46:22
trouble 43:19
true 52:16
trunk 11:2, 42:13
truth 52:11
turn 8:4, 11:22, 16:7, 18:19
turned 14:24, 21:8, 21:13, 21:18, 21:18, 21:23
turns 17:10
twice 37:14, 37:17, 40:25
two-door 12:18
type 10:14, 10:18
Typical 10:1

## U

U-turn 11:24, 12:1, 14:8
ultimately 30:8, 44:15
unable 40:1
uncuffing 42:6
understand 3:19, 3:22, 4:6, 4:12, 7:3, 7:11, 50:4, 50:6
understanding 14:8
understood 35:22
unh-unh 4:10
uniform 9:24, 10:1, 10:4
unit 5:11, 5:19
United 1:1, 3:12
unless 5:17
unquote 16:2, 41:4
unredacted 36:12, 37:16
updating 42:24
upon 8:11, 12:23, 21:22
upper 39:14
urinate 41:8
urinating 41:14
using 9:4, 25:21
usually 5:11, 5:13

## V

valuable 45:9
vehicle 8:21, 9:5, 9:5, 9:11, 10:21, 11:1, 11:23, 11:25, 15:10, 15:13, 16:5, 16:8, 17:16, 17:19, 17:22, 17:25, 18:23, 19:23, 20:3, 20:7, 20:12, 20:17, 21:1, 21:2, 21:4, 21:8, 21:10, 21:15, 22:3, 22:11, 22:20, 22:21, 22:22, 23:3, 23:4, 23:7, 23:13, 23:20, 23:23, 24:4, 24:7, 24:22, 25:3, 25:15, 25:18, 25:20, 26:1, 26:5, 26:21, 26:23, 26:23, 27:11, 27:17, 27:20, 27:24, 28:10, 28:14, 28:16, 28:20, 30:18, 32:3, 32:8, 32:9, 32:10, 32:15, 38:16, 38:18, 39:1, 40:13, 44:15, 45:7, 45:10, 48:16, 49:8
vehicles 9:1, 27:13, 30:19
verbal 4:6, 23:12, 23:14, 24:5, 24:6, 24:15, 24:16, 24:33, 28:13, 30:25, 40:1
verble 30:23
Vernor 11:5, 11:9, 11:13, 11:18, 11:22, 14:17, 14:22, 16:13, 16:24, 17:4, 17:6, 17:7, 29:18, 29:21
versus 3:14
Victoria 9:6
video 6:2, 50:8
view 24:14
viewed 11:6

violation 12:4, 12:16, 13:3, 47:4
violations 7:5, 7:6, 7:10, 7:13

## W

W3as 6:7
waited 15:7, 40:21
walk 38:15
walked 34:19
walking 38:18
wanted 7:23
watched 40:22
Wayne 52:13, 52:24, 52:25
weapon 5:20, 7:23, 23:9
weapons 6:21, 7:13, 8:14, 10:24, 11:1, 27:18, 27:21, 28:3, 34:18, 38:17
Wednesday 3:2
Wesson 10:19
west 11:4, 11:7, 11:12, 14:17, 25:11, 29:24, 30:3
westbound 17:3
what's 34:23, 37:23
whereas 12:5
whether 8:12, 14:1, 20:9, 20:15, 20:19
whom 39:11
window 12:3, 12:6, 12:11, 12:13, 12:14, 12:18, 12:18, 12:20, 13:2, 13:3, 13:13, 13:14, 13:15, 13:21, 20:12, 20:16, 20:20, 20:23, 24:2, 31:14, 31:15, 47:1, 47:3, 48:7, 52:4
windows 8:5, 11:23, 12:1, 12:2, 12:2, 12:11, 13:1, 13:10, 23:15, 30:20, 48:18, 48:21, 48:25, 49:15, 49:16, 49:17, 49:25, 50:2
windshield 16:6, 20:16, 20:16
within 15:7, 18:3, 19:23, 30:18
WITNESS 2:2, 14:4, 19:2, 20:23, 30:13, 47:17, 48:2, 50:2, 52:8
won't 4:10, 51:25
Woodward 1:15, 1:22
worse 41:19
wrist 33:15
written 8:25

## Y

yours 39:23
yourself 45:6

55