# EXHIBIT 11

No. 03-5068.
United States Court of Appeals, Sixth Circuit

# Champion v. Outlook Nashville, Inc.

380 F.3d 893 (6th Cir. 2004)
Decided Aug 19, 2004

## 895 *895 OPINION

KAREN NELSON MOORE, Circuit Judge.

The death of Calvin D. Champion ("Champion") shortly after being detained, restrained, and subdued by Nashville Police Officers presents us with a difficult issue of whether the Officers are entitled to qualified immunity such that we should reverse a jury verdict rendered against them. On April 30, 1999, Champion overwhelmed the facilities of his caregiver, promoting a response by the Nasvhille Police. Three Nashville Police Officers, Defendants-Appellants Debbie Miller ("Miller"), Richard Woodside ("Woodside"), and Craig Dickhaus ("Dickhaus") (collectively "Defendants" or "Officers"), subdued Champion with pepper spray and physical restraints. At trial, five different witnesses testified that after Champion was handcuffed and his feet were bound, the Officers continued to pepper spray Champion and to apply pressure to Champion's 896 back as he lay on his stomach. Champion *896 died en route to the hospital shortly after this incident. Champion's father, Calvin B. Champion, and Champion's sister, Jetonne Champion-Collins, (together "Plaintiffs"),[1] brought an action against the Officers pursuant to 42 U.S.C. § 1983. A jury awarded the Plaintiffs $900,000 in damages for Champion's physical and mental pain and suffering. Following the return of the verdict, the district court denied the Officers' motion for a judgment as a matter of law or a new trial or remittitur, in which they argued that they were entitled to qualified immunity and that the verdict was excessive.

[1] Champion's father brought the action individually and as the personal representative of Champion's estate. Champion's sister was a plaintiff in her individual capacity only.

While the Officers undoubtedly faced unenviable choices in their interactions with Champion, they are not entitled to qualified immunity. Based upon the testimony presented at trial, the Officers' actions in this particular situation violated Champion's clearly established rights. Consequently, we AFFIRM the judgment of the district court, which upheld the jury's verdict.

## I. FACTS AND PROCEDURE

### A. Factual Background

The parties mostly agree on the anguishing series of events that culminated in Champion's death, but they differ with regards to the most crucial moments of the incident. Champion, who was 32 years old at the time of his death, completely lacked the ability to care for himself on account of his autism. He was non-responsive and unable to speak. Outlook Nashville, Inc. ("Outlook"), which provided care for developmentally disabled individuals, was responsible for his well-being. On April 30, 2000, Jolene Delelys ("Delelys"), an Outlook employee, watched over Champion. Upon departing from a Nashville Babies `R' Us store, where Delelys had taken Champion and her three-year-old son Devin, Champion began to have a "behavior." Delelys had neglected to seat-belt Champion, and Champion began to move around Delelys's minivan, hitting himself in the

face and biting his hand, which was a type of "behavior" Champion frequently exhibited. Delelys stated that Champion was very agitated, "slapping his own head harder than usual, biting his own hand harder than usual, slapping the top of [Devin]'s head, shaking [Devin]'s hand" Joint Appendix ("J.A.") at 165.

Delelys stopped the van, fearing that Champion's behavior would further escalate. Delelys and Champion both exited the van. Champion grabbed Delelys's right hand and started to rub her hand all over his head, a response which, unbeknownst to Delelys, had helped Champion to calm down in the past. Delelys became frightened. She broke away from Champion and locked herself in the van, realizing she had lost control. Delelys tried to get help. She failed in her repeated attempts to call the Outlook emergency number. Finally, Delelys called 911. Right after she finished her phone call, Officer Debbie Miller appeared at the driver-side window, having been alerted to the developing problem by other Babies 'R' Us customers who had phoned 911. Delelys informed Miller that Champion was mentally ill, but Delelys did not tell Miller that Champion was non-verbal and non-responsive.

Miller approached Champion, asking him for his name and to explain the reason for his agitation. Champion was hitting and biting himself as he began to approach Miller. Miller told Champion to stop, but Champion kept advancing towards Miller. Miller had walked backwards about fifty feet through the parking lot, retreating from 897 Champion, when Champion grabbed *897 Miller's shirt. Miller pushed Champion's hand away and delivered a short burst of pepper spray to Champion's face.

Champion walked dazedly into the Babies 'R' Us. Miller followed him into the store, and after a few minutes she touched him on the arm and ordered him to leave. Champion responded to this command, giving Miller the false impression that Champion actually understood her. Just as the two exited the store, Officer Richard Woodside arrived. Miller informed Woodside that Champion was "10-35" — police code for "mentally ill individual" — and that she had previously sprayed Champion with pepper spray. Miller and Woodside attempted to arrest Champion outside the store, but the Officers struggled with Champion until Officer Craig Dickhaus arrived. The Officers decided to take Champion to the ground in the entrance foyer of the store, an area with carpeting. As Miller described it, "Woodside bends or squats down to where he has his arms wrapped around, a bear hug position if you will, of Champion's lower legs. And as Officer Dickhaus and myself step forward, we bring Champion down to his knees, and then from his knees we gently lay him from his knees, his knees to his stomach, and down on his chest to the ground." J.A. at 248.

Once on the ground Champion struggled. The Officers handcuffed Champion using two sets of handcuffs so as to allow Champion more movement. Champion continued to squirm and move around. Because Woodside had difficulty controlling Champion's feet, which were kicking high into the air, Miller and Dickhaus decided to restrain Champion further through the use of a "hobble device," which essentially binds an individual's ankles together. The Officers had difficulty putting on the hobble device because Champion was still kicking violently, but they eventually "hobbled" him.

The parties' divergent recounting of what occurred in the seventeen minutes between the application of the hobbling device and the arrival of the emergency medical technicians ("EMT") was one of the most significant factual issues at trial and is the axis around which this appeal revolves. The Plaintiffs have not suggested that the Officers acted improperly before Champion was handcuffed and hobbled. Indeed, the Plaintiffs' entire § 1983 claim is premised on the Officers' alleged use of pepper spray and application of asphyxiating pressure after Champion's incapacitation. The parties disagreed during trial, and continue to diverge,

in their respective understandings of how much force the Officers used after Champion was incapacitated on the ground.

After several minutes of being on the ground, Champion began to vomit. Woodside immediately called for an ambulance. Between Champion's first regurgitation and the arrival of the EMTs, Champion vomited two more times. Each time, according to the officers, Dickhaus and Miller pulled Champion back by the arms so that he would not be lying in his own vomit. They also checked Champion's mouth and nose to ensure that he was still breathing. The Officers reported that after vomiting, Champion was alert, blinking, breathing, and moving his head from side-to-side.

The EMTs entered the store shortly after Champion vomited for a third time. The first EMT to view Champion was Douglas Baggett ("Baggett"). Baggett testified that as he stepped over Champion, he noticed that Champion's legs moved a couple of inches, which gave Baggett the impression that Champion was alive. Then, Champion's "belly rose, his back rose up, and then he vomited," J.A. at 153 (Baggett Test.), such that Baggett thought he was watching Champion "take his last *898 breath." J.A. at 154. Baggett failed to find a pulse on Champion and asked the Officers to remove the handcuffs, which they promptly did. Champion went into cardiac arrest; despite effort to resuscitate him, he was pronounced dead on arrival at the hospital.

All three Officers claim that none of them put pressure on Champion's back or pressed Champion's face into the floor such that he could not breathe during this entire time period. See J.A. at 181, 185 (Dickhaus Test.); J.A. at 255-56 (Miller Test.) ("Not only did I not [lie across Champion's back, lie across his legs, or kick him], I took extra care myself to make sure that Champion did not receive any injuries from the ground. . . . [W]e knew he had a mental problem."); J.A. at 298 (Woodside Test.). Additionally, the Officers claimed that Champion was not sprayed again with chemicals after he was on the ground. J.A. at 185 (Dickhaus Test.); J.A. at 298 (Woodside Test.). Paramedic Douglas Sleighter, who is extremely sensitive to pepper spray such that he feels its effects if it is sprayed near him or on another individual near him, testified that he did not detect any pepper spray on Champion during the course of the ambulance ride.

However, five different lay witnesses testified that the Officers continued to sit or otherwise put pressure on Champion's back while he was prone on the ground with his face towards the carpet. J.A. at 156 (Ballenger Test.) (recalling that the Officers were lying on top of Champion); J.A. at 158 (Buford Test.) ("They were laying on him, like how wrestlers do in the ring, they were just all — upper body was on him, all their strength was on him."); J.A. at 228 (Jamerson Test.); ("I saw three officers on top of him."); J.A. at 230-31 (Martinez Test.) ("They were holding him down, laying on top of him after he was already down. . . . [T]hey are on top of him and with their elbows, and basically laying on top of him."); J.A. at 265 (Simpson Test.) ("I believe there was another officer with his knee in the middle of his back. . . ."). Additionally, these witnesses testified that the Officers continued to use pepper spray on Champion after he was subdued on the ground and had stopped resisting. J.A. at 156 (Ballenger Test.) ("[Champion] turned his head to move and breathe . . . and the female officer maced him."); J.A. at 229 (Jamerson Test.) (testifying that Miller sprayed Champion twice and that Champion subsequently turned white); J.A. at 231-32 (Martinez Test.) ("Well, he was on the ground already and [Miller] maced him again after he was already handcuffed."); J.A. at 265 (Simpson Test.) ("He turned his face to breathe and then he got sprayed again."). All of these witnesses stated that they did not see Champion struggle during this time. There were some inconsistencies, however, in the witnesses' stories, particularly with regard to the length of time that various activities

898

regarding Champion went on and the number of Officers who were lying on him after they brought him to the ground.

## B. Procedural History

Plaintiffs filed their action on June 15, 2000. The complaint featured several different claims against an array of defendants, but most of the claims were dismissed, leaving only: 1) negligence claims against Outlook and Delelys; and 2) § 1983 claims against the three Officers premised upon violations of Champion's rights under the Fourth Amendment (excessive force) and Fourteenth Amendment (failure to render medical assistance). Following discovery, the government defendants filed a motion for summary judgment, alleging for the first time that qualified immunity insulated the Officers from liability. The district court ruled that the

899 *899 Officers were not entitled to qualified immunity and denied the Officers' motion for summary judgment. The Officers did not appeal this ruling.

The parties prepared for trial. On July 31, 2002, the Officers filed a motion in limine objecting to the inclusion of the testimony of the Plaintiffs' three experts, Michael F. Dorsey ("Dorsey"), Kris Sperry ("Sperry"), and Geoffrey Alpert ("Alpert"). The district court denied the motion in part, permitting Sperry and Alpert to testify.

The trial began on August 20, 2002. The jury heard contradictory testimony from the Officers, the witnesses, and several experts regarding the amount of force exerted against Champion, Champion's cause of death, and the level of pain and suffering Champion might have endured. Before the jury retired, the Officers filed a motion for a judgment as a matter of law, which was denied. The jury returned a verdict on August 29, 2002. It found Outlook and Delelys liable in the amount of $3.5 million for their negligence. The jury also found each police officer liable to the Plaintiffs in the amount of $300,000 each.

The Officers filed a combined post-verdict motion, renewing their motion for a judgment as a matter of law, or in the alternative, seeking a new trial or remittitur. The Officers based their renewed motion for judgment as a matter of law on qualified immunity. J.A. at 123. The district court denied the Officers' motion on November 21, 2002, ruling that "[b]ased on the facts at trial, taken in the light most favorable to the Plaintiff, the officers' conduct violated the Plaintiff's constitutional right not to be subjected to excessive force and that right was clearly established at the time of the officers' conduct." J.A. at 127-28 (Dist.Ct. Or. 11/21/02). The district court also ruled that the $300,000 verdicts against the Officers were not excessive.

The Officers timely appealed several of the district court's rulings, including: 1) the order denying in part the motion for summary judgment; 2) the district court's ruling on Alpert's testimony; and 3) the denial of the Officers' motion for judgment as a matter of law, or in the alternative a new trial and/or remittitur.

## II. ANALYSIS

### A. Standards of Review

We evaluate the decisions of the district court through several different lenses. The Officers ask us to review both the denial of their motion for summary judgment and the denial of their motion for a judgment as a matter of law, which was initially filed before the jury retired pursuant to Federal Rule of Civil Procedure 50(a) and was renewed after the return of the jury's verdict pursuant to Rule 50(b). See Fed.R.Civ.P. 50(a)-(b). All of these motions concerned the Officers' alleged qualified immunity from liability. "[I]n cases where an appellant made a Rule 56 motion for summary judgment that was denied, makes those same arguments in a Rule 50(a) motion at the close of evidence that was also denied, lost in front of a jury, then renewed its arguments in a rejected Rule 50(b) motion after the entry of judgment, we will review only the denial of the Rule 50(b)

motion." *K T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 174 (6th Cir. 1996). "[R]eviewing a Rule 50 determination is preferable to reviewing a summary judgment decision because the Rule 50 decision is based on the complete trial record and not the incomplete pretrial record available at summary judgment." *Id.* (quotation omitted).

Thus, we review de novo the denial of the Rule 50(b) motion, but our de novo review is narrowed by the test for evaluating a renewed Rule 50(b) motion. *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, *900 537 (6th Cir. 2003); *Monday v. Oullette*, 118 F.3d 1099, 1101 (6th Cir. 1997). The Supreme Court has held,

> [I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.
>
> In doing so, however, the court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence. . . . [A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations and quotations omitted). "The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant." *Garrison*, 334 F.3d at 537-38 (quotation omitted).

Our review is further complicated by the underlying qualified immunity question. The issue of "whether qualified immunity is applicable to an official's actions is a question of law." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). "However, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) (quotation and ellipses omitted). Thus, to the extent that there is disagreement about the facts, such as whether the Officers put their body weight on Champion and pepper-sprayed him after he was handcuffed and hobbled, we must review the evidence in the light most favorable to the Plaintiffs, taking all inferences in their favor. We cannot weigh the evidence or make credibility assessments, and we are acutely aware that a jury, faced directly with the tasks we cannot undertake, believed the evidence presented by the Plaintiffs.

We employ a different method of review for the two other issues raised on appeal by the Officers. We review for an abuse of discretion the district court's denial of the Officers' post-trial motion for a new trial and/or remittitur filed pursuant to Federal Rule of Civil Procedure 59. *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000). We also review for an abuse of discretion the district court's decision to allow Geoffrey Alpert's expert testimony. *Pride v. BIC Corp.*, 218 F.3d 566, 575 (6th Cir. 2000).

## B. Qualified Immunity

In actions involving the alleged abuse of government power, the defense of qualified immunity accommodates the tension between permitting litigants to recover damages, which is often "the only realistic avenue for vindication of constitutional guarantees," *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982), and the "social costs" of such suits, including "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.* Qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established

casetext

statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. We *901 employ a three-step inquiry for determining whether qualified immunity is proper:

> *First,* we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. *Second,* we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Third,* we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir. 2003) (emphasis added) (quotation omitted). If the answer to all three questions is "yes," qualified immunity is not proper.

### 1. The Occurrence of a Constitutional Violation

First, we consider whether the facts, when taken in the light most favorable to the Plaintiffs, demonstrate the occurrence of a constitutional violation. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."). This is a threshold question that often requires the setting forth of legal principles "which will become the basis for a holding that a right is clearly established." *Id.* " [A]ll claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395 (1989). The test's "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. To take the facts in a light most favorable to Plaintiffs is to assume that the Officers lay on top of Champion, a mentally retarded individual who had stopped resisting arrest and posed no flight risk, and sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device. The use of such force is not objectively reasonable, as the Officers conceded at oral argument for the purposes of focusing on the question of whether Champion's right to be free from this particular type of force was clearly established.

### 2. A "Clearly Established" Right?

The first *Feathers* inquiry bleeds into the second question of whether the constitutional right was clearly established, which is the focus of the parties on appeal. "If the law at that time was not clearly established, an official could not ... fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). Officials do not enjoy qualified immunity simply because the exact action in question has not previously been held unlawful by a court, but "in the light of pre-existing law the unlawfulness must be apparent." *Id.* In the excess-force context, it is not *902 enough for a plaintiff to demonstrate that an officer's use of force exceeded the objective standard of reasonableness articulated in *Graham. Saucier,* 533 U.S. at 201-202 (2001). Rather, qualified immunity is proper unless "it would be clear to a reasonable officer" that his

casetext

use of excessive force "was unlawful in the situation he confronted." *Id.* at 202.

The Supreme Court has refused to require that a plaintiff demonstrate the existence of a "fundamentally similar" or "materially similar" case. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). There can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions g[i]ve reasonable warning that the conduct then at issue violated constitutional rights." *Id.* at 740 (quotation omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. Moreover, the fact that various courts have "not agreed on one verbal formulation of the controlling standard" does not by itself entitle an officer to qualified immunity. *Saucier*, 533 U.S. at 203.

To demonstrate that the Officers unreasonably violated a clearly established right, the Plaintiffs must therefore show the prior articulation of a prohibition against the type of excess force exerted here. "In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers*, 319 F.3d at 848. Other sources can also demonstrate the existence of a clearly established constitutional right; in *Hope*, the Supreme Court considered Alabama state regulations and communications between the U.S. Department of Justice and the Alabama Department of Corrections as evidence that the corporal punishment at issue in *Hope* was clearly proscribed. *Hope*, 536 U.S. at 744-45.

Our caselaw and the evidence presented at trial about the training that the Officers received demonstrate that the force exerted against Champion violated his clearly established Fourth Amendment rights. We have repeatedly stated that "the right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001) (decided after *Saucier*). For example, we have articulated a clearly established right to be free from specific types of non-deadly excessive force, such as handcuffing an individual too tightly. *See Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993). We have also consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right. *See, e.g., Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat Phelps after he had been neutralized, nor could a reasonable officer have thought there was."); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) ("[A] totally gratuitous blow with a policeman's nightstick may cross the constitutional line."); *Lewis v. Downs*, 774 F.2d 711, 715 (6th Cir. 1985) ("The unprovoked and unnecessary striking of a handcuffed citizen in the mouth with a nightstick is clearly excessive.").

The particular type of physical force exerted against Champion was unreasonable, and the Officers should have been aware *903 that they were violating Champion's rights. First, it is clearly established that the Officers' use of pepper spray against Champion after he was handcuffed and hobbled was excessive. In *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994), a plaintiff was sprayed with mace by authorities. *Id.* at 378. The police then handcuffed the plaintiff, placed him in his car, and according to the plaintiff and two witnesses, continued to spray mace in the plaintiff's face even though he was already blinded and incapacitated. *Id.* We held that this use of force was excessive, and we denied the officers qualified immunity because "[a] reasonable person would know that spraying mace on a blinded and incapacitated person . . . would violate the right to be free from excessive

force." Id. at 387; see also Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is excessive force in cases where . . . the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else.").

In addition to prior precedent, the Officers' training demonstrates that they were aware of Champion's clearly established right to be free from this type of excessive force. The Officers were taught that pepper spraying a suspect after the individual was incapacitated constitutes excessive force. Sergeant Robert Allen, who testified about the training the Nashville Police Officers received, agreed that if Champion were handcuffed and hobbled, spraying him with pepper spray would be excessive.

Second, it also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force. This appeal gives us no cause to consider whether leaving a bound suspect on his or her stomach without more constitutes excessive force that violates a suspect's clearly established Fourth Amendment rights. This is neither a "positional asphyxia" case nor a case in which the officers lightly touched or placed incidental pressure on Champion's back while he was face down. The asphyxia was caused by the combination of the Officers placing their weight upon Champion's body by lying across his back and simultaneously pepper spraying him.[2] Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force. For example, in *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990), several police officers entered an inmate's cell, placed the inmate in a neckhold, and put strong pressure upon his chest. *Id.* at 403. The inmate died as a result, and a physician's report suggested that the inmate may have died as a result of the pressure placed

upon his chest. *Id.* The Fifth Circuit denied qualified immunity to the officers, ruling that any reasonable officer would have known that the force exerted was excessive and thus constitutionally deficient. *Id.* Other district courts in our circuit have highlighted the dangers of putting pressure on a *904 prone, bound, and agitated detainee. *Swans v. City of Lansing*, 65 F. Supp.2d 625, 633-34 (W.D. Mich. 1998) (jury awarded verdict to a mentally ill arrestee who was hog-tied); *Johnson v. City of Cincinnati*, 39 F. Supp.2d 1013, 1019-20 (S.D. Ohio 1999) (finding that information existed in the law enforcement community, which put officers on notice of the dangers of positional asphyxiation).

[2] The Officers cite several cases that purportedly show that the application of pressure to a suspect's back while he or she is lying prone is not a clearly established constitutional violation. See *Wagner v. Bay City*, 227 F.3d 316, 323-24 (5th Cir. 2000); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 594 (7th Cir. 1997); *Cottrell v. Caldwell*, 85 F.3d 1480, 1488, 1491, 1492 (11th Cir. 1996). However, all three cases are inapposite because they involve an arrestee whose positional asphyxia was caused solely as a result of the officers leaving the arrestee on his or her stomach, but without applying pressure to the back. Because we are not confronted with such a situation, we need not decide whether such behavior violates a clearly established right.

Additionally, the Officers' training outlined the boundaries of excessive force and made clear that lying on a suspect can cause asphyxiation. All three Officers admitted that they were aware of the potential danger of putting pressure on an individual's back or diaphragm. J.A. at 187 (Dickhaus Test.) ("I believe our training was once he is under control we are to sit him up physically. . . ."); J.A. at 262 (Miller Test.). J.A. at 305 (Woodside Test.). Additionally, Sergeant Allen testified that he taught his officers that

lying across an individual's back when that person is on his or her stomach increases the possibility of asphyxia. Just as the Supreme Court determined that the Alabama Department of Corrections Regulations and the communications between the U.S. Department of Justice and the State of Alabama put the state on notice about what constituted cruel and unusual punishment, so too here the training these Officers received alerted them to the potential danger of this particular type of excessive force. See *Hope*, 536 U.S. at 744-45.

It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill or retarded, even though the Officers may not have known the full extent of Champion's autism and his unresponsiveness. The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted. See *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed."). For example, in *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), officers handcuffed a mentally ill individual and leaned their body weight onto his upper torso. *Id.* at 1054. The officers then applied a hobble device. Drummond fell into respiratory distress and eventually a coma. *Id.* at 1055. The court held that the district court's grant of summary judgment on the basis of qualified immunity was not proper because the officers had violated Drummond's clearly established rights. *Id.* at 1062. It stated, " *Any* reasonable officer should have known that such conduct constituted the use of excessive force." *Id.* at 1061. *Drummond* postdated the events that led to Champion's death, but it relies on cases decided before April 30, 2000 (including the *Swans* case) and notes that when officers receive training explaining the dangers of asphyxia, they are on notice that applying pressure to an arrestee's back is objectively unreasonable.

Consequently, the right to be free from the two types of excessive force exerted against Champion was clearly established by the law of this circuit and by the training of the Officers. Either action by itself violated a clearly established right, and the combination of the actions bolsters the conclusion that no reasonable officer could believe that excessive force was not being used. We recognize that the Officers perhaps did not intend to harm Champion; indeed, they may have believed they were helping him. Such a consideration is immaterial, however, because the qualified immunity doctrine is an objective one; motive is irrelevant. The evidence presented in the light most favorable to *905 Champion, and in the light accepted by the jury, demonstrates that the Officers unreasonably applied excessive force to Champion after he had been incapacitated in violation of Champion's clearly established rights. No reasonable officer would have continued to spray a chemical agent in the face of a handcuffed and hobbled mentally retarded arrestee, who was moving his or her head from side to side in an attempt to breathe, after the arrestee vomited several times. No reasonable officer would continue to put pressure on that arrestee's back after the arrestee was subdued by handcuffs, an ankle restraint, and a police officer holding the arrestee's legs.

The Officers concentrate their efforts on the evidence presented at trial that Champion may have died from a preexisting medical condition unrelated to his treatment by the police and that the pepper spray was unlikely to contribute to Champion's vomiting or his death. In particular, the Defendants' medical expert, Dr. Wetli, testified that Champion's injuries were inconsistent with a death caused by Officers lying across Champion's back. J.A. at 284-86 (Wetli Test.). This evidence is unavailing for two reasons. First, the Plaintiffs presented contradictory evidence, and the jury believed the Plaintiffs' experts (and the witnesses who viewed the Officers lying on Champion's back) more than the Defendants' witnesses. Second,

the Officers' argument sidesteps the point: even if Champion had not died, but had only been injured, his clearly established rights were no less violated.

### 3. Sufficiency of Evidence

Finally, the panel must determine "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848. As described in detail above, the Plaintiffs presented such evidence at trial. The fact that a jury found in his favor further underscores the sufficiency of the evidence.

### 4. Conclusion

In sum, all three *Feathers* inquiries have been answered in the affirmative. We therefore affirm the district court's denial of qualified immunity to the Officers.

## C. The Verdict Amount

The Officers contend that they are entitled to a new trial, or at least a remittitur, because the jury award of $900,000 ($300,000 per Officer), which only compensates for Champion's physical and mental pain and suffering, is excessive. In essence, the Officers suggest that "a cumulative verdict of $900,000 against the Officers for at most a 17-minute period of physical and mental pain and suffering is excessive." Def. Br. at 38. Because the Officers ask us to undertake a Sissiphyean task of comparing Champion's pain and suffering to other forms of pain and suffering and because the award does not shock the conscience, we hold that the district court did not abuse its discretion in denying the Officers' motion.

We undertake a highly deferential review of the district court, which itself is sharply limited in its ability to remit a jury verdict. "[A] jury verdict should not be remitted by a court unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000) (quotation omitted). Our remittitur standard favors maintaining the award, "[u]nless the award is (1) beyond the range supportable by proof or (2) so excessive as to shock the conscience, . . . or (3) the result of a mistake." *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 156 (6th Cir. 1996) (quotation omitted) "A trial court is within its discretion in remitting a verdict only when, after *906 reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." *Gregory*, 220 F.3d at 443.

The Officers attempt to prove that the award shocked the conscience in two ways. First, they suggest that the medical evidence is insufficient to support a $900,000 award. Citing the testimony of both sides' medical experts, the Officers charge that Champion suffered only superficial abrasions and hemorrhaging, which would not have caused severe pain. Additionally, the experts portray Champion's death as being relatively peaceful by showing that any of the three potential, and possibly cumulative, causes of Champion's death — positional asphyxia, asphyxia resulting from gastric aspiration, or cardiac arrest prompted by Champion's angulated right coronary artery — would not have been particularly painful.

However, other testimony averred that Champion may have suffered physical pain. First, Plaintiffs' expert Dr. Gerber located a contusion on Champion's lung that may have resulted from pressure applied by the Officers. Second, the autopsy revealed evidence of "extensive aspiration of gastric contents," J.A. at 270 (Sperry Test.), which may have signaled that Champion was choking on his own vomit. Third, Dr. Gerber agreed that "someone suffering from positional asphyxia would be gasping for breath," which generates psychic pain stemming from anxiety and fear. J.A. at 221 (Gerber Test.).

The jury heard inconsistent evidence attesting to the level of Champion's pain. We do not attempt to measure it anew. No one but Champion can ever know the full amount of physical and mental pain and suffering experienced during his seventeen-minute ordeal, but the jury heard various and conflicting pieces of evidence and believed that Champion suffered. Their verdict does not lack an evidentiary basis, particularly given that the verdict encompassed not only physical pain, but also mental pain and suffering. The panic of being unable to breathe and the pressure limiting one's breath cannot be discounted. *See* J.A. at 224-25 (Gerber Test.) (stating that from a physiological standpoint, an individual during asphyxiation would feel "fear, agitation and struggle; air hunger is something that causes fear"). Simply put, there is evidence sufficient to support the jury's award such that the district court did not err in denying the motion to remit the judgment.

Second, the Officers cite to several cases in which decedents received smaller awards for what the Officers construe as greater pain and suffering than that endured by Champion. Endeavoring to compare awards is difficult and often unfruitful, because the factual circumstances of each case differ so widely and because it places reviewing courts in the position of making awkward assessments of pain and suffering better left to a jury. *Layne v. Wal-Mart Stores, Inc.*, No. 00-5607, 2001 WL1480736, at *4 (6th Cir. Nov. 19, 2001) ("[C]omparable decisions are 'instructive' but 'not controlling' when we review for abuses of discretion."); *Thompson v. Nat'l R.R. Passenger Corp.*, 621 F.2d 814, 827 (6th Cir. 1980) ("[C]ases involving similar injuries are in no sense controlling."). The Defendants cite several cases that they believe demonstrate the unconscionability of the award given the relatively brief period of his pain and suffering. *Compare Gregory*, 220 F.3d at 433-44 ($778,000 award not remitted when decedent was beaten horribly by a fellow prisoner and lay in his cell for ten hours before being discovered); *Tatum v. Land*, No. 95-6378, 1997 WL 85144, at *5 (6th Cir. Feb. 26, 1997) ($600,000 award not remitted when decedent suffered severe injuries to shoulder, pelvis, and face as a result of a car accident and who survived for five hours after the accident); *with Sharpe v. City of Lewisburg*, 677 F. Supp. 1362, 1365 (M.D. Tenn. 1988) ($100,000 award for pain and suffering reduced after decedent was shot eight times and died within minutes of the shooting.). The plaintiffs respond by citing our decision in *Bickel*, when we affirmed the district court's denial of remittitur for several pain and suffering awards exceeding $1 million when the decedents, passengers on a Korea-bound plane attacked by the Soviet Union, "remained conscious during the twelve minute descent into the Sea of Japan, suffering the physical effects of decompression and recompression along the way, as well as the horror of knowing that death was imminent." *Bickel*, 96 F.3d at 155.

The Officers ask us to make an impossible comparison between Champion's pain and the pain of others. We cannot ascertain whether Champion's mental and physical pain and suffering, magnified by his likely inability to comprehend what was happening, equaled the pain and suffering of the airplane passengers plummeting out of the sky for twelve minutes in *Bickel* or the ten hours of slow death endured by the decedent in *Gregory*. Such comparisons are impossible and improper, because one cannot so mechanistically measure pain and suffering. In *Bickel*, we wrote: "It is impossible to determine the exact value of the pain and suffering which the decedents may have endured. . . . One simply cannot quantify the mental and physical pain and suffering such an experience would cause, and thus we cannot conclude that the evidence does not support the awards." *Id.* at 156. The award granted here by the jury, which was capable of judging credibility and actually heard live testimony regarding the incident as opposed to the written record before us, is not unreasonable, excessive, or conscience-

casetext

shocking. We therefore hold that the district court did not abuse its discretion in denying the Officers' motion for remittitur.

### D. Alpert's Testimony

Finally, we evaluate the Officers' claim that the district court erred in permitting Alpert's expert testimony. The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), established the standard for admissibility of scientific expert testimony under Federal Rule of Evidence 702. The requirement that "any and all scientific testimony or evidence admitted [be] not only relevant, but reliable," *Id.* at 589, "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. This test has also been applied to non-scientific expert testimony, such as Alpert's. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

The Officers argue that Alpert did not present any specialized knowledge that was reliable or of any assistance to the jury. The Officers rely principally on *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), in which we held that the plaintiff's expert, a so-called specialist in the field of "police policies and practices" was not qualified to speak about the city government's policy of disciplining officers for alleged uses of excessive force. *Id.* at 1348-54. In *Berry*, we stated that "there is no such 'field' as 'police policies and practices,'" mainly because we believed that the concept of such a field as presented by that "expert" was far too broad. *Id.* at 1352. We analogized to the legal profession, *908 stating that labeling the individual in *Berry* as an expert when he did not demonstrate that he had experience in any particular aspect of studying the police was "like declaring an attorney an expert in the 'law.'" *Id.* However, by reasoning that a divorce lawyer was no more an expert on patent law than anyone else, we implicitly recognized that individuals with specialized knowledge could most certainly serve as experts, i.e., patent lawyers can serve as experts in patent law. We did not hold that an individual cannot ever testify as an expert about some aspect of police affairs. Rather, the holding in *Berry* reasoned that unqualified individuals could not broadly testify about an area in which they possessed no specialized knowledge. While "police practices" in the broadest sense of the phrase may not be a field, surely criminology is.

Indeed, the chief reason for our decision in *Berry* was that the expert's credentials demonstrated that he had no specific expertise about police activities. He had limited experience, given that he was appointed as a deputy sheriff, a post that required almost no qualifications, and he had been fired twice from the position. Furthermore, he lacked any formal training or experience on the subject of criminology or police actions. Compounding the problem was his ungrounded and methodologically flawed testimony regarding what effect the City of Detroit's procedural shortcomings would have upon the future conduct of 5,000 police officers who would be confronted with a diverse and unpredictable array of situations in which force would be used. *See Dickerson*, 101 F.3d at 1163-64 (relying on the affidavit of a criminology professor, which opined that an officer used excessive force, in deciding that material fact issues remained regarding qualified immunity); *Estate of Boncher v. Brown County*, 272 F.3d 484, 486 (7th Cir. 2001) (recognizing implicitly the field of criminology by labeling the expert a reputable criminologist, but excluding expert's affidavit as useless because it was too general).

By contrast, the Plaintiffs' expert, Alpert, testified about a discrete aspect of police practices, namely use of excessive force, based upon his particularized knowledge about the area. In contrast to the expert in *Berry*, Alpert's credentials are much more extensive and substantial. Alpert has a PhD in sociology from Washington State University, is employed by the University of South Carolina's Department

casetext

of Criminology, teaches classes on police procedures and practices, has been involved with federal research funded by the Department of Justice that evaluates the use of force by officers, trains officers in the use of force, works with police departments to create use-of-force policies, has testified before Congress and state legislatures about police policies, and has authored forty to fifty articles on the subject of police procedures, many of which have appeared in peer-reviewed journals. Alpert Test., Transcript Vol III at 428-32 (Attached to Motion to Take Judicial Notice). Unlike the expert in *Berry*, Alpert testified about much more specific issues: the continuum of force employed by officers generally, the specific training the Officers received, and Alpert's opinion that if the witnesses' testimony is credited, the Officers' actions violated nationally recognized police standards governing excessive force. The critical difference between testifying about the impact of police policies upon a large group of officers and testifying about the proper actions of individual officers in one discrete situation highlights the inapplicability of *Berry*. Courts have permitted experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact. *See Dickerson*, 101 F.3d at 1163-64; *Kladis v. Brezek*, 823 F.2d 1014, 1019 (7th Cir. 1987). *909 Because Alpert had considerable experience in the field of criminology and because he was testifying concerning a discrete area of police practices about which he had specialized knowledge, we hold that the district court did not abuse its considerable discretion in admitting Alpert's testimony.

## III. CONCLUSION

We AFFIRM the rulings and judgment of the district court. First, the district court properly denied the Officers' Rule 50(b) motion for qualified immunity, because on a view of the facts in the light most favorable to the Plaintiffs, the Officers violated Champion's clearly established right to be free from the specific types of forces administered after Champion was subdued and restrained. Second, the district court did not abuse its discretion in denying the Officers' motion to remit the size of the pain-and-suffering award because the award was supported by evidence and it did not shock the conscience. Third, the district court did not abuse its discretion in admitting Alpert's testimony. We AFFIRM.

casetext